# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

RYAN R. KRUEGER, Derivatively on behalf of Nominal Defendant PERRIGO COMPANY PLC,

        Plaintiff,

    v.

BRADLEY A. ALFORD; ROLF A. CLASSON; ADRIANA KARABOUTIS; JEFFREY B. KINDLER; DONAL O'CONNOR; GEOFFREY M. PARKER; THEODORE R. SAMUELS; JEFFREY C. SMITH; LAURIE BRLAS; GARY M. COHEN; JACQUALYN A. FOUSE; ELLEN R. HOFFING; MICHAEL J. JANDERNOA; GERALD K. KUNKLE, JR.; HERMAN MORRIS; JR., MURRAY S. KESSLER; JOHN T. HENDRICKSON; JOSEPH C. PAPA; JUDY L. BROWN; RONALD L. WINOWIECKI; DOUGLAS S. BOOTHE; and MARC COUCKE,

        Defendants,

PERRIGO COMPANY PLC,

        Nominal Defendant.

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY OF CLAIMS ....................................1

II.   JURISDICTION, VENUE AND APPLICABLE LAW ...............................16

III.  PARTIES ...................................................................................21

     A.    Plaintiff ............................................................................21

     B.    Nominal Defendant ..........................................................22

     C.    Director Defendants .........................................................23

     D.    Former Director and Officer Defendants .............................24

IV.   THE INDIVIDUAL DEFENDANTS' DUTIES AND
     OBLIGATIONS .........................................................................26

     A.    Duties of All Individual Defendants ...................................26

     B.    Additional Duties of Audit Committee Members.................31

V.    PERRIGO AND DEFENDANTS VIOLATED THEIR
     FIDUCIARY DUTIES AND THE LAW WITH KNOWING
     MIREPRESENTATIONS AND OMISSIONS...........................................36

     A.    Perrigo's Longstanding Antitrust Conspiracy.....................36

     B.    Defendants Cover Up Recent Poor Performance to Ensure
         They Retain Control, Leading Stockholders to Reject Value-
         Enhancing Merger .............................................................65

     C.    Defendants Hid the Difficulties with Integrating Omega .................107

     D.    Perrigo Improperly Accounted for the Tysabri Revenue
         Stream, and the Repercussions Reverberate to the Present Day.......157

VI.   DEFENDANTS ISSUE MISLEADING PROXY STATEMENTS
     FAILING TO DISCLOSE TAX AUDITS...............................................172

VII.  DAMAGES TO PERRIGO ............................................................174

VIII. DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS.................175

i

IX.   CAUSES OF ACTION..................................................................177

X.    PRAYER FOR RELIEF ............................................................181

XI.   JURY DEMAND.........................................................................183

Plaintiff Ryan R. Krueger ("Plaintiff"), by and through his undersigned counsel, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of Nominal Defendant Perrigo Company PLC ("Perrigo" or the "Company"), against certain current and former members of Perrigo's Board of Directors (the "Board") and executive officers (collectively, "Defendants"), seeking to remedy Defendants' breaches of fiduciary duties.

Plaintiff makes these allegations upon personal knowledge as to the facts of his ownership of Perrigo stock and upon the investigation of counsel, which included review and analysis of:  (a) public filings made by Perrigo and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and other publications disseminated by certain of the Individual Defendants (defined herein) and other related non-parties; (c) news articles, shareholder communications, and postings on Perrigo's website concerning the Company's public statements; (d) the proceedings in related antitrust and securities litigation; and (e) other publicly available information concerning Perrigo and the Defendants.

## I.  INTRODUCTION AND SUMMARY OF CLAIMS

1.  This is an action seeking to hold Perrigo's Board and senior management accountable for their breaches of fiduciary duty, unjust enrichment, and violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Perrigo manufactures specialty, generic, and over-the-counter ("OTC") pharmaceutical and healthcare products.  From January 2006 to May 2019 (the "Relevant Period"), as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market, which artificially inflated Perrigo's common stock price.  Defendants' false statements and omissions concerned five key areas: (a) Perrigo's participation in a generic drug price-fixing conspiracy that is the focus of investigations by Congress, the U.S. Department of Justice's Antitrust Division ("DOJ"), and 45 state Attorneys General; (b) the integration of Perrigo's largest acquisition, Omega Pharma N.V. ("Omega"); (c) Perrigo's organic growth; (d) the accounting treatment for Perrigo's largest financial asset, a royalty stream from the drug Tysabri; and (e) tax liabilities relating to improper accounting relating to the Tysabri accounting treatment. Defendants' false statements and omissions in each of these categories artificially inflated Perrigo's common stock price and also misled investors considering Mylan's tender offer, described infra.

3.     Through most of the Relevant Period, Defendants concealed the fact that results in Perrigo's most profitable division, Generic Rx, were significantly inflated by illegal price fixing.  From 2006 to 2017, Perrigo entered into collusive price-fixing agreements with other generic prescription drug manufacturers to contemporaneously raise prices for many generic products by 300% to 500% or

more.  In particular, Perrigo colluded with its competitors to fix the prices of clobetasol, desonide, econazole, halobetasol, permethrin, and tretinoin.  These price hikes allowed Perrigo to reap hundreds of millions of dollars in collusive revenues.

4.    The evidence that Perrigo participated in the price fixing of generic drugs is substantial.  The drugs' prices moved in near-perfect unison and increased suddenly and simultaneously at each drug company.  The price increases were exponential.  There is a clear pattern of industry conference attendance by Perrigo and its competitors followed by an abrupt and unprecedented spike in Perrigo's prices closely timed with spikes in Perrigo's competitors' prices.  For example, in April and May 2013, shortly after an industry conference attended by executives from Perrigo and its competitor, Taro Pharmaceuticals ("Taro"), both companies suddenly hiked their prices for generic desonide from just over $0.50 per gram to almost $4.50 per gram.

5.    There is no non-collusive explanation for Perrigo's and its co-conspirators' sudden, synchronized price increases – there was no supply shortage, production problem, or sudden increase in demand for these drugs during this period.  The price hikes were not precipitated by competitors leaving the market. Moreover, the markets for these drugs are highly susceptible to collusion because they are dominated by only a few companies – such a market concentration makes collusion easy.  The market for these drugs featured several other characteristics

that facilitated collusion:  demand for the drugs was inelastic, with increases or miniscule reductions in the quantities sold even after massive and sudden price hikes; the drugs were commodity-like products – generic drugs with price being the only distinguishing factor for purchasers; there were no viable substitutes for the drugs; the markets for the drugs had high barriers to entry; and information sharing and price discovery were common.  Finally, the drug prices did not decrease following the initial price increases as one would expect if the sudden price increases reflected temporary supply shortages, cost increases, or other benign market explanations.

6.     Perrigo's extraordinary and historic price increases for these generic drugs would have been against Perrigo's economic self-interest absent the existence of a price-fixing scheme.  Because generic drugs are commodity products, absent price collusion, if one manufacturer raises the price of a given drug, its competitors will seek to increase their own market share by selling the drug at a lower price.  Indeed, under the "maximum allowable cost" pricing regime that governs much of the U.S. generic pharmaceutical market, drug cost reimbursements from insurance companies are capped at a certain price, and if a drug manufacturer raises its price above this cap while its competitors do not, the reimbursements for the higher priced drug will cease.  Thus, it would not be in any drug manufacturer's interest to

increase the prices of its generic drugs unless it had an agreement with the other manufacturers that they would do the same.

7.     The suspicious price increases by Perrigo and other drug manufacturers have spawned investigations by Congress, the DOJ, and at least 45 state Attorneys General.  These investigations have begun to reveal a broad, well-coordinated and long-running series of schemes to fix prices for a number of generic drugs.  They also have revealed that collusion on generic drug prices was centered around meetings of trade associations, such as the Generic Pharmaceutical Association ("GPhA"), and other industry gatherings attended by senior Perrigo officials.

8.     Throughout the Relevant Period, Defendants fraudulently concealed their illegal conduct, misrepresented the generic drug market's competitiveness, misled investors about the true cause of Perrigo's growth, revenues, profits, and improved product pricing, and falsely claimed competitive advantages based on expertise and execution, when in reality they were derived from illegal price fixing. As a result, Perrigo's public statements were materially false and misleading throughout the Relevant Period.

9.     Perrigo's sales figures and other measures of Perrigo's financial performance – such as organic growth – were also misleading.  Defendants led investors to believe that Perrigo's results were an accurate representation of its

products' success in a competitive market.  In fact, those results were inflated as a result of Perrigo's anti-competitive conduct and did not reflect the sales Perrigo would have been able to achieve absent its price-fixing activity.  Reasonable investors would have wanted to know this difference in the basis for Perrigo's sales – Perrigo's sales figures were inflated through its participation in anti-competitive activities and were therefore susceptible to being deflated if and when Perrigo was forced to cease these activities.

10.    Furthermore, Perrigo's sales inflation through collusive price fixing carried the significant risk of prosecution by state and federal antitrust authorities, along with the attendant negative financial and reputational harm.  Defendants downplayed that risk and falsely assured investors that Perrigo was "in compliance with all laws, regulations and orders of any government authority," that it was "committed to doing business in an ethical manner," and that it provided "consumers access to safe, effective and affordable healthcare products."

11.    Through these representations, Defendants led investors to falsely believe that higher generic drug pricing was sustainable and that the Company's success was the result of its active competition in the industry.  Defendants' misleading statements voluntarily put the source of Perrigo's revenue from generic drugs at issue while concealing the use of illegal anti-competitive conduct to drive that revenue.  The Company's income statements were also misleading, because

they conveyed a sense of strong profitability without mentioning the price-fixing collusion that fueled that profitability.

12.    Throughout the Relevant Period, Defendants also made false and misleading statements about Perrigo's organic growth.  In particular, Defendants projected between 5% and 10% organic revenue growth.  However, Defendants failed to disclose that organic growth (which Perrigo did not regularly report) had slowed to a trickle at the start of the Relevant Period and was negative during some fiscal quarters.  Defendants also failed to disclose that Perrigo's purported organic growth included revenue obtained from the sale of generic drugs with artificially high prices that resulted from its unlawful and collusive price-fixing scheme. Perrigo also improperly recorded the Tysabri royalty stream as revenue and included that revenue in its organic growth predictions.

13.    On April 8, 2015, Mylan announced an unsolicited bid to purchase Perrigo for cash and stock.  During the takeover process, Defendants doubled down on Perrigo's misleading organic growth projections.  Indeed, several of the alleged false statements made by Perrigo during the Relevant Period are accompanied by the following language:  "The directors of Perrigo accept responsibility for the information contained in this announcement.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with

the facts and does not omit anything likely to affect the import of such information."

14.    Defendants also issued an unattainable profit forecast, guiding investors to expect 2016 earnings per share of $9.30 to $9.85, which Perrigo would later concede was not "realistic."  Defendants' misleading profit forecasts during the tender offer period were made with assurances to investors that "[e]very such profit forecast (including the assumptions upon which it is based) shall be compiled with scrupulous care, accuracy and objectivity."  Despite these representations, Defendants issued aggressive and unrealistic profit forecasts based upon flawed, grossly inaccurate assumptions.  For example, Defendants improperly included income from the Tysabri royalty stream as operating revenue, assumed an organic growth rate far higher than the Company had recently been able to achieve, assumed success in achieving synergies in its Omega acquisition despite knowledge of various problems with the integration, and assumed that Perrigo could continue the unlawful and collusive price hikes driving profits in its Generic Rx division.

15.    Indeed, Defendants touted synergies with Omega as central to Perrigo's growth claims during the Relevant Period, despite the fact that defendants Papa, Brown, Hendrickson, and Coucke knew or should have known that there were multiple problems with the Omega integration and the underlying assets, including: (a) a decentralized structure, disparate information technologies ("IT") and

management resistance at Omega; (b) regulatory hurdles to achieving the claimed synergies; and (c) weakening sales in many of Omega's key markets, including Spain, Belgium, Italy, and Turkey.  The concealed problems with Omega forced the Company to begin taking impairment charges less than a year after the Omega acquisition closed, ultimately impairing more than $2 billion, or nearly half of the total purchase price for Omega.

16.    Further, throughout the Relevant Period, Defendants falsely recorded revenue from and presented an inflated value for Perrigo's largest financial asset – the Tysabri royalty stream.  Perrigo publicly disclosed that the Tysabri royalty stream was worth $5.8 billion to $6.1 billion, claiming its accounting for the asset followed generally accepted accounting principles ("GAAP").  Perrigo now admits both assertions were false.  Perrigo's accounting for the Tysabri royalty stream as an intangible asset rather than a financial asset during the Relevant Period violated GAAP.  Through its GAAP violations, Perrigo artificially inflated its revenue and hid billions of dollars of deterioration in the Tysabri royalty stream's value.

17.    From April 8, 2015 through November 13, 2015, Defendants used these misrepresentations to convince Perrigo shareholders to reject Mylan's tender offer.   Defendants' statements convinced shareholders that Mylan's offer undervalued Perrigo, and they ultimately rejected Mylan's offer.   In reality,

Defendants' misrepresentations overvalued Perrigo and shareholders retained their artificially inflated Perrigo stock.

18.    In early 2016, Defendants' scheme began to unravel.  On February 18, 2016, Perrigo reported 4Q 2015 revenue, profits, and margins that were all well below Defendants' projections.  After Defendants had raved about the accretive Omega acquisition and the progress of the integration, Perrigo revealed that certain assets would need to be restructured and took a $185 million impairment charge, while also slashing the top end of the Company's 2016 per share profit guidance range from $10.10 to $9.80.  On this news, the price of Perrigo shares fell $14.77 per share, or more than 10%, to close at $130.40 per share.

19.    Next, on April 22, 2016, Reuters and other news agencies reported that Papa would leave Perrigo for Valeant Pharmaceuticals International, Inc. ("Valeant"), a struggling company widely criticized for accounting violations and ethical lapses.  Analysts and shareholders understood Papa's exit to mean that the problems at Perrigo were even worse than they were told in February.  As a result, the price of Perrigo shares fell $7.33 per share, or nearly 6%, to close at $121.35 per share.

20.    The following business day, April 25, 2016, Perrigo formally announced that Papa was leaving and, to facilitate his exit, Perrigo had waived parts of his noncompete agreement.  Perrigo also lowered its 2016 earnings guidance to

$8.20 to $8.60 per share, a full $1.40 less than the midpoint of the guidance range three months earlier.  The Company also reported that it expected 1Q 2016 earnings to be only $1.71 to $1.77 per share, which it attributed to more competitive generic drug pricing, and that it was considering additional Omega impairment charges. CNBC Commentator Jim Cramer declared it a "terrible moment for Perrigo."  The April 25, 2016 partial disclosures caused the price of Perrigo shares to tumble $21.95 per share, or 18%, to close at $99.40 per share.  On May 12, 2016, Perrigo announced another $467 million impairment charge for Omega, tripling the original impairment figure only months after the Company had trumpeted the success of the Omega acquisition.  On this additional news, the price of Perrigo shares fell $3.71 per share, or 4%, to close at $89.04 per share.

21.    The fall in Perrigo's stock price was tempered, in part, by a new policy announced by the incoming Chief Executive Officer ("CEO"), John T. Hendrickson ("Hendrickson").  Going forward, Hendrickson promised, Perrigo would "try to be as transparent as possible" and issue "realistic" forecasts.  This was intended to be, and was taken by investors as, a clear admission that prior guidance under Papa had been neither transparent nor realistic.  Analysts praised Hendrickson's promise of candor, emphasizing the need to "reestablish credibility" after the prior regime.  But despite these promises, Perrigo did not come clean about the full extent of its problems integrating Omega, its collusive pricing in the Generic Rx division, the

declining value of the Tysabri royalty stream, or the GAAP violations associated with the accounting for the Tysabri royalty stream.  On August 10, 2016, Perrigo announced that it was cutting guidance yet again as a result of having to implement "transformational organizational changes" at Omega and because of additional pricing pressure in the Generic Rx division.

22.    Even worse, Perrigo projected that Omega impairment charges in 2016, which were excluded from this guidance, would nearly double, from $1.74 to $3.29 per share.  Consequently, the price of Perrigo shares fell approximately 10% to close at $86.00 per share.  On November 3, 2016, a *Bloomberg* article announced that U.S. prosecutors were "bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion."  According to the article, the investigation was focused on whether executives colluded to raise prices. Following this announcement, the price of Perrigo shares dropped 4% from a November 3, 2016 opening price of $83.49 per share to close at $79.95 per share. On December 8, 2016, after announcing that it needed to restructure the entire branded division (consisting mostly of Omega assets), the price of Perrigo shares declined by an additional 2.37%, from $83.94 to $81.95 per share.  Before the year was over, Perrigo had accrued *over $2 billion in impairment charges* related to Omega, an asset it had just purchased in March of the previous year.  On February 27, 2017, Perrigo stunned investors by announcing that it would sell the Tysabri

royalty stream for only $2.2 billion in cash (plus additional contingent payments of up to $0.65 billion), over $3.5 ***billion less than the value of the asset recorded on Perrigo's books*** and presented to investors throughout the Relevant Period.  This deterioration would have been known to investors throughout the Relevant Period had Perrigo recorded the fair value of the asset each quarter.  The Company eventually conceded it had improperly accounted for the asset under GAAP.

23.     Perrigo also disclosed on February 27, 2017 that it could not timely file its 2016 Annual Report on Form 10-K because it needed to review historical revenue recognition practices for the Tysabri royalty stream and because of other potential GAAP violations.  The GAAP violations ultimately led to the restatement of every single financial statement issued during the Relevant Period up till then. The Company also revealed that its Chief Financial Officer ("CFO"), defendant Brown, was unexpectedly resigning.   Total impairments due to the improper accounting of the Tysabri revenue stream and due to the failure of the Omega integration, Perrigo announced on February 21, 2017, were ***$5.4 billion***.  On these additional disclosures, the price of Perrigo shares dropped another nearly 12%, or $9.91 per share, from $84.68 per share to $74.77 per share.

24.     On March 3, 2017, *Bloomberg* reported that Perrigo – like many other generic drug companies – was the target of DOJ investigators looking into generic drug price fixing.  In a filing made in a private lawsuit, the DOJ asked that private

discovery be delayed with respect to Perrigo and other manufacturers of generic topical drugs, including desonide, because the government attorneys were concerned that private discovery "could reveal details of the ongoing criminal investigation and delay, or even frustrate, its progress." This additional disclosure drove the price of Perrigo shares down an additional $2.80 per share to close at $72.76 per share.

25.     Finally, after the market closed on May 2, 2017, Perrigo announced that its offices had been raided by the DOJ as part of a criminal price-fixing probe, a more severe action than was taken against most other generic drug companies. *The Wall Street Journal's* Charley Grant noted on Twitter: "Federal investigations happen all of the time to companies. Federal raids do not." On this final disclosure, the price of Perrigo shares fell over 5%, or $3.88 per share, to close at $72.35 per share on May 3, 2017. Shortly afterwards, Perrigo issued a restatement admitting that it violated GAAP in every single financial statement issued during the Relevant Period. Perrigo's restatement was one of the largest issued by any public company over the past two decades.

26.     In addition to the current litigation Perrigo is subject to for its antitrust and securities violations, Perrigo also faces potentially ruinous tax liabilities that stemmed from its improper accounting of the Tysabri revenue stream. Both the Office of the Revenue Commissioners of Ireland ("Irish Revenue") and the United

States Internal Revenue Service ("IRS") have assessed huge tax bills against Perrigo for unpaid taxes as a result of the improper categorization of Tysabri revenues; together, the tax assessments amount to over *$3 billion*: over $840 million from the IRS and over $1.9 billion plus interest from the Irish authorities. Perrigo has undertaken the reckless action of not reserving for these losses under the claim that they believe they will win appeals of both assessments. Misrepresentations regarding these tax liabilities have subjected Perrigo to yet more private litigation, this time in *In re Perrigo Company PLC Securities Litigation*, C.A. No. 1:19-cv-00070-DLC, 2d Am. Compl. (S.D.N.Y. May 31, 2019).

27.     On October 30, 2018, Plaintiff served a pre-suit investigation and litigation demand (the "Demand") on the Board, setting forth the facts concerning: (a) Perrigo's participation in a generic drug price-fixing conspiracy that is the focus of investigations by Congress, the DOJ, and 45 state Attorneys General; (b) the false and misleading statements Defendants made concerning the integration of Perrigo's largest acquisition, Omega; (c) Defendants' false statements concerning Perrigo's organic growth; and (d) the false and misleading statements concerning Defendants' accounting treatment for Perrigo's largest financial asset, a royalty stream from the drug Tysabri.  A copy of Plaintiff's Demand is attached hereto as Exhibit A.

28.     Counsel for Perrigo wrote back to Plaintiff on November 7, 2018 and January 29, 2019.  In both letters, counsel for Perrigo refused to take any action in response to the Demand.  Eleven months have passed since Plaintiff served his Demand and nine months have passed since Perrigo or its Board last offered any response.  The Board has not responded in writing to Plaintiff's Demand to indicate what efforts, if any, the Board is taking to investigate the Demand or remediate the conduct described therein.  Thus, Plaintiff's Demand has been wrongfully refused.

## II.     JURISDICTION, VENUE AND APPLICABLE LAW

29.     Jurisdiction lies pursuant to Article III, Section 2 of the United States Constitution at 28 U.S.C. §1331.  The claims asserted herein arise under 14(a) and 29(b) of the Exchange Act, 15 U.S.C. §§78n(a), 78t(a), and 78cc(b), and Rules 14a-9, 17 C.F.R. §240.14a-9, promulgated thereunder.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 as to the state law claims alleged, as they arise out of the same transactions and occurrences as the federal claims.  In connection with the wrongdoing complained of herein, Defendants (defined below) used the means and instrumentalities of interstate commerce, the U.S. mail, and the facilities of the national securities markets.

30.     This Court has personal jurisdiction over each of the Defendants named herein because each Defendant is either a corporation incorporated, maintaining its principal executive offices, and operating in this District, or is an

individual who is domiciled in this District, maintains a place of business in this District, or has sufficient minimum contacts with this District, so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Further, the Individual Defendants conducted much of the wrongdoing complained of herein in this District.

31.     Venue is proper in this jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because: (i) one or more of the Individual Defendants either resides or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein in violation of fiduciary duties owed to Perrigo and its stockholders, occurred in this District; and (iii) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

32.     This Court should apply Michigan corporate law, rather than Irish corporate law, because of Perrigo's overwhelmingly greater business ties in Michigan and the United States compared to anywhere else in the world, and because the principal wrongdoers lived and worked in Michigan and orchestrated their wrongdoing there. Moreover, Papa, Brown, Hendrickson, and Boothe –

Michigan residents at that time – also violated their employment agreements when they engaged in unlawful conduct, which also tends to show that Michigan has greater interest in having its law applied than Ireland.  And with respect to liable directors, Michigan law should apply because Michigan has the greater interest in applying its law with respect to defendants who breach their fiduciary duties by failing to independently verify the information Papa and Brown gave them.

33.     Perrigo's business activities are predominantly in the United States: as Perrigo's 2018 annual report states, "Our primary manufacturing facilities are in the U.S.," including 45 facilities in the U.S. while the country with the second most, Mexico, only has 10, and Ireland only has one.  Perrigo's consumer healthcare business alone captures 70% of the domestic market for store-brand over-the-counter products.  And Perrigo's largest customer is Walmart, accounting for 13% to 19% of Perrigo's net sales; those sales generally align with Walmart's U.S. retail market shares in the products Perrigo sells to Wal-Mart.

34.     Moreover, some of the misconduct dates back to 2006, when Perrigo was still incorporated in Michigan, even though the misconduct (relating to antitrust) was not discovered until 2016 and 2017, when numerous antitrust lawsuits were filed and raids were conducted against Perrigo's Michigan offices.

35.     The chief wrongdoers primarily worked from Michigan headquarters and were Michigan residents when the wrongdoing occurred.  For example, Brown

served on several non-profit Michigan boards.  And Papa currently lives in New Jersey because the company he runs is based here, so he would have lived in Michigan when he was at Perrigo because Perrigo was primarily based there. Boothe headed Perrigo's generics pharmaceuticals business, which was headquartered in Michigan; Perrigo Pharmaceuticals is also incorporated in Michigan.  Hendrickson lived and worked and still lives and works in Michigan.

36.    Moreover, Perrigo's business still primarily occurs in Michigan.  In 2015, news reports indicated that Perrigo's workforce was mostly in Allegan, Michigan and that the Allegan, Michigan community supported the Company. Perrigo's nerve center is in Michigan, as demonstrated by how the DOJ raided Michigan offices in its antitrust investigation.   Perrigo was incorporated in Michigan until the closing of the Elan transaction at the end of 2013, and its North American headquarters and overall administrative headquarters remain in Allegan, Michigan.  Furthermore, after being hit by an almost $2 billion tax bill in Ireland late last year, news reports have indicated Perrigo may seek to re-incorporate in Michigan.   Perrigo's key domestic subsidiaries are also headquartered and incorporated in Michigan: Perrigo Company, a holding company; Perrigo Sales Corporation, a sales company; and Perrigo Pharmaceuticals Company and L Perrigo Company, which are pharmaceuticals manufacturers.

37.     Moreover, Ernst & Young's offices in Grand Rapids, Michigan performed Perrigo's audit, which is another strong indicator that business decisions get made in Michigan rather than Ireland.

38.     Perrigo itself admits in contemporaneous pending litigation where it seeks a refund from the Internal Revenue Service that its "principal place of business is, and at all times relevant to this action was, in Allegan, Michigan." *Perrigo Company and Subsidiaries v. United States*, 1-17-cv-00737-RJJ-PJG (W.D. Mich. Oct. 22, 2018), ECF No. 115 at 3.

39.     At the time Perrigo announced its plans to reincorporate in Ireland, it focused on the tax savings.  Papa also emphasized that the merger would cut Perrigo's effective tax rate from 30% to 17%, and Brown told investors the rate could go even lower.  But top Perrigo executives reiterated their commitments to Michigan and the United States.  Papa emphasized that Perrigo would maintain and even expand its commitment to Michigan.  Hendrickson, at the time, Perrigo's executive vice president of global operations and supply chain, told local media, "It doesn't mean any changes for our current strategies, our current investments. We're very committed to Michigan, continuing on with our investment path of $300 million (in Michigan) over the next three years, expanding 650 jobs just in the west Michigan area."

40.     Most recently, in its May 9, 2019 Investor Day presentation, Murray Kessler represented that Perrigo's focus will be "building on our U.S. store brand core" and its "first priority will be fixing the Consumer Americas business" – thus suggesting Perrigo will focus more heavily on the U.S. than on international expansion.

41.     Perrigo's latest acquisition of Grand Rapids, Michigan-based oral care company, Ranir, for $750 million, further shows how the focus is on the United States.

42.     Perrigo also recently entered a licensing deal with Merck where it will manufacture Merck's Nasonex, also a U.S. based product.

## III.    PARTIES

### A.    Plaintiff

43.     Plaintiff Ryan R. Krueger is a current stockholder of Perrigo, has continuously held Perrigo stock since 1997, and is committed to retaining Perrigo shares throughout the pendency of this action to preserve his standing.  Plaintiff will adequately and fairly represent the interests of Perrigo and its stockholders in enforcing his rights.   His most recent account statement showing current stock ownership is attached as Ex. B.

**B.    Nominal Defendant**

44.    Nominal Defendant Perrigo is incorporated in Ireland.  Formally, it is headquartered in Ireland and in Michigan.  However, in reality, its business is primarily based in the United States, and especially in Allegan, Michigan, as explained above.  It also maintains substantial business operations in New Jersey, including manufacturing and corporate offices in Piscataway and Parsippany, New Jersey.  Defendant Papa also currently works and lives in New Jersey as the chairman and CEO of Valeant (now rebranded as Bausch Health).

45.    Perrigo traditionally has had two main businesses: creating private-label consumer healthcare products, such as infant formula, for major retailers, and manufacturing generic pharmaceuticals.  In 2015, Perrigo acquired Omega, a Belgium-based pharmaceuticals company, in an attempt to create a branded products business as well.

46.    Before December 2013, when Perrigo merged with an Irish company, Elan Corporation Plc ("Elan"), Perrigo was incorporated in Michigan and has historical roots there.  But to take advantage of purportedly favorable tax treatment, Perrigo redomiciled in Ireland after the acquisition.  This move appears to have backfired, however, when the Irish Revenue in November 2018 assessed Perrigo a $1.9 billion bill in back taxes, alleging that Perrigo had improperly accounted for

the Tysabri revenues as trade income, rather than as the Irish equivalent to capital gains.

**C.   Director Defendants**

47.   Defendant Bradley A. Alford ("Alford") has been a director of the Board since 2017.

48.   Defendant Rolf A. Classon ("Classon") has been a director of the Board since 2017, and chair of the Board since May 2018.

49.   Defendant Adriana Karaboutis ("Karaboutis") has been a director of the Board since 2017.

50.   Defendant Jeffrey B. Kindler ("Kindler") has been a director of the Board since 2017.

51.   Defendant Donal O'Connor ("O'Connor") has been a director of the Board since 2014.  O'Connor was a director of Elan from 2008 until Perrigo acquired it in December 2013.  He is also chair of the Audit Committee.

52.   Defendant Geoffrey M. Parker ("Parker") has been a director of the Board since 2016.  He is a member of the Audit Committee.

53.   Defendant Theodore R. Samuels ("Samuels") has been a director of the Board since 2017.  He is a member of the Audit Committee.

54.   Defendant Jeffrey C. Smith ("Smith") was a director of the Board from 2017 until August 2019.

55.     The aforementioned defendants, aside from Nominal Defendant Perrigo, are referred to as the "Director Defendants."

**D.     Former Director and Officer Defendants**

56.     Defendant Laurie Brlas ("Brlas") was a director of the Board from 2003 to 2018.  She was also chair of the Board from April 2016 to 2018.

57.     Defendant Gary M. Cohen ("Cohen") was a director of the Board from 2003 to 2018.

58.     Defendant Jacqualyn A. Fouse ("Fouse") was a director of the Board from 2012 to 2016.

59.     Defendant Ellen R. Hoffing ("Hoffing") was a director of the Board from 2008 to 2017.

60.     Defendant Michael J. Jandernoa ("Jandernoa") was a director of the Board from 1981 to 2017, Perrigo's CEO from 1998 to 2000, and Chairman from 1991 to 2003.

61.     Defendant Gerald K. Kunkle, Jr. ("Kunkle") was a director of the Board from 2002 to 2017.  He was lead director from 2009 through April 2016.

62.     Defendant Herman Morris, Jr. ("Morris") was director from 1999 to 2017, and an Audit Committee member.

63.     Defendant Murray S. Kessler ("Kessler") has been CEO of Perrigo and a director of the Board since 2018.

64.     Defendant John T. Hendrickson ("Hendrickson") was CEO of Perrigo from 2016 to 2018, and a director of the Board during that period.  Before then, he was President of the Company from October 2015 to April 2016, and before then he was Executive Vice President of Global Operations and Supply Chain.

65.     Defendant Joseph C. Papa ("Papa") was Chairman and CEO from 2006 to April 2016, when he resigned to lead then-Valeant Pharmaceuticals.

66.     Defendant Judy L. Brown ("Brown") was Chief Financial Officer ("CFO") from 2003 to February 2017, when she resigned to take a role in Amgen Inc.

67.     Defendant Ronald L. Winowiecki ("Winowiecki") was CFO from 2017 to 2019.

68.     Defendant Douglas S. Boothe ("Boothe") was EVP and General Manager of Perrigo Pharmaceuticals from 2003 to 2016, when he resigned to lead the generics division of Impax Laboratories.

69.     Defendant Marc Coucke ("Coucke") was director from November 2015 to April 2016, and before then was co-founder, Chairman, and CEO of Omega, who was then fired by Hendrickson.

70.     Defendants, aside from Nominal Defendant Perrigo, are referred to herein as the "Individual Defendants."

71.    Nominal Defendant Perrigo and the Individual Defendants are referred to herein as the "Defendants."

## IV.    THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS

### A.    Duties of All Individual Defendants

72.    By reason of their positions as present or past officers and/or directors, and by virtue of their ability to control the business and corporate affairs of Perrigo, each Individual Defendant owed, and owes, Perrigo and its stockholders fiduciary obligations of loyalty, good faith, and candor and were, and are, required to use their utmost ability to control and manage the Company in a lawful, fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Perrigo and its stockholders, so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

73.    By virtue of their fiduciary duties of loyalty, good faith, and candor, each Individual Defendant was required to, among other things:

a.    exercise good faith to ensure that Perrigo's affairs were conducted in an efficient, business-like manner;

b.    exercise good faith to ensure that Perrigo was operated in a diligent, honest, and prudent manner and complied with all applicable laws, rules, regulations, requirements, and contractual obligations, including acting only within the scope of its legal authority;

c.    when put on notice of problems with Perrigo's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

      d.     remain informed as to how Perrigo conducted its operations and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith.

74.    The Individual Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Perrigo, the absence of good faith on their part, a reckless disregard for their duties to the Company and its stockholders, gross negligence in not ensuring the statements they made were true or in failing to conduct oversight of management and other employees, which the Individual Defendants were, or should have been, aware posed a risk of serious harm to the Company.

75.    Perrigo's Memorandum and Articles of Association[1] spells out the specific business purposes that the Company may engage in, but underlying all these specific purposes is the assumption that the activity would be lawful. Furthermore, the Articles of Association's exculpatory provision provides, "To the maximum extent permitted by law, no Director or officer of the Company shall be personally liable to the Company or its Shareholders for monetary damages for his or her acts or omissions ***save where such acts or omissions involve negligence, default, breach of duty or breach of trust.***" *Id*. at 73 (emphasis added). Thus, the Articles of Association explain that the Board is not exculpated for breaches of duty and trust, negligence, and default.

---

[1]    *Memorandum and Articles of Association*, PERRIGO.COM (as amended Nov. 4, 2015), https://www.sec.gov/Archives/edgar/data/1585364/000158536417000136/cy17q210qex32memo.htm (the "Articles of Association") (last visited 09/29/2019).

76.     Similarly, the Company's Code of Conduct is binding on "[a]ll Perrigo employees, officers, directors, temporary employees, contractors, [and] consultants."  Code of Conduct at 2.  The Code mandates that Perrigo personnel (which includes, *inter alia*, employees, directors, and officers) "[c]onduct our business according to ethical and legal standards and follow all applicable laws, regulations and policies.  Ignorance cannot justify anyone doing the wrong thing." *Id*. at 3.  Moreover, they are required to "[r]eport concerns and known or suspected misconduct immediately.  Do not assume that someone else will raise a concern." *Id*.  And Perrigo executives and officers must, *inter alia*, "[m]onitor business conduct to ensure compliance with our Code[,]" "[a]nnually certify compliance with our Code and other policies[,]" and "[i]mmediately report any known or suspected misconduct and never retaliate or ignore acts of retaliation against others." *Id*.

77.     The Code reiterates in a section devoted to legal compliance:

> Acting with integrity is vital for maintaining our reputation with our customers, consumers, shareholders and other stakeholders. As part of a global company, each of us must comply with the letter and spirit of applicable laws, rules and regulations in the countries in which we operate.
>
> Even minor violations of law and regulations can be costly to Perrigo and subject both the Company and you personally to civil and/or criminal penalties.  Each of us is responsible for understanding the laws and regulations that relate to our responsibilities.  When you do not understand them, seek guidance.

This Code references corporate policies that provide more detailed information.  You are expected to review and comply with these policies.

*Id*. at 6.

78.    The Code also has a section on antitrust compliance:

*We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices. Competition laws, also known as "antitrust" laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition. . . .*

To promote fair competition, it is important that we do not unfairly differentiate in prices offered to various customers, set unfair prices below cost or make false statements about competitors.

. . .

It is important that we use caution when interacting with competitors.   Even the appearance of cooperating with competitors can damage our reputation and legal standing.  We must never work with competitors to fix prices, rig bids, allocate markets among us, boycott certain organizations or industry segments, or make other non-competitive agreements.

*Id*. at 8 (emphasis in original).

79.    Furthermore, the Code obligates Perrigo personnel to "Protect[] Our Shareholders' Assets[:]"

All of us are responsible for ensuring Perrigo's books, records, and accounts accurately reflect Perrigo's financial condition and operations.

. . .

As a public company, it is important that Perrigo's filings with the Securities and Exchange Commission and other public

29

communications be accurate, timely and understandable. Perrigo expects all its personnel to take this responsibility seriously and, if called upon to provide information, to give prompt and accurate answers to such inquiries related to its public disclosure requirements. The Chief Executive Officer, Chief Financial Officer and other senior finance department personnel have a special role both to adhere to these principles themselves and to ensure that a culture exists throughout Perrigo that upholds the fair and timely reporting of our financial results and conditions. The Chief Executive Officer, Chief Financial Officer and senior finance department personnel are also responsible for promptly bringing to the attention of the Audit Committee any material information of which they may become aware that affects the disclosures made by Perrigo in its public filings or otherwise assisting the Audit Committee in fulfilling its responsibilities as specified in its Charter.

. . .

Certain employees and directors have additional responsibilities relating to financial reporting and safeguarding Perrigo information.

. . .

It is illegal to buy or sell securities (*i.e.*, stocks, options, etc.) when you are aware of material, non-public (or "inside") information. Material inside information is any information that, if it were made public, could affect any investor's decision to buy or sell a Company's stock.

Making trades based on inside information violates both civil and criminal law. You must protect all non-public information from unauthorized access.

*Id.* at 9-11.

80.     In addition, Perrigo's Corporate Governance Guidelines state, "The

Board has approved the Company's Code of Conduct for employees. Directors

shall adhere to those sections of the Code of Conduct that are appropriate for members of the Board." Corporate Governance Guidelines at 5.

81.     The Corporate Governance Guidelines also state, "The Board expects that senior officers of the Company will regularly attend Board and committee meetings, present proposals and otherwise assist in the work of the Board. Members of the Board shall have reasonable direct access to any of the Company's management employees and, as necessary and appropriate, may consult with independent legal, financial, accounting and other advisors to assist in their duties to the Company and its shareholders." *Id*. at 5.

82.     The Corporate Governance Guidelines also state, "At least once a year, the Board will review the Company's long-term strategic plans and the principal issues that the Company will face in the future." *Id*. at 4.

**B.     Additional Duties of Audit Committee Members**

83.     According to the Audit Committee Charter:

> The primary purpose of the Audit Committee of the Board of Directors (the "Board") of Perrigo Company plc (the "Company") is to assist the Board in fulfilling its responsibility of overseeing:
>
> •     the Company's accounting and financial reporting principles and policies;
>
> •     the integrity of the Company's financial statements and the independent audit thereof;
>
> •     the Company's compliance with legal and regulatory requirements;

31

- the qualifications, independence and performance of the Company's independent registered public accounting firm;

- the qualifications and performance of the Company's internal audit function, including any such services that are outsourced; and

- the Company's internal control over financial reporting.

Audit Committee Charter at 1.

84.     Furthermore, "all members of the Audit Committee shall be financially literate." *Id*. at 1.

85.     The Audit Committee is also charged with being required to "Meet with management four times annually (more frequently if circumstances dictate) to discuss the annual financial statements and quarterly financial results[.]" *Id*. at 2.

86.     The Audit Committee "shall have the sole authority to appoint or replace the Company's independent registered public accounting firm" and that "public accounting firm is ultimately accountable to, and shall report directly to, the Audit Committee." *Id*.

87.     Under its general authority, the Charter provides that the Audit Committee "shall review and approve the report of the Audit Committee required by the SEC to be included in the Company's annual proxy statement" and "shall have sole authority over all aspects of the Company's internal audit function". *Id*. at 3.

88.　In addition, the Charter spells out more specifically the Audit Committee's duties with respect to financial statements and disclosures:

89.　The Audit Committee . . . shall:

1.　review and discuss the annual audited financial statements and quarterly financial statements with the independent registered public accounting firm and with Company management, including reviewing disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

2.　review and discuss earnings releases, as well as financial information and earnings guidance provided to analysts and rating agencies;

3.　advise management and the independent registered public accounting firm that they are expected to provide to the Audit Committee a timely analysis of significant financial reporting issues and practices;

4.　review with the independent registered public accounting firm the matters required under current auditing standards relating to the conduct of the audit;

5.　review with the independent registered public accounting firm any audit problems or difficulties and management's responses;

6.　review and discuss reports submitted to the Audit Committee by the independent registered public accounting firm regarding (a) all critical accounting policies and practices to be used, (b) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, the ramifications of the use of such alternative treatments and the treatment preferred by the independent registered public accounting firm, and (c) other material written communications between the

independent registered public accounting firm and management;

7.     review any disclosures made to the Audit Committee by the Company's CEO and CFO during the certification process for Forms 10-K and 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any corrective actions taken, and any fraud involving management or other employees who have a significant role in the Company's internal controls;

8.     recommend to the Board that the audited financial statements be included in the Company's Annual Reports on Form 10-K;

9.     review the form of opinion the independent registered public accounting firm proposes to render to the Board and shareholders;

10.     inquire of management and the independent registered public accounting firm regarding significant risks or exposures and assess the steps management has taken to minimize such risks to the Company, and discuss policies with respect to risk assessment and risk management;

11.     review significant changes to the Company's auditing and accounting principles, policies, controls, procedures and practices proposed or contemplated by the independent registered public accounting firm or management;

12.     obtain from the independent registered public accounting firm assurance that the audit was conducted in a manner consistent with Section 10(A)(a) of the Exchange Act, which sets forth certain procedures to be followed in any audit of financial statements required under the Exchange Act;

13.     review and discuss with the independent registered public accounting firm *PCAOB Auditing Standard No. 16, Communications with Audit Committees*: and

14.    review with the Company's General Counsel any significant legal or regulatory matters and compliance policies that may have a material effect on the financial statements, including material notices to or inquiries received from governmental agencies.

*Id*. at 3-5 (italics in original).

90.    In addition, the Audit Committee is required to:

at least annually, receive and review a report by the independent registered public accounting firm describing (a) the firm's internal quality-control procedures, (b) any material issues raised by the most recent internal quality-control review, peer review or PCAOB review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues and (c) all relationships between the firm and the Company;

at least annually, evaluate and report to the Board regarding the Audit Committee's assessment of the independent registered public accounting firm's qualifications, performance (including the lead partner) and independence, taking into account the opinions of management and the internal auditors and considering whether the auditor's quality controls are adequate and the provision of permitted non-audit services is compatible with maintaining the auditor's independence[.]

*Id*. at 5.

91.    Regarding the Company's internal controls, the Audit Committee shall "review the budget and internal audit plan of the Company's internal audit function" and "review the progress and results of the internal audit projects."  *Id*. at 5.  In addition:

> Annually, the Audit Committee shall review the report prepared by management assessing the effectiveness of the Company's internal control over financial reporting and stating managements' responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Company's annual reporting.

*Id*. at 6.

## V.   PERRIGO AND DEFENDANTS VIOLATED THEIR FIDUCIARY DUTIES AND THE LAW WITH KNOWING MIREPRESENTATIONS AND OMISSIONS

### A.   Perrigo's Longstanding Antitrust Conspiracy

92.    For many years, Perrigo's most profitable business was its generics prescription medicine business ("Generics Rx"), which was centered in the United States.  Perrigo had manufacturing facilities in Michigan, New Jersey, and other American locations.  From the end of 2013 to the end of the first quarter of 2015, Generics Rx contributed between $81.1 million to $127.7 million in quarterly net operating income, and was the number one net operating income generator among all Perrigo divisions.

93.    However, Perrigo's profits did not come through honest competition.  Rather, these profits came from a massive market allocation and price-fixing conspiracy that engaged numerous other generics manufacturers between 2006 to 2017.  From Perrigo's standpoint, its role in the conspiracy only ended in May 2017 when its Michigan offices were raided by the DOJ.  Around this time, Perrigo was the subject of numerous antitrust suits, which were later consolidated into an MDL,

captioned *In re Generics Pharmaceuticals Pricing Antitrust Litig.*, 16-md-0274 (E.D. Pa). Perrigo was alleged to have conspired to fix prices for Desonide starting in 2012 by more than 800%, Econazole by up to 851% in 2014, and Clobetasol by up to 1,852%.

94.    In this conspiracy, Perrigo and its co-conspirators agreed to "[p]lay [n]ice in the [s]andbox" and informally decide on prices to set through agreements reached at trade association events and via widely distributed pricing lists.

95.    Individual Defendants Papa, Brown, Hendrickson, and Boothe were personally involved in this conspiracy. Boothe was alleged to have served on a trade association board when he was at Perrigo and when he was an employee at another conspirator, Actavis, immediately before he joined Perrigo. Boothe's membership in these associations, and his role as a former executive vice president and general manager of Perrigo Pharmaceuticals (the U.S.-based subsidiary that housed Perrigo's pharmaceuticals business) were directly cited by the court in its opinion denying a motion to dismiss Perrigo from the complaint.

96.    Specifically, in an October 16, 2018 Opinion ("Op."), the Eastern District of Pennsylvania, in the MDL action, cited the following evidence of Perrigo's involvement:

> a.    "search warrants were executed on Perrigo's corporate offices" regarding two of the drugs in the alleged conspiracy, clobetasol and econazole. Op. at 21;

b.      The U.S. Government Accountability Office ("GAO") issued a report in August 2016 that "identified relevant formulations of clobetasol. . . [and] econazole . . . as having experienced 'extraordinary' price increases even though other generic drug prices had declined or remained stable in the absence of shortages or other market disruptions."  Op. at 24;

c.      Perrigo had "some level of representation on the board of directors of the Generic Pharmaceutical Association ('GPhA') (now called the Association for Accessible Medicines) before or during the putative class period."  Op. at 24;

d.      An executive who "plead[ed] guilty to criminal charges" of antitrust conspiracy and represented a defendant company on the board of GPhA was on the board when "executives from other Defendants, including . . . . Perrigo" were also on.  Op. at 25;

e.      "Defendants had opportunities to conspire because they had contact with each other as regular members of certain trade associations as follows:

- Of the clobetasol Defendants, at least Actavis, Perrigo, the Sandoz Defendants and the Wockhardt Defendants are alleged to have been 'regular members of the GPhA during the Class Period.'  In addition. . . the Hi-Tech Defendants, Perrigo, the Sandoz Defendants, Taro, and Wockhardt were members of the National Association of Chain Drug Stores ('NACDS'). . . .

- Of the econazole Defendants, Perrigo and Taro are alleged to have been NACDS members, and Perrigo is alleged to have been a GPhA member during the class period. . . .

[The complaints] allege that during 'meetings, conversations, and communications,' Defendants agreed 'to engage in customer and market allocation or bid rigging' and also agreed 'not to compete against each other for certain customers.'  More specifically, they allege that Defendants' high-level representatives, including employees with price-setting authority, attended meetings and industry events hosted by [the

relevant trade associations.] . . . Plaintiffs contend that Defendants shared information at these events about their current and future business plans and thus had an 'opportunity to communicate about bids and pricing strategy, and share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates.' . . . . [Plaintiffs] include allegations regarding Defendants' attendance at trade association meetings taking place over a number of years, identifying meeting dates and names and job titles of employees who attended on Defendants' behalf.

. . .

Representatives from each of the clobetasol Defendants are specifically alleged to have attended GPhA, NACDS, and other meetings. . .

Representatives from each of the econazole Defendants are alleged to have attended meetings of the GPhA and another organization. . . . It is specifically alleged that representatives of Perrigo and Taro attended NACDS meetings." Op. at 26-30.

f.     "Plaintiffs allege that Perrigo increased its clobetasol price during a time when Doug Boothe, then its Executive Vice President and General Manager, sat on the board of the GPhA alongside Heritage's CEO Glazer and executives of other Defendants.  Boothe, who served on the GPhA board on behalf of Perrigo from 2013-2014, is also alleged to have served on the GPhA board in 2012 when he was Actavis' President and CEO. Clobetasol Plaintiffs have also alleged that Perrigo and Actavis were 'regular members of the GPhA during the Class Period,' and that representatives from Actavis and Perrigo attended GPhA, NACDS, and other meetings during the time of the clobetasol price increases.  Keeping in mind that allegations against individuals 'must not be "compartmentalized,"' the Court is satisfied that clobetasol Plaintiffs' allegations are sufficient to plead parallel conduct." Op. at 49-50.

g.     "With respect to econazole Plaintiffs' pricing allegations, Perrigo's and Taro's price increases allegedly occurred almost simultaneously, with Teligent's following several months behind. Teligent's alleged econazole price increases did not precisely match the alleged price

increases by either Perrigo or Taro, but the manufacturers' peak prices were within close range of each other for each relevant drug formulation. These differences alone do not provide a basis for dismissal." Op. at 53.

h.    "Actavis, Apotex, Dr. Reddy's, Heritage, Impax, Lupin, the Mylan Defendants, Par, Perrigo, the Sandoz Defendants, Sun, Taro, Teva, and Zydus are alleged to have belonged to relevant trade association boards and to have attended various industry meetings . . . . [T]hrough these interactions, . . . Defendants' representatives had occasion to connect with each other, to engage in strategic business discussions, and to gain awareness of their competitors' current and future business plans." Op. at 59.

97.    Furthermore, another court found statements by Papa and Brown to indicate knowledge of the antitrust conspiracy, through Papa and Brown's "repeated[] respon[ses] to pointed analyst questions regarding pricing pressure in the Generic Rx division," Papa discussing what he had "tried to do with pricing at Perrigo in the eight years" and Brown discussing "planned pricing strategies," the size of the alleged antitrust scheme, where Perrigo allegedly reaped hundreds of millions of dollars per year; the existence of a parallel DOJ criminal investigation that included a highly publicized raid in Perrigo's Michigan offices (though the raids occurred after Papa and Brown had gone to other companies).

98.    Moreover, Papa and Brown made repeated misstatements to investors to conceal the antitrust conspiracy, such as Papa claiming prices were "flat to up slightly" when in reality they were up by as much as 1,852%, that profits were sustainable because the division was a "real star" with "unique positioning" when in reality the profits came from an antitrust conspiracy, or Brown masking the extent

of the conspiracy by focusing on "sharp price erosion" and "continued pricing pressure" and "competitive pressure."

99.    Moreover, the Securities Action Court, found that:

"Plaintiffs have pled a motive to collude by describing the downward pricing pressure in competitive generic drug markets, quantifying the market concentration for each impacted drug, establishing that there were high barriers of entry due to FDA requirements, and demonstrating that demand was both theoretically inelastic and actually inelastic in that changes in price would not affect the quantity demanded."

. . . .

[T]he Amended Complaint alleges that Perrigo's dramatic price increases would have left it vulnerable to market share loss to competitors in the absence of collusion . . . [n]otably, Defendants fail to provide any explanation for the price hikes that would not render them against self-interest for a seller in the generic market." Moreover, the Court noted, "[T]he timing of the price hikes in relation to the trade meetings, the allegations of motive, the unexplained assertion that the price hikes were contrary to Perrigo's interests absent collusion, and the reference to a recent civil complaint brought by the attorneys general of forty states alleging that trade meetings are used to 'sow the seeds for illegal arrangements,' lend greater significance to Defendants' participation in the trade meetings as evidence of conspiracy . . . . The Court finds there are sufficient allegations to demonstrate underlying misconduct, even when viewed through the PSLARA's heightened standard[.]"

*Roofers Pension Fund v. Papa,* No. 16-2805 (D.N.J. 07/27/2018).

100.    Furthermore, at the same time Papa and Brown were hiding the antitrust conspiracy, they were also hiding the fact that the conspiracy was rapidly unraveling due to the FDA getting ready to issue a flood of generics approvals.  As the court found in denying the motion to dismiss in opt-outs based on the same

underlying misconduct as the Securities Class Action, Papa and Brown made the following misleading statements:

a.     Papa and Brown repeatedly told investors between April to October 2015 "that Perrigo sought to keep its generic drug prices 'flat to up slightly.'"  *Carmignac Geston, S.A. v. Perrigo Company PLC*, C.A. No. 2:17-cv-10468-MCA-LDW (D. N.J. July 31, 2019), Slip Op. at 6 (quoting Papa and Brown).

b.     When asked during an August 5, 2015 earnings call about "how sustainable" Papa believed generics price increases to be made, Papa omitted to mention the increased competition from pending generics approvals.  *Id.*

c.     During an October 22, 2015 earnings call, Papa dismissed an analyst's concerns about the "price inflation component of growth" relating to drug prices by reaffirming that the Company's strategy was to "keep pricing flat to up slightly."  *Id.*

d.     During the same call, "Brown advised that 'nearly all of [Perrigo's] revenues are insulated from the current pricing drama you see playing out in the pharmaceutical industry today.'"  *Id.* (brackets in original, quoting Brown).

101.   Moreover, the court credited the confidential witnesses the plaintiffs cited regarding how Perrigo knew because Perrigo kept track of competitors and their generics approvals.  *Id.* at 6-7.

102.   In the February 6, 2014 2Q 2014 10-Q, Perrigo described its generic Rx strategy as: "to be the first to market with those new products that are exposed to less competition because they have formulations that are more difficult and costly to develop and launch (*e.g.*, extended topicals, specialty solutions or products containing controlled substances)".  It made additional misrepresentations in 10-Qs filed on May 7, 2014, November 6, 2014, February 5, 2015, and April 29, 2015.

103.  In its August 14, 2014 10-K, signed by Defendants Papa, Brown,

Brlas, Cohen, Fouse, Hoffing, Jandernoa, Kunkle, Morris, and O'Connor, Perrigo

represented:

> The market for generic prescription drugs is subject to intense competition from other generic drug manufacturers, brand-name pharmaceutical companies launching their own generic version of a branded product (known as an authorized generic), manufacturers of branded drug products that continue to produce those products after patent expirations and manufacturers of therapeutically similar drugs. Among the Company's competitors are Actavis, Apotex, Glenmark Generics Inc., Impax, Mylan, Prasco, Sandoz, Taro Pharmaceuticals, Teva Pharmaceutical Industries Ltd., Triax Pharmaceuticals, and Zydus Pharmaceuticals, as well as brand-name pharmaceutical companies where the Company offers a generic equivalent.

> The Company believes that one of its primary competitive advantages is its ability to introduce difficult to develop and/or manufacture topical and other specialty generic equivalents to brand name drug products. Generally, these products are exposed to less competition due to the relatively longer and more expensive development, clinical trial and approval processes. In addition, the Company believes it has a favorable competitive position due primarily to its efficient distribution systems, topical production economies of scale, customer service and overall reputation.

> Price competition from additional generic versions of the same product, as well as potential price competition from the original branded or authorized generic products, may result in a significant and/or rapid decline in sales and profit margins. In addition, competitors may develop their products more rapidly or complete the regulatory approval process sooner and market their products earlier than the Company. New drugs and future developments in improved and/or advanced drug delivery technologies or other therapeutic techniques may provide therapeutic or cost advantages to competing products.

. . .

Many of the Company's customers, which include chain drug stores, wholesalers, distributors, hospital systems and group purchasing organizations, continue to merge or consolidate. In addition, a number of its customers have instituted sourcing programs limiting the number of suppliers of generic pharmaceutical products carried by that customer. As a result of these developments, heightened competition exists among generic drug producers for business from this smaller and more selective customer base.

. . .

The markets for OTC pharmaceutical, animal health, nutritional, infant formula, generic pharmaceutical and API products are highly competitive. Competition is based primarily on price, quality and assortment of products, customer service, marketing support and availability of new products. Competition also comes from national brand companies and branded pharmaceutical companies. That competition could be intensified should those companies lower prices or manufacture their own store brand or generic equivalent products. Due to the high degree of price competition, the Company has not always been able to fully pass on cost increases to its customers. The inability to pass on future cost increases, the impact of store brand competitors and the impact of national brand companies lowering prices of their products, offering special promotional discounts or operating in the store brand market could have a material adverse impact on financial results. . . .

Selling prices of generic drugs typically decline, sometimes dramatically, as competition intensifies due to additional companies receiving approvals for a given product or brands launching authorized generics. To the extent that the Company succeeds in being the first to market a generic version of a significant product, the Company's sales and profit can be substantially increased in the period following the introduction of such product and prior to a competitor's introduction of an equivalent product. The Company's ability to sustain its sales

and profitability on any product over time is dependent on both the number of new competitors for such product, some of whom may be significantly larger than the Company, and the timing of their approvals.

104.   Moreover, between 2014 to 2017, Papa, Brown, and Hendrickson made various misleading statements as to the strength or competitiveness of Perrigo's pharmaceuticals business, which they either knew or should have known were untrue.

105.   On an August 14, 2014 earnings call, Papa also stated Perrigo's strong sales were "driven by great executions, especially within our Rx business segment, and the acquisition of Elan."  Brown further commented, "[Y]ou can see that our Rx business continues its robust performance, as net sales growth was driven by new product sales of $35 million, and sales related to products acquired form the acquisition of Fera, of $20 million."

106.   On the August 14, 2014 call, in response to a question about growth and "pricing dynamics" and competition, and why Perrigo was forecasting a much slower growth rate for Rx, dropping from 25% growth last fiscal year to a forecast of 5%-9%, Papa responded:

> [A]ctually, the growth rate for the full year was actually a little higher than that: 31%.  So we did have a very strong year. Having said that, we're excited about the future.  We think we've got some great new products.  One of the questions, really – there's some competitive challenges that we expect for some of the new products.  If that does not manifest itself, and we find ourselves without some of those competitive challenges, there

may be some upside in the growth.  But much of what we're doing in the Rx business, in terms of having an upside, would really manifest itself in the new product category, depending on what happens in new products.

a.      On the same call, in response to another question about Rx "pricing assumptions" and "positive price trends", Papa responded:

[D]o I think there are some opportunities on pricing in the Rx category?  The answer is yes.  The overall comment I would make is that our strategy on pricing hasn't really changed in the past six, seven years when I've been at Perrigo, is to try to keep our pricing flat to up slightly across our total book of business, in other words, across all of our portfolios, keep pricing flat to up slightly.  Our logic being that in any given year, in any given quarter, we may raise prices on product A, but we may take a concession on product B and C, but try to keep that pricing flat to up slightly.

107.   In an April 21, 2015 investor presentation regarding the Board's rejection of the Mylan tender offer, Perrigo and the Director Defendants projected an 8%-12% net sales growth for generics Rx, stating, "Directors of Perrigo accept responsibility for the information contained in this presentation.  To the best of the knowledge and belief of the directors (who have taken all reasonably care to ensure such is the case) the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information."

108.   In the April 22, 2015 call discussing the Board's rejection of the Mylan tender offer, Papa stated:

[W]e have a very strong Rx business in what I always refer to as the extended topical part of our portfolio.  As you know, with us,

46

in our Rx category, we are number one or number two for over 75% of our product portfolio. . . .  We got a very strong position in the Rx portfolio, especially because of the differential product portfolio we have in focusing on what we always referred to as extended topical or any drugs that are absorbed topically through the skin, the lungs, et cetera. . . .  [O]ur goal on pricing has been the same goal, really for all the time, almost nine years I've been at Perrigo.  What we seek to do on our pricing is keep pricing flat to up slightly and I'm very comfortable that, certainly in our current year in our calendar 2015, as we look to the future, we can keep pricing flat to slightly up slightly.  So that's really what our goal has been.  There is no doubt that there has been some continued wholesaler consolidation and buying group consolidation has occurred.  We're working very closely with those customers.  They are very important to our consumer business; obviously they are very important to our Rx business.  So we continue to work very closely with all of them to continue to drive and talk about what we refer to as the Perrigo advantage and what [is] unique about us that allows us to help them to meet the needs of their customers or the customers of the world.  So clearly, we do think that that is something we can continue to drive.

109.  In a May 12, 2015 Bank of America Merrill Lynch conference, Papa assured investors, in response to a question about pricing strategy and how to address customer demand in Rx:

Obviously, it's a competitive market out there.  There is always going to be – in a pricing world, somebody is going to gain some share, somebody is going to lose some share.  I think, as a general rule, what I've tried to do with pricing at Perrigo in the eight year, nine years, I've been a part of the company is to keep pricing flat to up slightly.  And if I do that, I believe that puts me in the best long-term position to deliver shareholder value for the Company.  Any specific product conflict issue is just a normal part of give and take in terms of market share, gaining market share, losing market share.  Right now as I sit here today, Perrigo is the leader in what I would call extended topical.  So

anything that's observed topically, dermatology, respiratory, nasal, ophthalmic, we've got a leading position there and I think we're just going to certainly try to continue to make good decisions on that pricing because I think as you've seen in our business, we've been able to drive some very significant growth both on the top-line and the bottom-line for the company relative to our operating margins in the mid-40%s.

110.   At a June 2, 2015 Jefferies Global Healthcare Conference, Papa again reaffirmed, in response to a question about Perrigo's pricing strategy and if there are "pricing opportunities" and M&A opportunities:

> The approach we take on pricing is really a portfolio approach. I'm sure it's very similar to many of you in the audience, as you think about the individual stocks you buy.  You take a portfolio view on what you're trying to accomplish.  That's what we do on our pricing for our business.  Across all the Perrigo segments, the consumer segment, the nutrition segments, the RX segment and the API segment; we try to take a view on pricing across that total portfolio with the goal of keeping our pricing flat to up slightly.  Now in any individual category, like Rx, there may be more upside.  But we're recognizing that there is going to be some products in Rx that I'm going to have to decrease for competitive reasons, as well as increase some.  So what we try to do is take a holistic view across that total portfolio, and keep pricing flat to up slightly.  I will say over the last several years to be fair, there's been more pricing upside in the Rx category than perhaps some of the other categories.  But we still take that kind of total portfolio view of keeping pricing flat to up slightly as a view.

111.   At the August 5, 2015 earnings call, Papa was asked about whether "in this price increase dynamic . . . how sustainable you feel those increases are," he responded:

> On the generics and the pricing environment, our team has done
> a great job at looking at pricing . . . .  Across the portfolio we
> think there are still opportunities to do pricing.  We will
> continue to look at it.  We think there's something that we'll be
> talking about in the future for pricing.  But I think it really
> supports the strength of that operating profit line of 49.5% and
> what we achieved with our Rx business in the quarter.  And
> importantly, the gross profit line is 64.8%.  For those reasons,
> we think we have got a strong Rx business.  And we look to still
> find some additional pricing opportunities for the future.

112.   Moreover, in response to another August 5, 2015 earnings call question, Papa stressed that "our Rx business is a very unique business.  It is a business model with these incredible margins."  But in fact the Rx business's profits did not come from being "unique."   Rather, the profits came from Perrigo's participation in an antitrust conspiracy.

113.   The August 13, 2015 10-K, signed by Papa, Brown, and Defendants Papa, Brown, Brlas, Cohen, Fouse, Hoffing, Jandernoa, Kunkle, Morris, and O'Connor falsely stated the Generic Rx division "operate[d] in a highly competitive environment" and "face[d] vigorous competition from other pharmaceuticals companies that may threaten the commercial acceptance and pricing of our products."  The 10-K further stated:

> The market for Rx pharmaceuticals is subject to intense
> competition from other generic drug manufacturers, brand-name
> pharmaceutical companies launching their own generic version
> of their branded products (known as authorized generics),
> manufacturers of branded drug products that continue to produce
> those products after patent expirations, and manufacturers of
> therapeutically similar drugs.   Among our generic drug

49

manufacturer competitors are Actavis plc, Apotex Corp., Glenmark Generics Inc., Impax Laboratories, Inc., Mylan, Prasco, LLC, Sandoz, San Pharmaceuticals, Taro Pharmaceuticals, Teva Pharmaceutical Industries Ltd., Triax Pharmaceuticals, LLC, and Zydus Pharmaceuticals, Inc.

We believe that one of our primary competitive advantages is our ability to introduce difficult to develop and/or manufacture topical and other specialty generic versions to brand-name drug products. Generally, these products are exposed to less competition due to the relatively longer and more expensive development, clinical trial, and approval process. In addition, we believe we have a favorable competitive position due primarily to our efficient distribution systems, topical production economies of scale, customer service, and overall reputation.

114. In the September 17, 2015 call discuss the Board's rejection of the Mylan offer, Papa responded to an investor question regarding why Perrigo felt it would be better off as a standalone rather than part of Mylan with respect to its generics business, since Mylan had the larger generics footprint:

I do believe that as we think about this transaction, as I have said a couple of different times now, we think it is a bad deal, and part of it is the strategic intent. As you know, as we have thought about where we are going with our Rx business, our generic Rx business, we have got one of the best growth rates and the best margins in the Rx business, because of exactly what we've done. We think product selection is very important.

We have focused our business on what we refer to as extended topicals, products that are applied topically, dermatology, respiratory, nasal, ophthalmic products that are absorbed topically. We think those make more sense for what we do, and what we do really well. It would be a complete change in what we have attempted to do so far, would be the first comment.

115.   In the October 22, 2015 earnings call, Brown represented that Perrigo had "double-digit organic top line growth" because "nearly all of our revenues are insulated from the current pricing drama you see playing out in the pharmaceutical industry today."

116.   In the October 22, 2015 earnings call, Papa responded to an analyst question how "financial markets have become very concerned about the pricing inflation component of growth" and how much of growth can be driven by pricing where "the generic topical business has been one of the few segments of generic industry that has really benefited from a strong overall pricing dynamic" and whether "we've kind of hit an inflection point maybe we're looking at the potential negative impact of pricing going forward":

> On the question of pricing, certainly, we see that out in the marketplace, but I would remind the audience today that what we've always said about pricing is that our pricing across our total book of business is flat to up slightly.  While there may be a product that we do raise the price on, there are other products we're taking price down.  Our total strategy for pricing, as I have said I think on numerous calls, is keep pricing flat to up slightly, which means that yes, some products we may attempt to raise the price there, but in other products we're bringing the price down.  So think about us as keeping pricing flat to up slightly as really the way we're going to look at our total portfolio.  Whether we're talking about any specific product or any specific category or any segment of our business, the overall comment is flat to up slightly for our pricing.  And I think that's really the best place for the long, sustainable consistent approach to pricing that we've had in the past and will in the future.

117.   On the October 22, 2015 call, in response to a question about why Rx growth was forecast at a much lower rate than before, Papa responded that "we've got our best pipeline ever. . . .  So we still feel very optimistic about the future."  In addition, he pointed out, "we feel very good about . . . both the gross margin and the operating margins."  Brown added that past higher growth rates were provided when the Rx "business was half the size" and now it is "off $1 billion base and continuing to add new products into the portfolio on a go-forward as well."  She emphasized the "industry-leading operating margins that have continued to be stable for full-year run rate basis" and that the 8%-12% growth rate projected is "a phenomenal number given a $1 billion base."

118.   At a January 5, 2016 Goldman Sachs Healthcare CEO conference, in response to a question about whether "your business has benefited from a very positive pricing environment," Papa stated:

> Number one, our goal – I've been at Perrigo nine years.  My goal in pricing has been the same for the nine years: try to keep my pricing flat to up slightly.  Now, to be clear, what that means is that I'm taking some products up, and some products can be competitive and I'm taking them down.  On balance, what I've tried to – what I strive very hard to achieve is what I would call pricing flat to up slightly.
>
> Now, within a category like let's use the generic Rx products, there may be more volatility up or down in products.  Certainly there's more [in] generics than there is in my consumer business.  My consumer business has very minimal volatility.  So that's what I've strived to accomplish.

Is there a place now as we sit here today that there's going to be less pricing?  I think the answer really is – I'm a believer in economic theory.  It all comes down to supply and demand.  In other words, if there are five players, 10 players supplying drug, I can pretty much tell you what the pricing points are going to be.  It's going to be your cost of goods plus 10%.  It's going to find its way down to that level.

In a case where there's only two or three players, it's – you are going to make better margins.   And that's why we have purposely tried not to be in the commodity generics but to stay in the extended topicals.

Do I think the point of your question is there going to be more price competition in even things like dermatology?  Yes, I do because there are some people coming in.

119.   And in the January 5, 2016 call, when asked about whether Rx would continue to be "durable," Papa responded, "I think it's going to continue to be very durable in the sense that if you think about metered-dose inhalers, we filed on ProAir three or four years ago, and to my knowledge no one else was even filed yet. So I think we've got a three- to four-year head start on people on the Pro Air equivalents. . . .  But those are the things that we're continuing to find these more difficult generics that it all comes down to product selection, and that's what I think we're really good at.   And the ability to run the clinical trials to show that our product is equivalent to the national brand or the case it's a national brand.  Those are the things that we think we do well."

120.   In a January 11, 2016 presentation, Papa attributed "what marks and differentiates us [in generic RX] is that we've gone after extended topicals.  We are

not trying to be the largest generic supplier.  . . . [O]ne of the things that differentiates these product characteristics is . . . they are difficult to get approved because they also usually require a clinical endpoint trial.  So you get a lot less competitors in that space because it makes it very difficult to show that you are bioequivalent if you do not do a clinical trial."

121.   In the February 18, 2016 earnings call, in response to a question about the Rx revenue contribution, Brown and Papa made further representations:

> **Brown**:  Were you to go through and accumulate the comments we made each quarter throughout calendar 2015 on new products and Rx, new products contributed approximately $121 million over the course of those four quarters.  And pricing-wise, we did see some pressure, give or take, in the total portfolio over the course of the year, approximately 1%.

> **Papa**:  And the latter part of your question, it really talks about the pricing dynamics and what we're thinking about and looking at for the future.  And I'd say the following.  Is there some incremental product competition that we're going to face?  The answer is yes.  However, what we've tried to do at the Perrigo Group is not just stay focused only on dermatology.  As you know, we've moved into what I would refer to as extended topicals.  So those are things beyond just certainly dermatology, but respiratory, nasal, ophthalmic.

> And with those product categories – for example, at the end of the year, we'll launch our ProAir product in terms of a meter-dosed inhaler for respiratory – those are the things that are giving us great strength in our Rx category.  And as we believe, that will give us a very high gross margin and operating margin, certainly as we think about 2016 and beyond.  So, we like what we see in terms of our ability to launch these new products and what they mean for gross margins and operating margins.

122.   Furthermore, on the February 18, 2016 call, with respect to a question regarding competition in the Rx business, Papa replied, "we do see calendar year 2016 improving on both the operating and the gross margins for that business, as we continue to show very significant growth[.]" Brown further responded, "Our plan for Rx . . . is still at the high end of our 8% to 12% growth guidance that we've provided in the past."

123.   The February 25, 2016 filed Form 10-K, signed by Defendants Brlas, Cohen, Coucke, Fouse, Hoffing, Jandernoa, Kunkle, Morris, O'Connor, Papa, and Brown, made similar misstatements as the earlier 10-Ks, stating:

> The market for Rx products is subject to intense competition from other generic drug manufacturers, brand-name pharmaceutical companies launching their own generic version of their branded products (known as an authorized generic), manufacturers of branded drug products that continue to produce those products after patent expirations, and manufacturers of therapeutically similar drugs.   Among our generic drug manufacturer competitors are Allergan plc, Apotex Corp., Glenmark Generics Inc., Impax Laboratories Inc., Mylan, Prasco, LLC, Sandoz, Sun Pharmaceuticals, Taro Pharmaceuticals, Teva Pharmaceutical Industries Ltd., Triax Pharmaceuticals, LLC, and Zydus Pharmaceuticals, Inc.
>
> We believe that one of our primary competitive advantages is our ability to introduce difficult to develop and/or manufacture topical and other specialty generic versions to brand-name drug products.   Generally, these products are exposed to less competition due to the relatively longer and more expensive development, clinical trial, and approval processes.   In addition, we believe we have a favorable competitive position due primarily to our efficient distribution systems, topical production economies of scale, customer service, and overall reputation.

Many of our customers, which include chain drug stores, wholesalers, distributors, hospital systems, and group purchasing organizations, continue to merge or consolidate: Such consolidation has provided, and may continue to provide, customers with additional purchasing leverage, and consequently may increase the pricing pressure we face. The emergence of large buying groups representing independent retail pharmacies enable those groups to extract price discounts on our products. In addition, a number of our customers have instituted sourcing programs limiting the number of suppliers of generic pharmaceutical products carried by that customer. These developments have resulted in heightened pricing pressure on our products, as well as competition among generic drug producers for business from a smaller and more selective customer base.

124.   In a May 12, 2016 earnings call, Brown gave as a reason for the performance of the Rx sector (but did not disclose that the competition was foreseeable by her, or known by her, due to her access to competitor monitoring internal lists):

Rx net sales increased 2% which came in below our expectations. We experienced negative organic growth within the segment resulting from several factors, so let me explain. The change in the competitive landscape was much more disruptive to our plan than had been anticipated and impacted our overall pricing strategies for the segment.

During the quarter, we experienced 24 competitive launches against our portfolio, producing sharp price erosion in a number of topical products we sell. These factors, combined with continuing pricing pressure due to the consolidation of the large buying cooperative groups, and the absence of significant new products in the quarter, further impacted our ability to execute on our planned pricing strategies.

Despite all of this, however, the team was able to maintain its extended topicals leadership position in the quarter. These

pricing pressures impacted both the adjusted gross and operating margins, accounting for the decline you see here year-over-year.

125.   And on the same call, in response to why Perrigo was not facing "More margin erosion, given the competitive dynamics and pricing" and in light of how "many of [Perrigo's] peers who are seeing pricing competition, that's translating to very sleep margin erosion[,]" Brown responded:

> And we've had the acquisitions completed at the end of 2015, and beginning of 2016, which has contributed attractive margins to the basket as well.  So on a year-over-year basis, there are pluses and minuses.  On a quarter-over-quarter basis, there were the pricing pressures that we spent a lot of time on already this morning, offset in large part from a margin perspective with the acquired products.  So the basket's still working.  The portfolio, on a margin perspective, is still working well.

126.   In the May 16, 2016, August 10, 2016, and November 10, 2016 10-Qs signed by Brown, Perrigo represented that the Company had experienced "a recent reduction in pricing expectations in our U.S. businesses from historical patterns, in particular in our Rx segment due to industry and competitive pressures in the sector," which Perrigo attributed to "competition in specific product categories."

127.   In the May 16, 2016 press release announcing quarterly earnings, Perrigo stated, "[T]he Rx segment delivered strong margins in an increasingly challenging pricing and competitive environment" and the quarterly operating income decreased by 3% compared to the previous year "primarily driven by industry pricing and competitive pressures."

128.   At the May 24, 2016 UBS Global Healthcare Conference, Brown stated in response to whether pricing changes were caused by buyers "getting tougher just in general versus typical product-specific pricing issues . . . because of competition":

> So, of the total guidance change, if you go midpoint to midpoint on our guidance range and you back up into operating income movement as a proxy for the EPS change, over half of that align move came from Rx.
>
> And the majority of that is coming not through operating expenses, but it's coming through the pricing and timing on new products just being adjusted from the original guidance, mostly though pricing related.
>
> So, now, if you're trying to say, of that basket, how much is pressure versus specific pricing initiatives, in some cases, one could say that they're intrinsically linked.  What do I mean?  We saw a dynamic in Q1 of products being launched against us when we didn't have our product launches right at that time.  So, we saw some competitive pressure.  We'll have our products launching later in the year, but we got the pressure at this point and weren't ready with our own launches at that moment.
>
> Now, you start to say: Okay.  Now, we're seeing a different pricing dynamic for the remainder of the year.  We have some price increases slated over the rest of the calendar year.
>
> How do you feel?  Are those really going to happen?  Are we going to have some pressure on being able to execute against that tactical plan in our price increases?   Will there be challenges?   So, is that directly pricing pressure from the consortia, or is it really a situation of indirect?  And is it our own reticence perhaps to be able to execute on those specific actions?
>
> So, they're linked.  So, you think, of the changing guidance, more than half is Rx.  And of those changes, it's linked to the environment.  It's linked to how well we'll be able to execute on

those remaining plans because of the environment, as well as some things, the dynamic that happened in Q1 that flows through, obviously, for the rest of the year.

129. On the August 10, 2016 Q2 2016 earnings call, Hendrickson and Brown admitted to facing difficult headwinds in the Generic Rx market. However, they neglected to mention that due to their participation in the antitrust conspiracy, they could have, or did, anticipate many of these headwinds, and instead misrepresented to the public that they were caught as by surprise as anyone else.

130. For example, Hendrickson, in his initial presentation noted, "The Rx business has been our most challenging to predict in the short term, given price erosion and the competitive dynamics in the sector. Despite those challenges, we continue to deliver attractive operating margins versus our Rx pharma peers, and believe in the long-term fundamentals of this business." He also admitted that "our financial results were below internal expectations" largely because "we continue to focus on improving the profitability of the BCH business [and] we continue to face pricing headwinds in Rx even greater than we had anticipated against the highly variable pharmaceutical pricing environment." He made it clear the internal estimates were missed "primarily as a result of the pricing impacts in this Rx segment." He reemphasized, "In Rx, we experienced a weaker second quarter than forecasted due largely to more aggressive pricing environment." But he noted, "I believe Rx is a fundamentally sound business with solid, strong long-term

prospects.  We remain in a leading market position with a deep pipeline into which we continue to invest. . . .   That said, Rx competes in a fast moving, dynamic environment, as evidenced by public comments from the sectors peer who have also disclosed greater price erosion than expected.  Against our own expectation, price erosion in the quarter was unfavorable to adjusted operating income by approximately $20 million."

131.   Brown added that the reasons for the decrease in Rx performance included "the lack of an exclusive market position for two key products versus the prior year" that "was known and included in our May guidance."  But there were also other factors, including "a number of competitive product launches in the first quarter of 2016, which led to additional year-over-year price erosion beyond what the leadership team had anticipated."  And "there were continued pricing headwinds from consolidated buying groups."

132.   Moreover, Hendrickson reassured investors that "the Rx business has a deep pipeline of new products, is committed to R&D investments, and will continue to offer differentiated products, particularly in those high barrier-to-entry areas where Perrigo has exceptional capability."

133.   And in response to a question about any "change in strategic thinking around the generics business" and about allocating more capital towards R&D to bolster the pipeline."  Hendrickson responded that Rx was "still a solid profitable

business despite all the negative pricing, et cetera. . . .  We feel that there are still barriers to those margins."  In addition, he pointed out that "despite the pricing challenges, we feel we have a good pipeline, good link to all our operations . . . .  Even if it's not specific products, just what we have there on the Rx side links into that OTC side. . . .  But even without putting more in, we feel that there's a decent pipeline there."

134.   And in response to a question about whether "you were saying that, so far, pricing pressure [re Rx generics] has not materialized to the extent of the adjustments, or it's actually been worse than your adjustments," Hendrickson replied, "[Brown] said it correctly in her statement.  We have not seen it yet.  So even though we planned for more, it has not materialized yet."

135.   When Brown was asked if "the pricing environment" in Rx was like "nuclear war," she replied:

> I'm not entirely sure I used the phrase nuclear Armageddon, but, suffice it to say, the process that we went through last quarter, it starts with the Rx management team.  And, as you know we've gone through an Rx management team change in the last few months.  And we have seen continued price declines in the last few months.
>
> I tried to elaborate in the prepared remarks but maybe a little bit more color.  The entire Rx leadership team came together and sat down and then went through every single product this time, taking maybe a more jaded lens on the reality of the market in which they're competing.  And as we commented on, I'll use the great analogy of Donald Rumsfeld.

They first in the past went through the known knows, their entire product line up, what they know is happening, what they can actively see and manage, and included that in their forecast.

. . .

In the past, they stopped at some known unknowns with a little bit of wiggle room. But after last quarter's performance also went a step further and aggressively went and made some modeling assertions on known unknowns and, as well, went the next layer with unknown unknowns, because after the second quarter and the cumulative effect of Q1 and Q2, the teams under new leadership took a very different perspective on the potential for more dynamism on a go-forward basis just given the rapid rate of change that they saw over last six months.

It's not a reporting system problem because it's the accounting and the debits and credits and the gross to net function as always, but rather a rapid pace of change unlike anything they had ever seen in the past. A very open dynamic with that, between that team as well as the executive committee, and talking very frankly and very openly about what they were seeing and putting forward assertions that made sense given the circumstances that we're working in today of trying to elaborate and be prepared for possible body blows if the pace of change were not to moderate, as well.

So, that is the type of process they went through. I don't want to use the analogy but nuclear Armageddon, but given the last quarter they definitely pushed hard on the unknown unknowns, as well, to try to prepare for the worst case scenario.

136.    Hendrickson added:

[Y]ou have good visibility to first to file and those sorts of things, and/or new approvals. So, you see those. But once you're beyond that there is not a great channel to see who's actually here. So, you have to do estimates of what do we think, who could have this filing, where would it come from, where would they go.

You are doing some scenario planning on what do we think is going to happen with these products.  So, visibility to a big chunk, don't get me wrong, but then the others is a best, well-educated plan around where do we think it's coming.  And that's where we did a lot more work on how we look at that part of the business.

137.   Regarding a question about how long it would take to fix Rx, Hendrickson responded:

Again, if I step back big picture-wise and look at our Rx business, certainly, and it goes without saying, the pricing changes and dynamics there have been very large, and certainly were the main driver of the quarter, a big part of our lowering guidance.  So, it's a big key.

If we step back then and say – okay, let's look at the business today, after all those changes, after we built in the 9% to 10% for the back half, all of that – we still have a business with a great return on invested capital, a great operating margin, great new product prospects.  So, while I think there are many things we can do to enhance that business and drive more value and products to it, the main dynamic right now is this pricing dynamic.  And that one is a – got to get through it, got to allow that to happen, and have our new products start hitting in.

We always describe Rx as a leaky bucket.  We knew this was going to be a tough new product year.  And we've had more leaking out of the bucket from a pricing standpoint than we've been able to put in with new products and other kinds of pricing actions in the top.  So, that's been what really compounded and added in this year.  I look at the overall business fundamentals and they are still solid.

138.   And in response to a further question about whether there would be "a return to more normalized pricing by 2017 on your generic business," Hendrickson responded, "I would expect it to moderate back to what would be more normalized

levels, which means there's always price decreases.  But I would expect what we see this year to be more normalized as we get into future years, yes."

139.  Then Hendrickson responded to another question about whether the Gen Rx business can "get back to a . . . normal pricing level":

> [O]n the general Rx pricing looking forward, here is the way I'd think about it.  We currently are certainly at a much higher level. So of that is the first to file items, et cetera.  But even at the normalized rate we're talking about in the back half at 9% to 10% that we have built in, certainly abnormal.
>
> I believe that this part, as I look at it, will normalize back to a mean, and a mean is a 5% to 6% normalized price decreases.  If you look back historically, those are the kinds of numbers that you'd see in the industry.  Not the ones that we're seeing at this stage.
>
> I don't have a better crystal ball but when I look at it and say – it has to normalize out, a great generic industry, and eventually gets back to a normalized point.  So, you get back to a 5% to 6% normal decreases without first to file, other items, but just normalized bucket increases, put new products on top of that, put on some pricing you might be able to get on other products that are way under-valued right now, to me, you get back to a more normalized level.

140.  Finally, in closing, Hendrickson remarked, "Rx pricing has been very dynamic.  But when I look and step back at the returns and the product pipeline, [I] feel good about those.  So, looking back at those core operating assets, the core things that we have, I'm optimistic about where business can go."

141.  Moreover, since none of the financial statements reveal that an antitrust conspiracy was the reason for higher earnings in generic RX, all the

financial statements were misleading, *e.g.*, August 14, 2014 Form 10-K and accompanying 8-K press release, November 6, 2014 10-Q, February 5, 2015 10-Q, April 29, 2015 10-Q, August 5, 2015 8-K, and August 13, 2015 10-K, November 2, 2015 10-Q, February 18, 2016 8-K, and February 25, 2016 10-K, May 16, 2016 10-Q, August 10, 2016 10-Q, and November 10, 2016 10-Q.

**B.    Defendants Cover Up Recent Poor Performance to Ensure They Retain Control, Leading Stockholders to Reject Value-Enhancing Merger**

142.   Papa and Brown were motivated to lie about growth, integration success, and the Generics RX business because in 2015, they were in a pitched battle to ward off a hostile bid by Mylan.

143.   At the time Mylan made its first unsolicited offer to Perrigo in early April 2015, Perrigo was riding high – though it turns out its gains were due to fraud, as exposed later.  When Mylan's first offer, in cash and stock, came to around $205 per share, Perrigo's Board unanimously rejected the offer with the reasoning that it was too low, despite the fact that it was a 25% premium to the previous trading day's closing stock price of Perrigo and higher than Perrigo ever achieved.  Papa and Brown, in a call on April 21, 2015, articulated their thoughts that the offer undervalued Perrigo because the Company had great growth potential standing alone, as evident from what they estimated to be $32 billion of Rx-to-OTC switches that would come and their recent acquisition of Omega.  But even when in April

2015, Mylan twice increased its offer, to the equivalent of $246 per share, Perrigo's Board and management continued to reject the bid and come out against it, insisting that these bids undervalued Perrigo.  Perrigo's Management continued to mislead its stockholders after Mylan initiated a formal tender offer on September 14, 2015, valued at the time around $246 per share, with a deadline of November 13, 2015 – the misrepresentations had their intended effect when they led to the majority of Perrigo's stockholders rejecting the offer on that date, which ended the offer.

144.   The misrepresentations Papa and Brown actively made, and that the then-Board signed off on, dealt with misleading statements regarding Perrigo's organic growth, the success of the integration efforts at Omega, and inflating the value of the Tysabri asset.

145.   Defendants Papa and Brown misled the public about Perrigo's organic growth for several years.  Papa and Brown, as the CEO and CFO, signed the Company's filings and spoke to investors during conference calls.  And instead of speaking the truth, they repeatedly chose to lie.

146.   Papa and Brown knew that organic growth was slow to non-existent in the years preceding the Class period.  The court in the securities case found it telling that Perrigo did not dispute that Perrigo's recent growth had slowed or that it was negative.  But Papa and Brown signed statements that masked the true decline of organic growth by misreporting net sales in violation of GAAP by reporting

three-year blended growth instead of annualized growth, which blended the older higher growth years with newer lower growth years. Papa and Brown also repeatedly asserted that organic growth rates could be "5% to 10%" per year – implying that existing growth was high so that these rates could be achievable.

147.   Even in early 2014 before Mylan made its offer, Papa stated that organic growth accounted for half of Perrigo's annual revenue growth of 15%-16% over the past four years, and the Company targeted 5%-10% organic growth during any three-year period.

148.   On May 7, 2014, during Perrigo's earnings call, Papa responded to an analyst's questioning about modeling:

> As we've said in our February analyst day, we expect to be able to grow the top line in this business by somewhere in that 5% to 10% range and then that's organic growth. And then to grow the operating income line approximately double that range from a growth rate for both those numbers. So, 5% to 10% growth rate over a three-year time period per year, and then approximately double that on the operating income line.

149.   In the same call, Brown re-emphasized, "You will probably never meet a more self-aware and hard-on-themselves team as this one, and we've obviously looked at these numbers very carefully as we talk about finishing up the rest of the year and the run rates going into next year."

150.   On the August 14, 2014 earnings call, Brown made a similar statement:

67

We're not commenting specifically on what we put into our forecast for specialty science revenue, but suffice it to say, the remainder, as you're backing into that, still implies a growth rate of our overall business in that five-year CAGR, or three-year CAGR range.   Remember, our three-year CAGRs, we've said, are between 5% and 10% top-line revenue growth.

151.   And on the November 6, 2014 earnings call, Papa reiterated, "We continue to believe that the organic growth rate of the Perrigo Company will be somewhere in that 5% to 10% top line growth rate.   And then opportunity to potentially double that growth rate to 10% to 20% on the operating income and EPS line for the core business that we have at Perrigo."

152.   For instance, on April 22, 2015, Papa and Brown made an investment presentation to announce the Board's rejection of Mylan's first $205 per share offer, stating that Perrigo had a "compelling growth strategy" with a "proven history of meeting our goals" and cited organic growth figures from 2011 to 2014 of between 7%-8%, and stated Perrigo had the "ability to keep delivering" that organic growth at 5%-10% for years to come.   Perrigo built a pyramid graph to visually present its growth strategy, which it called "Base Plus Plus Plus" – and as part of the "Base Guidance" stated they had "5-10% organic CAGR Goals."   The three "Plus[es]" were over $32 billion of anticipated RX to OTC switches, "Expensive M&A" that it claimed would have a "Multiplier Effect" and "Tysbari Upside."   Furthermore, the presentation states, "The durability of our diverse product portfolio is clearly evident, as our consolidated result is solidly in the range.   We have met our

consolidated organic-only goals in the past and fully intend to do so in the future. Looking forward, our goal is to once again deliver an organic net sales CAGR for the next three years in the 5% to 10% range while off a significantly larger base." The presentation also states, "The directors of Perrigo accept responsibility for the information contained in this presentation.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information."

153.  Papa also claimed, in oral statements accompanying the presentation:

> As disclosed on April 8, Perrigo received an unsolicited proposal for Mylan to acquire all outstanding shares of Perrigo at $205 per share.  Today, we announced that our Board of Directors has unanimously rejected the proposal.  The Board concluded that the proposal substantially undervalues the Company and its future growth prospect and it is not in the best interest of Perrigo's shareholders.  Simply put, the Board believes that continued execution by the management team against our existing global growth strategy will deliver superior shareholder value.  Perrigo has a long history of driving shareholder value through consistent, above-market growth and we are exceptionally well positioned to continue to deliver superior growth and shareholder value as we build our strong independent future.
>
> . . . Perrigo's value proposition can be thought of as a base plus story.  We began with a durable base business that we have built and continuing to enhance through strategic investment.  This base includes an unparalleled consumer business, highly profitable Rx business and a Specialty Science [Tysabri] business that generates consistent royalty revenues and strong cash flow.  Layered on top of this is a new product pipeline that

is expected to deliver $1 billion of new product revenue over the next three years.  Let me repeat that, we expect over $1 billion of new products revenues over the next three years.  These three elements form the foundation of our future business, are the basis of our three-year 5% to 10% organic net sales CAGR growth goal.

We're just back from the Board meeting in Ireland and I'm thrilled to talk to you about our future growth prospects, which gives me great confidence that our strong durable base will enable us to achieve our goal to grow our net sales by 5% to 10% into the future.  We continue to grow at this rate on a significantly bigger base, but there is significant potential upside not include in the CAGR goal.  To reiterate this, our growth goal is purely organic.  We have historically delivered a balanced mix of organic and inorganic growth, which we expect to continue into the future.  We also see substantial upside for Perrigo on the horizon over and above this three-year goal.

. . .

It's a very exciting chapter in the Perrigo growth story.  We built a tremendous platform for growth and value creation and our pipeline is stronger than ever.  Plus, we are positioned to benefit from clear demographic trends and the movement of products from Rx to OTC.  Plus, we have just completed the Omega acquisition, which, among other major benefits, provides a significantly enhanced independent platform for additional growth. Simply put, Omega allows us to pursue paths that were never available to us in the past.  Plus, as we noted above, we have sizable upside from potential new indications from Tysabri.

154.   And Brown, in discussing the presentation, stated:

[W]e have a proven history of meeting our rolling three-year organic only compound annual growth rate goals.  Each year, I always like to look back to confirm these objectives were met. We were right in the middle of our consolidated CAGR range for the 2011-2014 period.  Our Consumer Healthcare CAGR for this period was within the goal range.  Rx significantly exceeded the goal, although Nutritionals did fall shortly.  The durability of

70

our diverse product portfolio is clearly evident as our consolidated result is solidly in the range. We have met our consolidated organic only goals in the past and fully intend to do so in the future. Looking forward, our goal is to once again deliver an organic net sale CAGR for the next three years in the 5% to 10% range, while off a significantly larger base.

One of the most powerful aspects of our business that I love to talk about is our business model's strong free cash flow generation. Our robust cash generation is a strategic weapon enabling us to quickly delever the balance sheet following acquisitions. Simply put, our cash generation provides us the financial flexibility to continue to grow and invest in our business and allows us to pursue expensive inorganic opportunities.

155. Papa then further highlighted the prospects of Perrigo and its track record under his leadership:

> [D]uring our current management team's eight-year tenure, Perrigo has achieved an impressive record of value creation, above market growth and profitability as illustrated by the performance metrics highlighted here. Since 2007, we've grown net sales from $1.4 billion to $4.1 billion and have significantly diversified our revenue streams. The breadth of Perrigo's product portfolio is a unique strength to the Company. We have increased our SKUs by 80%. We developed an innovative and diverse product pipeline supported by our excellence in supply chain management and by a sustained global compliance. With our recent acquisition of Omega, Perrigo is now a Top 5 global over-the-counter company, generating more than 75% of its net sales from consumer-facing products. We are better positioned than ever to continue a strong growth strategy. And in the last quarter, we achieved almost 30% operating adjusted margin, up 580 basis points since the prior year quarter.

> . . . [O]ur unique combination of pharmaceutical expertise, specialization and technology makes us a powerhouse focusing on serving the consumer. There are a lot of companies that could make pharmaceutical products but there are few who

could manage the complex supply chain and logistics that we do and no one else can manage the SKUs like Perrigo. And with Omega, we further expanded our global model.

. . . [W]e have layered a successful acquisition strategy on top of a steady organic growth. We have a great track record for acquisitions which has enhanced Perrigo's global platform. The most recent examples are Elan, which provided us with a global springboard for growth and Omega, which significantly expands our global commercial infrastructure.

Perrigo's five-year total net sales CAGR since fiscal 2008 is an impressive 16%. This growth has been achieved through a balanced combination of organic and inorganic contributions. Meanwhile, we have significantly expanded our operating margin and profitability. We've almost doubled our adjusted operating margin from 14% in 2008 to 25% in 2014.

. . . [Y]ou can see our success in growing cash flow and expanding profitability. We have spent the last few years building our infrastructure and the beauty of the Perrigo model is that each additional product that we launch through this infrastructure enhances margin and accelerates topline growth. When we add additional categories, we don't have to add additional SG&A. Simply put, we are uniquely positioned to add new products to the back of the global Perrigo truck.

. . . [I]n the end, it all comes down to shareholder value creation and we have delivered. Over the past eight years, during our current management team's tenure, we have generated returns in excess of 950%, far exceeding the S&P 500.

. . . [I]n closing, Perrigo had a history of creating significant value for shareholders and we are ideally positioned to continue to do so. We have a durable business and consistent and diversified growth profile and a proven team to deliver growth. This team and our Board of Directors are very confident in the future of our business and how we have positioned the company to capture the positive trends we've talked about this afternoon. We are keenly focused on executing on our strategy to generate superior value and we are just getting started.

156.   In response to another question about how Perrigo could keep shareholders invested when they now have a price target of $205, from the Mylan offer, in mind, and "What are some of the mechanisms that the Company might consider to keep shareholders around or pay them to wait?", Papa responded:

> One of the things that we've tried very hard to talk about is really this strong about Perrigo we think is the base, plus, plus, plus.  You get our base business, you get all the compound annual growth rate of that, 5% to 10%, plus you get the $1 billion of new product revenues that we are expecting over the next three years, plus you get the M&A that we talked about, plus you get the upside from the Tysabri, certainly the optionality of that Tysabri.

> So we think there is a very good compelling story towards what we can do and especially the number of products that are moving from Rx to OTC that I talked about in the call, we think are really going to be the big drivers.  And certainly, I hope we would agree that we think Perrigo is the best-positioned company on these Rx to OTC switches to really take advantage of the opportunity in the marketplace.

> So we clearly understand the question.  We really think once again it's a story of the base growing 5% to 10% plus M&A plus Tysabri plus these new Rx to OTC switches that are all going to really drive the future for The Perrigo Company and for shareholders obviously.

157.   In response to a question about whether "the Board has engaged other possible buyers or other possible deals for Perrigo[,]" Papa responded:

> Perrigo's Board of Directors feels very strong that we have a good strong independent opportunity to continue to build our business and execute our business plan.  We felt the offer from Mylan substantially undervalues our company.  I can't really make any further comments about potential speculation that we may be talking to other companies.  It wouldn't be appropriate

for me to make any further comments at this time on that remaining part of that question.

But clearly, I think what the Board has said is that we feel very good about the long-term opportunities in front of the Perrigo – for the Perrigo shareholders relative to certainly looking at what we've done in the past, looking at what we talked about there is opportunity for these $1 billion of new products that we look forward to over the next three years and certainly with what Omega does for us in terms of giving us this geographic footprint for the future.

158.   In response to another question about whether the Board's rejection of the offer was "focused solely on price" or whether there were "any other factors that you can share":

> With the board, as you know, we're an Irish company and the Board has a shareholder maximization approach the business and try to make sure we look at all aspects of any transactions so the board did a very thoughtful and complete review. . . . . But, as we went through [the Mylan offer] the Board felt very clear that this offer substantially undervalued our company.  We denied the shareholders of Perrigo Company's long-term benefits of our durable competitive positioning.  And certainly, including the long-term CAGR goal of our – fair goal of 5% to 10% growth annual or the annual growth, I should say as well as this opportunity for additional M&A now that we've built this global footprint, it really is a springboard for future opportunities.  I would say it was really the thoughtfulness of the board going through the entire program that really drove that decision.

159.   Brown added:

> I'll say the serendipity of the timing is that . . . we had fully planned to roll out an update for our Board as well as investors with respect to our updated long-term growth.  Our long-term strategic plan and part of that, of course, was following on the heels of the Omega close.  So, all of the changes to the financial

presentation that we're part of today's story, we're also part of our update that was planned for April to go through with the Board.  So, the Board was able to go to a very thoughtful refresh of the strategic plan numbers and base their decision upon that new information that we were able to walk them through.

160.    In response to an analyst question regarding how "the last couple of years . . . it's been harder to forecast with CHC [Perrigo's domestic consumer healthcare business] then "with the addition of Omega . . . how should we have confidence in your ability to forecast again what has happened" Papa responded:

> We had a very stable team that has been able to help us deliver these growth projections and importantly, continue to build the business on the question of some of the challenge we've had, you're absolutely right.  . . .
>
> . . . If you look at those compounding growth rates, we still have a very strong compound annual growth rate.  As [Brown] went through the number historically, even despite some delays[,] our trajectory and [Brown] you may want to comment about, has been very strong, from our consumer business, our nutrition business, our Rx business and totally driving the total Company.  Now, we put Omega on top of that, we just think that adds tremendously towards core what we're going to do for the future.

161.    Brown further added:

> I just like to highlight again, that's why I did this self-reflective, let's, let's always double check.  When we give forward-looking thoughts about our future growth, let's always double check, did we do what we say we're going to do on an organic basis.  And every year, I look back and share with you that, yes, we have done so.  We are very good as the management team for self-fladulating [sic] about missing any one quarter, but the fact of the matter is, we continue to deliver on the bottom line, we continue to deliver those topline growth goals.

And so, yes, we are feeling good about sharing with you our opportunities for growth in the future and we'll of course try to provide you very good color on our business segments. But you'll notice also, we are approaching our segment guidance. Our consolidated guidance is slightly differently, so that we are giving you the really good picture of our consolidated portfolio and how we manage across the portfolio and help you to see how we're going to continue to grow on the consumer-facing and Rx side.

162.   In response to a question about whether any merger or another offer from Mylan would be palatable, Papa responded:

[T]he Perrigo Board unanimously rejected the unsolicited proposal from Mylan to acquire the company at $205 per share and the Board believes that we have a strong business plan as an independent company. So it's not only price, they did the analysis of where we are as a company. We think we have a very strong business plan. We do think that accepting this offer would deny shareholders the long-term benefits of our durable competitive position. How many companies can go out and talk about a position in a market like Perrigo in the store brand, over-the-counter products, where they have a 70% share which Perrigo has. It's a very unique asset. And also, over 90% in the store brand business for infant formula. So I think we have a very unique asset.

163.   Perrigo also included a press release on April 21, 2015, filed as Form 8-K with the SEC, which attributed these views to the Board:

Following a thorough review, advised by its financial and legal advisors, the Board unanimously concluded that the [Mylan] proposal substantially undervalues the Company and its future growth prospects and is not in the best interests of Perrigo's shareholders.

Key factors informing the Board's determinations include:

76

- The Proposal substantially undervalues Perrigo's differentiated global business, including the Company's leading market position in key franchises, global distribution platform, and proven expertise in product development and supply chain management.

- The Proposal would deny Perrigo shareholders the full benefits of Perrigo's durable competitive position and compelling growth strategy, which is reflected in the Company's three-year organic net sale compound annual growth rate (CAGR) goal for calendar 2014 to 2017 of 5%-10%.

- The Proposal does not take into account the full benefits of the Omega Pharma acquisition, which closed on March 30, 2015, including additional value to be derived from synergies and increased global presence; and

- The Proposal does not take into account Perrigo's innovative new product pipeline, which is expected to generate nearly $1 billion in net sales over the next three years, excluding sizable upside from potential new indications for Tysabri®.

. . .

Joseph C. Papa, Chairman, President and CEO, said, "The Board believes the Proposal substantially undervalues Perrigo and its growth prospects and that continued execution by the management team against our global growth strategy will deliver superior shareholder value.  Perrigo has a long history of driving above market shareholder value through consistent growth with a focus on profitability and operational excellence, which is reflected in our organic net sales CAGR goal of 5%-10% for the next three ears. . . .  We will continue to capitalize on our durable competitive position by expanding our international platform organically and through future synergistic deals.

164.    On May 6, 2015, Papa spoke to investors at the Deutsche Bank Health

Care Conference in Boston, Massachusetts, and again made misleading statements

about "top line organic growth [of] 5-10%."  He also stated:

> We believe we have a business that will grow 5% to 10%,
> organically.  So we believe we can grow revenue 5% to 10%
> organically in our base business.
>
> . . .
>
> Perrigo Company is number one, going to continue to execute
> on our base business.  We think we can execute as we said with
> the 5% to 10% compound annual growth rate over the three
> years organically.
>
> . . .
>
> What we've always said is, what's most important for us is to
> continue to execute on our business, show that 5% to 10%
> compound annual growth rate.
>
> Historically, what we've been able to do is actually, we've done
> right in the middle of that.  We've done about 8% compound
> annual growth rate organically.  And then we supplemented that
> with another approximately 7% to 8% of inorganic opportunity.
> Those were the things we're going to continue to do.  And that's
> why I think the Board is very comfortable in stating that we felt
> the Mylan offer substantially undervalues the company.

165.    During the May 6, 2015 presentation, Brown added, "We have met our

consolidated organic-only goals in the past and fully intend to do so in the future.

Looking forward, our goal is to once again deliver an organic net sales CAGR for

the next years in the 5% to 10% range while off a significantly larger base."

166. At a May 12, 2015 presentation, Papa further represented to stockholders:

> I think the biggest challenge we have right now is that we just don't see the offer that's on the table as being equivalent to what we think the value of the Perrigo Company is.  So we think it substantially undervalues the Company.  Given that, what's incumbent on me and the Board of the Company and the executive committee is make sure that we continue to focus on driving the business, making sure that we continue to deliver on the 5% to 10% compound annual growth rate, continue to deliver on really the bottom line.
>
> Given that, what's incumbent upon me and the Board of the Company and the executive committee is make sure we continue to focus on driving the business, making sure that we continue to deliver on the 5% to 10% compound annual growth rate, continue to deliver on really the bottom line.

167. And on June 2, 2015, at the Jefferies Global Health Care Conference, Papa stated, "historically, Perrigo has grown by about 5% to 10% annually. Specifically, it has grown about 8% organically, and we've grown about 8% inorganically on an annual basis."

168. On the August 5, 2015 earnings call, Papa and Brown made several representations regarding Perrigo's overall growth. While much of the growth picture focused on Omega, Papa also stated, "Excluding the impact of Omega, we expect $1 billion in new product launches over the next three years representing more than $3.6 billion in national brand sales[.]"  And he added, "Given the mega trends that I have talked about for many years, including an aging population,

increased use of medications as individuals get older and rising healthcare cost, Perrigo is well-positioned to meet the future needs for the global healthcare community."  Brown continued that Perrigo's "strategies [would] achieve organic three-year compound annual growth rate of 5% to 10%, announced three acquisitions since closing Omega, received two unsolicited offers from Mylan to acquire Perrigo, and continue to actively pursue new corporate development opportunities.  All while achieving record results in the quarter.  Never a dull moment at Perrigo and seemingly never enough pages in our passports."  Moreover, she highlighted, "the moat around Perrigo's margins via our supply chain prowess, was clearly evident this quarter as year-over-year organic adjusted gross margin expanded over 300 basis points driven by focused global sourcing and continued manufacturing efficiencies through our operations."  Furthermore, she added, "these are certainly very exciting times at Perrigo, both in terms of reaching new customers around the globe and executing our BP3 strategy.  Yet again, we've delivered remarkable year-over-year adjusted net income performance, 37% this quarter, coming off 41% growth in the March quarter, with expected growth next quarter again, north of 30%.  At the same time, record cash flows will continue to provide meaningful returns to shareholders and as well as they create the dry powder to enable meaningful M&A and the multiplier effect these transactions can achieve."

169. Papa then discussed the reasons for rejecting Mylan's offer:

As we've been saying since April, we strongly believe that Mylan's offer substantially undervalues Perrigo, is not in the best interest of Perrigo shareholders and both remain true today. We do not believe this is the best interest of Perrigo shareholders.

Our Board's rejection of Mylan's offer was unanimous and specifically that it had nothing to do with Teva. It has always been a strength of our standalone Perrigo business. You have seen this reflected time and time again as we return value to our shareholders by executing on our Base Plus Plus Plus strategy. Our acquisition strategy continues to provide a multiplier effect to our already strong organic growth as we have shown with our acquisitions of leading European brands over the past few months.

. . .

But there is a lot of noise in the market and I want to try to distill it down into really three comments on the unsolicited Mylan offer to acquire Perrigo.

Specifically, combining with Mylan, number one, would dilute the strength of our durable consumer business. It would risk the value that we continue to create for shareholders. Number two, we believe it would result in a significant P/E multiple contraction as we take our Perrigo durable business and combine it with the Mylan business. Number three, I make no statement about the timing of EpiPen generic, however, clearly it would expose Perrigo if we merged the two companies together to a product concentration risk of EpiPen. I'll let you all decide when and if a generic will show up of EpiPen.

. . .

In closing, we continue to believe that Mylan's offer substantially undervalues our business and we are confident that by executing on our Base Plus Plus Plus strategy, we can deliver far superior growth to what is represented by the Mylan offer.

170.   In response to a question about "how much growth is left for Perrigo" Papa responded, "we see the growth opportunities as being very substantial for the Perrigo Company.  [W]e really think there's three mega trends that continue to drive the business, each of them contributing to the growth."  He then goes on to discuss these three trends as "the demographics and the intensity of usage of pharmaceuticals" then "continued movement from national brand to store brand" and "movement of new products that are today prescription, moving over the counter."  He noted that the Omega transaction was just "[o]n top of" the three aforementioned trends.

171.   Then in response to another question about Perrigo's "exposure" in the "consumer facing business" he responded, "Now that we are sitting at approximately 85% of our revenues are very strong revenues in our Consumer Facing business.  We think that gives us a very durable platform for the future."

172.   In response to a question about whether Perrigo has "reach[ed] out to other interested parties," Papa responded: "We think we've got a durable position over the long-term. . . . Right now, I think we want to stay focused on continuing to drive our Base Plus Plus Plus strategy for the future."

173.   In response to another question about growth and about the possibility of the Company being for sale, Papa responded:

> On the question of organic growth for CHC. . . there's always going to be some amount of growth relative to just the

demographics and population.  There's some growth could be from national brands switching to store brand.  But the biggest part of the growth and the biggest exciting part of the growth is when we launch those new products.

. . . [W]e said with confidence that we expect to launch over $1 billion of new products in the next three years when you put these types of products into the marketplace.  We think there is a significant return for our shareholders.

. . . [W]e do believe we have strategic options.  Right now, we are focused on running our standalone business.  We think that's the most important thing to do as a Company and as you can see, we are doing it quite well with what we've shown just a 34% revenue growth, a 48% gross margin growth and a 35% operating income growth, 25% EPS growth.  We think that's an important part of our success in the standalone and we're going to continue to focus on that.

. . . I do know there are other companies have expressed some conversations to me but I don't want to go too far too fast.  I think we're going to stay focused on what we are doing as a Company on a standalone basis.

174.   In response to a question about whether Perrigo "could get more shelf space" for its omeprazole magnesium product, Papa responded, "[O]ne of the best things I can say right now . . . and what we have said out in the marketplace is that we expect $1 billion of new products over the next three years."  Brown reiterated that the $1 billion anticipated growth "is without Omega" and "suffice it to say, that the team has a long list of new product opportunities[.]"

175.   In response to a question about how "[i]n the absence of a white knight investor for Perrigo, how do you drive upside to your share price as a standalone company just based on consensus estimate" because "[i]f you strip out Omega,

there was no topline growth this quarter," Brown responded that this was due to "seasonality" and the higher tax rate from "the inclusion now of Omega in our pool of earnings before tax[.]"  Papa then added:

> [T]he issue for me really goes back to how do we continue as a standalone company, how do we continue to be successful?  And I think really the best way to say it is it's that Base Plus Plus Plus approach.  Looking at what we are talking about here, clearly new products.  Just getting three new approvals this year, I think just is a great illustrative example of why we are excited about it, why we think if I could add $1 billion of new products over the next three years into our portfolio, we think that's going to be an important part of driving both top line and our bottom line.  Because as you know that our new products tend to be more profitable.

> . . . [I]f you think about what we have done sequentially; our Consumer Healthcare business is up $61 million or approximately 9% sequentially if you go from quarter 1 to quarter 2.

> . . . [T]his is the first quarter we've had a chance to talk about Omega.  Omega we think is tremendously important to our future and what we're looking to try to accomplish as we take those businesses and we get the revenue synergies and the cost of goods sold synergies in Omega, we think that's going to be an important part of it.  And obviously, as [Brown] talked about, the business has done quite well in the quarter and we expect to see great things from Omega.

> Final comment I offer and it really reflects on also what [Brown] was talking about for our cash generation.  We are generating a significant amount of cash.  We intend to put that cash back to work in M&A.  Expect to see more of the bolt-on transactions that we think are going to be very accretive to our shareholders and we believe that's going to help us tremendously. . . .  That's why we are very passionate about our standalone business and what we think are great prospects for the future.

176.   And on August 5, 2015, Perrigo represented in an investor presentation that it has a "[c]lear strategy for delivering 5% to 10% organic growth" for the upcoming several years and "[m]ultiple avenues for additional upside."  The presentation states, "The directors of Perrigo accept responsibility for the information contained in this announcement.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."

177.   Papa had a statement in the accompanying press release of August 5, 2015, "Our durable business model and future growth prospects are self-evident as we continue to progress on our stand-alone strategy."  The press release states, "The directors of Perrigo accept responsibility for the information contained in this announcement.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."

178.   On August 28, 2015, Perrigo filed a Schedule 14D-9 with the SEC, subject to the Irish Takeover Rules, that attached a press release encouraging

shareholders to reject Mylan's offers.   The press release included the following false and misleading statement from Papa:

> Perrigo's experienced management team has an outstanding record for creating value, generating total shareholder return of more than 970 percent since 2007.  We remain focused on our 'Base Plus Plus Plus' growth strategy – realizing an organic net sales CAGR goal of 5-10% over the next three years, compelling upside from $29 billion in prescription to OTC switches, attractive M&A opportunities that we believe will have a multiplier effect on earnings and cash flow generation, and sizable potential new indications for Tysabri®.   The entire Perrigo Board and management team are confident that, through continued successful execution of this growth strategy, and considering other opportunities that may be available to us over time, we will continue to create superior value well in excess of Mylan's offer, and with less risk.  We are confident that the majority of Perrigo shareholders will not tender their shares to Mylan.

179.   Perrigo continued to press forward its case against Mylan by exaggerating Perrigo's growth and fundamentals.  On September 17, 2015, it issued a letter filed on Schedule 14D-9 on behalf of the Board publicizing the Board's unanimous rejection of Mylan's tender offer:

> Our Board of Directors has repeatedly rejected Mylan's offer because it substantially undervalues our company and does not adequately compensate shareholders for our exceptional standalone growth prospects.

> Mylan's offer not only fails to reflect Perrigo's outstanding track record of value creation, it also undervalues our compelling prospects for continued growth and sustainable, long-term shareholder value through the execution of our 'Base Plus Plus Plus' strategy:

Base: We expect our durable global base business, with consumer-facing products comprising approximately 75% of net sales, coupled with $1 billion in new product launches over the next three years (not including additional launches from the Branded Consumer Healthcare segment) to realize an organic net sales compound annual growth rate ("CAGR") goal of 5-10%.

. . .

After consideration of Mylan's offer, our Board of Directors unanimously concluded that the offer substantially undervalues the strength of Perrigo's business, operations, and future growth opportunities.   We are confident in our 5%-10% three-year organic revenue CAGR goal, as executed historically, and we expect to meet our financial targets in the years to come, creating value for you well in excess of Mylan's offer, and with less risk.

. . .

The Perrigo Board unanimously believes that Mylan's offer substantially undervalues the Company's current cash flows, business and financial platforms and future growth opportunities.

. . .

Perrigo has demonstrated a reliable ability to grow organically. Perrigo has grown organic net sales at a 6% CAGR since fiscal 2018, and the Perrigo Board expects that by continuing its leading market position, Perrigo's durable global base business will continue this trend and realize an organic net sales CAGR goal of 5-10% over the next three years.

. . .

The Directors of Perrigo, whose views are set out in [this press release], accept responsibility for the information contained in this document. . . .  To the best of the knowledge and belief of the Directors of Perrigo (having taken all reasonable care to

87

ensure that such is the case), the information contained in this document for which they accept responsibility is in accordance with the facts and does not omit anything likely to affect the import of such information.

180. Papa and Brown spoke to investors on the same day, urging them to reject Mylan's offer.  Papa opened with:

> As you know, on April 6, Perrigo received an unsolicited proposal from Mylan to acquire all outstanding shares of Perrigo for $205 a share.  Perrigo's Board considered this proposal, in concert with our advisors, and determined that it substantially undervalued our Company and our future growth prospects. Mylan made two subsequent formal offers to acquire all of the outstanding shares of Perrigo, with the final offer being $75 in cash and 2.3 shares of Mylan for each Perrigo share outstanding.
>
> These offers were rejected by our Board, which noted that both of the subsequent offers were less than the original $205 that was previously rejected.  On September 14, Mylan launched a tender offer for Perrigo.  Yesterday's closing price at $49.01 from Mylan makes the final offer on the table $187.7 per share, again, significantly below the initial offer.  Since Mylan formally launched the tender offer, the Perrigo Board has convened to consider its merits, and concluded that Mylan's offer substantially undervalues the strength of the Perrigo business, our operations, and our future growth prospects.
>
> In fact, our Board's independent advisors and I all believe that the current offer on the table is not even in the right zip code, when compared to Perrigo's stand-alone value.  Today, we have issued our strong and unanimous Board opinion and recommendation that Perrigo shareholders do not tender into Mylan's inadequate offer, as this is not in your best interest.
>
> Now, we would like to walk you through a number of the factors the Board evaluated to come to this recommendation in detail. From the inherent value destruction displayed by this final offer today to the corporate governance prison that would present [sic] shareholders from receiving an appropriate value for their – and

realizing any upside tomorrow.  This is fundamentally a bad deal, which underpins our Board's recommendations.

. . .

Mylan cannot win the hearts of Perrigo shareholders based on the merits of this offer, so they are trying to win, based on fear and coercion.  The Perrigo Board is convinced our shareholders will see through Mylan's scare tactics and evaluate this offer for what it is, an unreasonable offer for a Company with a strong growth trajectory ahead, and a track record of delivering value to shareholders while treating shareholders as partners in our business.

181.  Brown continued with:

[I]n April, our Board rejected a $205 offer, because it substantially undervalued Perrigo's standalone value and growth prospects, regardless of the components of consideration.  Even if this had been an all-cash offer, it would have still substantially undervalued Perrigo. . .

Mylan's current offer substantially undervalues Perrigo, offering shareholders a meager 13% premium.  The so-called premium of this offer doesn't come close to adequately compensating Perrigo's shareholders for the strength of our business, and the risk of value destruction associated with accepting Mylan's currency.

. . .

Given approximately two-thirds of Mylan's proposed consideration consists of Mylan stock, Mylan's weak business profile is of great concern for Perrigo shareholders.  As Perrigo shareholders, you have seen the growth we have delivered throughout the tenure of this Management team.  The market has rewarded Perrigo's performance and strong growth rates with the premium evaluation.  We have earned our valuation and multiple, based on the strength of Perrigo's high-growth durable businesses, leading market shares, high-quality products, proven

Management track record, and our significant space to consumers.

If this transaction occurs, Perrigo shareholders would own a significant stake in a slower growth and riskier business, resulting in multiple contractions of the combined companies relative to Perrigo and reduce value for Perrigo shareholders. In short, we don't want Mylan's inferior growth profile and valuation to be a drag on what Perrigo stands to achieve on its own, and nor should our shareholders. As I said a moment ago, they are trying to steal this company.

. . . Perrigo's extensive new product pipeline includes $1 billion from hundreds of new product launches expected over the next three years, and that number doesn't even include any new products from our branded consumer healthcare segment.

182. Papa reiterated:

Perrigo investors do not need to accept a bad deal to realize growth. The strength of our base business and the promise of inorganic growth opportunities we see on the rise are poised to deliver value in excess of the meager offer on the table today.

. . . [W]e outlined our standalone value proposition under the Base Plus-Plus-Plus model. I know this isn't the first time you have seen this, but it reiterates Perrigo's strategic advantages, that are difficult to replicate. Base Plus-Plus-Plus has delivered for our shareholders, and it will continue to do so. As one of our shareholders aptly said, if you wait a few months, shareholders will see the same price as Mylan's inadequate offer without the risk and hassle.

. . .

Perrigo has an outstanding track record . . . of creating value and promising a future as a durable standalone company. This offer falls far short of the fair value of Perrigo and our future prospects. I am personally excited about what the future holds for Perrigo, and as a shareholder myself, I would not give up the

upside I see in Perrigo by tendering my shares into this risky, bad deal.

Our future is bright, and by continuing to execute on our strategy, Perrigo can deliver shareholder value well above what Mylan offers. I said it before, and I will say it again. This is a bad ideal. Mylan can't win on the meager, actually I would call it insulting, premium on the table, the lowest for comparable transactions in several years. They can't win on accretion. This transaction will be dilutive to Mylan EPS at least until year four. They can't win on growth. This transaction would be dilutive to Perrigo's superior growth and valuation.

. . .

On behalf of the Perrigo Board of Directors, I strongly urge you to protect your investment in Perrigo, and not tender your shares into Mylan's inadequate offer. Thank you all for the continued support of the Perrigo Company over the last several years, and I look forward to engaging with you over the coming weeks.

183. Papa, on the same day at the Morgan Stanley Global Healthcare Conference represented:

We try to focus on quality, affordable healthcare. And for us that's been a big driver of our average growth rate of somewhere around 5% to 10% organic.

. . .

Our goal is to continue to drive organically 5% to 10% growth rate. On top of that, we'll look to do additional M&A to get another 5% to 10%. So that the revenue side will grow, and that, let's call it 10% plus, and then grow the bottom line even faster. That's how we structure the business and that's why we think we've got a great opportunity for the future.

184. In further response to another question about whether Perrigo could protect itself other than a white knight or another M&A partner, Papa responded:

> This transaction [with Mylan] is associated with is dilutive to our growth rate, dilutive to our earnings, our combined earnings, it is dilutive to what we would perceive as our P/E multiple. . . .
>
> As a standalone Company, we have a bright future, and we believe the Perrigo shareholders will see that. . . .  So for that reason, we think we have a very strong standalone case. . . . . [W]e're not beyond considering other alternatives.  But I think at this point, we think we have a very strong standalone case.

185.   In a response to a question regarding how to compare Papa's optimistic pronouncements versus the concrete numbers Mylan has offered, Papa responded:

> I would say it is that the way we focused on this, and a I referred to in the document, on the Base-Plus-Plus-Plus strategy.  That strategy is associated with revenue growth in the 5% to 10% range.
>
> In addition to that 5% to 10% range we now have the Omega transaction that, as you have seen in the last quarterly report, has done outstanding, and we are very excited about bringing that into the business and looking for additional deals.  On top of that, what we have done since this transaction has first been announced is we have done four additional accretive transactions that bring that into our mix, in terms of what we are looking at for the future.  That 5% to 10% organic growth, even more in the bottom line, plus the transactions that we have done, the four transactions we think are a very sound foundation for us going to the future.
>
> In addition to that, we will continue to look at additional M&A activities, as I talked about before.  I think the way to say it, say it best is that before the Mylan transaction, we have done approximately 23 transactions.  During this Mylan transaction, we have done four transactions.  If I think about what we're going to do after this, we're going to do more.  This is something that as we think about where we will be a year from now, Perrigo will be a bigger, and better and more valuable company[.]

186.   In response to a question about whether people should "think about consensus numbers as they are for 2016 or 2017 as a reference point for the earnings power in Perrigo" or whether "that consensus perhaps under captures the standalone value that you can create," Papa responded:

> This is the question, as you know, we are an Irish Company, there are certain requirements of what we can say and can't say. I think the best way to answer this question is to think about historically what Perrigo has accomplished.  As a Company we have generated 970% total shareholder returns in the past nine years, so that's point one.  Point two, if you think about our growth rates and our trajectory rate, we have grown by 5% to 10% on the organic side for revenue, and added to that additional 5% to 10% for a compound annual growth rate on our revenue of somewhere in the mid-teens, around 15%.  If you take a look at what we have done for the bottom line it is essentially twice that, a little bit less than that, but approximately twice that.  I think as you think about the Perrigo Company, as you think about our growth, you have to put that into the equation.
>
> The only other thing I would add to what has been said by [Brown] and myself, the other thing to consider is, as you think about what we have now in front of us, we have a significant number of new product introductions.  .  .  .   We have the opportunity, as we talked about launching $1 billion of new products over the next three years.  It is those types of metrics that will drive the bottom line for the Perrigo Company, and gives us great comfort in how we think about the future of where we are going as a Company.  And we believe that this is a bad deal, we can do better for ourselves.

187.   In response to a follow-up question to the above that "you think that your past performance is a pretty fair metric for how people should think about the

earnings potential" and that "they apply those historical growth rates for 2016 and 2017," Papa and Brown responded:

> **Papa**: I think the best thing we can say is our performance and our goals, as we think about this, is really the outline of our Base Plus-Plus-Plus.  We have a goal in place to grow our revenue 5% to 10%.  Traditionally when we grow something 5% to 10% on the top line we tend to do significantly more, almost double that of the bottom line, as has historically been our track record.  That is the kind of goal that we have.  On top of that . . . we expect to do additional M&A.  We've done four transactions during this Mylan unsolicited offer.

> **Brown**: Just elaborating what we have said in previous discussions since we have been under Irish takeover rules, is that we anticipate that top line of 5% to 10%.  Our goals, our focus as a Management team has and will continue to be growing the bottom line by rate greater than that.  At this stage, we are not able to give specific guidance again, because of the specificity of the rules and forward-looking numbers.

188.   Papa concluded, in speaking against the Mylan deal:

> [W]e think this is a bad deal. I've said that a couple of times.  We think that the premium that's being offered is insulting.  We believe that Mylan can't win on accretion, they can't win on growth, and for that reason, they can't win on any of the financial metrics we believe that Perrigo has a very strong future as a standalone company.  And I think about us today, and where we will be a year from now, I think we will be a stronger, better, more valuable company a year from now than we are today.

189.   Perrigo, on October 22, 2015 doubled down on these numbers, stating in "CY2016 Segment Revenue Guidance" that they assumed organic growth of 5%-10% overall.  Defendants' presentation projected that Perrigo would earn $7.65-$7.85 for calendar year 2015, while in 2016 it would "[a]ccelerat[e] [s]hareholder

[v]alue" and "[a]mplify Perrigo's [e]arnings [p]ower" by delivering baseline earnings of $9.40 to $9.83 after taking into account a placed share repurchase and "optimization actions."  The presentation represented that the guidance constituted "profit forecasts" under the Irish Takeover Rules (Rule 28.1) and that the "assumptions upon which [profit forecasts] based" using "scrupulous care, accuracy and objectivity by the directors."  The presentation also stated, "The directors of Perrigo accept responsibility for the information contained in this presentation.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information."

190.   And in an 8-K filed the same day, Perrigo stated "the Profit Forecast assumes the following factors within the Directors Influence and Control[:]

- Fourth quarter 2015 net sales for the CHC, BCH, Rx and Specialty Sciences segments are assumed to grow in line with the growth rates achieved 2015 year-to-date.

- The 2016 net sales for CHC, BCH, and Rx segments are forecasted to grow organically in the middle of the three year compounded annual growth rate ranges published and disclosed to investors in the October 22, 2015 earnings release presentation.  The ranges published and disclosed in April 2015 forecasted compounded annual growth of 5% - 10% for the CHC and BCH segments and 8% - 12% for the Rx segment.

- The integration and realization of synergies in relation to the acquisition of, Omega Pharma, certain branded consumer and as

a result of healthcare products from GSK, and Yokebe will proceed as planned and will not be subject to unforeseen material delays.

- The forecast only includes those acquisitions closed or announced on or prior to October 22, 2015, and does not include any additional acquisitions, dispositions, partnerships, in-license transactions, or any changes to Perrigo's existing capital structure or business model after October 22, 2015.

- Adjusted operating margin is forecasted to remain consistent in 2016 when compared to 2015 and average ~28% of net sales.

- Interest rates underlying Perrigo's variable rate debt instruments will not vary significantly from the spot rates in effect as of October 22, 2015.

- The announced restructuring activities will proceed as planned and will not be subject to unforeseen material delays.

- The adjusted effective tax rate for the year ended December 31, 2016 is estimated at 14%-15% assuming a jurisdictional mix of incomes in line with the Company's current operations and the implementation of the actions announced on October 22, 2015.

- Other than the Share Buyback Program, there will be no material share repurchases, or issuances, in determining weighted average number of diluted shares.

191. The presentation is accompanied by the statement, "The directors of Perrigo accept responsibility for the information contained in this presentation. To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information." Moreover, the filing states that earnings guidance reflect "profit forecasts" and as a result "the assumptions upon which [the

96

profit forecast was] based" used "scrupulous care, accuracy, and objectivity by the directors" per the requirements of Irish Takeover Rule 28.1.

192.   At the October 22, 2015 earnings call, Brown emphasized, "our world-class team and highly efficient operations delivered expanding margins."   Papa added:

> Our 2016 revenue guidance . . . exemplifies our confidence in our ability to deliver real results, turning that strategy into tangible growth.  Our fundamental growth drivers for the near term position each of our segments to achieve their three-year CAGR expectations published in the February 2014 analyst day.
>
> And now, including our brand new consumer healthcare segment, we have 5% to 10% for consumer facing business and 8% to 12% for our Rx business.   These growth rates are inclusive of our previously announced $1 billion of net new product sales from 2015 to 2017.
>
> Today we are announcing the seven actions that will build on that strategy, leverage the power of our global platform, and accelerate value creation for shareholders.  What we are doing is amplifying the profit and cash flow profile of the business which will allow us to accelerate profit growth in 2016 and beyond.
>
> For every dollar of growth we are going to achieve more profitability.  Our continued organic and inorganic growth will drive even stronger profit accretion.  But let me be clear, these actions are readily achievable.
>
> They are the natural progression of our global expansion and ongoing focus on operational efficiency, quality, innovation, and shareholder value.

193.   And Papa further emphasized on the October 22, 2015 call:

> Over the last six months, I said it countless times, the Perrigo Board of Directors is committed to creating value for our

shareholders.  That means value in the near term, medium term, and the long term.

You have two options in front of you: Mylan's offer, which destroys value with a meager premium, low future multiple, limited prospects for future growth, and a Board and Management team that have shown a blatant disregard in their actions for shareholders' interest.  And then there is value represented by Perrigo's durable business.

We earned our strong multiple, one that we are poised to continue delivery on into the future.  We have delivered consistent double-digit bottom line growth time and time again, and this as an outstanding quarter is no different,

We've committed to access today that combined with our share buyback program and our existing strong organic growth, will generate an expected $9.83 in EPS value for shareholders over the future.  And there is further drive however to use towards inorganic growth as we continue to execute under M&A strategy as a natural acquirer with a premium multiple.

When you look at the side-by-side it is painfully clear that Mylan is trying to steal this Company.  It bears repeating, we are a strong Company delivering value well above Mylan's offer today.

All this leads me to reiterate our conclusion that the Perrigo Board of Directors has reiterated its strong recommendations that you protect your investment in Perrigo and not tenure [sic] your shares into Mylan's inadequate offer.  Our future is bright in the near term, the mid-term and the long term, and we are excited to have you along with us as we move forward.

194.  On November 3, 2015, Perrigo's amended 14D-9 included a letter from Papa under the Irish Takeover Rules making the following assurances of Perrigo's growth:

This positive outlook reflects our clear 'Base Plus Plus Plus' strategy to deliver top line growth and includes specific actions we are taking to accelerate shareholder value by maximizing efficiency and productivity, and further leveraging the strength of the durable global platform we have built.  These actions will supercharge our earnings power and ensure that we maximize the benefits of our global platform to drive continued growth and superior shareholder value.   Our business is uniquely positioned, more so than ever before – through our durable consumer-facing base, our global platform, and significant upside from future OTC switches – to continue our history of producing compelling growth and value.

195.   And in response to a question about Perrigo's "long-term gross [sic] profile," Brown replied, "We've talked in the past about on April 21 confirming our long-term promise or goal setting in terms of top line, 5% to 10%. . .  As you are modeling you are already putting into the organic growth rate on 5% to 10%."

196.   And in a November 10, 2015 letter filed on Schedule 14D-9, serving as Perrigo's final communication to its shareholders on the day the tender offer was due, the Board again urged rejection of Mylan's offer because they claimed it was "grossly inadequate" and "does not even remotely reflect the value of the terrific growth company Perrigo shareholders own" and again "urge you to focus on the incredible value creation that lies ahead for Perrigo and its shareholders with Perrigo remaining as a standalone company."

197.   And at a November 10, 2015 Credit Suisse Healthcare Conference, Papa talked about trends in favor of Perrigo's business that would lead to "an

organic topline growth rate of 5% to 10%.  And we think whenever we can grow 5% to 10% on the top line, we can do about twice that on the bottom line."

198.   And in response to a question about "the Mylan situation," Papa responded that the Mylan merger "will slow down the growth rate of the Perrigo Company."  On top of that, in response to another question about what if Mylan won the tender, Papa responded that "there's up to $1 billion of negative synergies with this transaction if it were to occur."

199.   And in response to what options Perrigo considered while weighing the Mylan offer (*e.g.*, bolt-on acquisitions, or seeking a white knight acquirer), Papa responded, "As we assessed all . . . of those opportunities, we felt that the best alternative for Perrigo shareholder was the standalone Company, based on our historical ability to drive shareholder value but, importantly, on the future and what we've described as a strategy of base-plus-plus-plus, where we will grow the base business by 5% to 10% a year on the top line and even almost double that on the bottom line."  Furthermore, he added that Perrigo offered a higher 2016 guidance "because we get through this and we decouple ourselves from Mylan, we think our historical run rate for both growth earnings per share, and, importantly, our P/E multiple will revert back to what it's been before."

200.   Furthermore, in response to another question, he stated that Perrigo "has dramatically improved our bottom line.  Our bottom line – or, let's talk about

the operating income line, has gone from about 9% to the latest quarter, I think I was like 27%. . . .  I think that same exact situation that existed for us in the U.S. for the past nine years is wide open for us in Europe."

201.  And even after the Mylan tender offer was rejected by Perrigo's shareholders based on Defendants' misrepresentations, they continued to misrepresent the Company's growth prospects.  On January 5, 2016, at the Goldman Sachs Healthcare CEOs Unscripted conference, Papa stressed that "the business is still a very strong business.  It's a very durable business, one that has sustainability behind it."  He emphasized Perrigo's "consumer-facing" business that "has classically been associated with higher multiples" and its "very unique generics business" through its focus on "extended topicals" where "you always compete with two or three players, not twenty players" – and he thinks "that is what gives the sustainability and durability of our assets versus maybe some of the other generic players."  And when Papa was asked to address why Perrigo was trading at $145 but could have taken Mylan's initial offer at $205 and asked how he could "make up that difference," he answered that what Perrigo would "focus on and deliver on every day is execution on the business" and "deliver on the top-line growth."  He also noted that earnings per share were helped by Perrigo completing its share repurchase program and "a couple of additional deals."  Furthermore, when Papa was asked to "defend why you think your Company deserves much

higher multiples than the rest of your peer group[,]" Papa again replied it was the "consumer-facing" business where "companies classically have been associated with ballpark, a 20 times multiple" and the generics business where "[o]ur model is to go after products where there is a need" and "the large part of where we go on extended topicals are drugs that we think have a legitimate chance to go over the counter."  Moreover, he continued to tout the success of Omega – when discussing how "integration risk" was a factor he looked at in M&A, he did not mention Omega, but instead, he mentioned Omega in the context of "hav[ing] an infrastructure now in 39 countries.  It gives us a chance to take that infrastructure and bolt on some additional assets into our business in Germany, our business in Sweden.  Those are the things that just make so much strategic sense for us from a concept."  And regarding a question about "the drivers for getting back to your 5% to 10% goal" Papa responded that the problems were "headwinds" related to competition from national brands but then he touted the growth in the "consumer business.  It was up 8%" and "we increased our gross margins on the business like 400 basis points. . . .  So not only did we get good growth, they got the efficiency of our business."  He again repeated that "there are really three megatrends driving our business on our legacy consumer" – the aging demographics and their "intensity of usage" which would approximate "2% to 3% growth per year" then with just the population growth of older people 'it' like somewhere in that 2% to 3% rate for

demographics and populations." Then "pick up another 2% to 3% [growth] as people move from national brand to store brand" and "new products" resulting in growth "anywhere between 1% to 5%. You add that up, and you get to the growth rate of 5% to 10% in our business." Regarding Perrigo's goal of launching $1 billion in new product sales over the next few years, he explained he meant "$300 million of gross" and "it's across our total portfolio" and "exclusive of the Omega products. So it's the legacy Perrigo business." He again defended Perrigo deserving to be at a high multiple because "there are not a lot of companies that are consumer-facing that are promising growth rates of 5% to 10%. And if you can do that, that by itself is worth a very sizable multiple. And that's what we have been able to do in the past and we'll be able to do even more so – that's even before we do any M&A."

202.  On January 11, 2016, Perrigo increased its earnings per share guidance from $9.50 to $10.10, with Papa stating in the press release announcing the guidance:

> We enter 2016 excited about the prospects for our durable business model and plan for growth. We expect to launch greater than $1.2 billion in new products over the next three years, including products on our European branded platform. We have the deepest Rx pipeline in our history and are excited about the quality of our M&A pipeline. For these reasons, we remain confident in our ability to deliver on our 2016 growth targets.

203.   At the January 11, 2016 JPMorgan Healthcare Conference, Papa again touted the trends he thought would help continue Perrigo's growth, attributing specific percentages of growth to each of the "megatrends that drives our growth." He thought the "intensity of usage" as consumers get older "is going to drive 2% to 3% growth."  He thought "consumers moving from national brand to store brand" would lead to "2% to 3% growth on an annual basis."  And he thought every "100 basis point or 1%" increase in market share in consumer health "generates about 2% to 3% growth on our business."  And "the final area that we think is a megatrend is this RX to OTC switch, which drives our new products" that he attributes "somewhere around 5% growth" in a "good year" while "[i]n a bad year, it is about 1%."  These growth trends added together "gives us our overall growth rate of somewhere between 5% to 10% on a revenue point of growth.  And anytime I can grow 5%, 10% on the top line, we think we can do much better on the bottom line based on our efficiency of delivering products to our large retailers."  Furthermore, while he did not think Perrigo would have any "blockbusters, . . . there is clearly a large number of products that we will launch over the next several years.  We have publicly stated that we will launch over $1.2 billion in consolidated new product sales between the years of 2016 and 2018 off our base number of somewhere in the $5 billion, $5.5 billion. . . .  Just in the time period of calendar year 2016, we are delighted to say we expect to launch over $400 million of new products."

204.   At the February 18, 2016 Q4 2015 earnings call, Papa again highlighted the Company's growth rates, stating "new OTC innovation and Rx to OTC switches provides us with numerous opportunities to continually launch new products.  All this contributes to our 2016 top-line organic growth framework of approximately 5% to 10%."  He then stated, "as we look ahead over the next three years, we see promising opportunities within our new product pipeline.  We expect to launch greater than $1.2 billion in our new products by 2018 across all segments. The majority of these will enhance our durable consumer-facing revenue stream, with about 70% of these new product sales over the next three years being in the consumer-facing segments."   Papa further added, "In summary, we believe that Perrigo Company is a very unique asset.  It's a top five global OTC player with an industry-leading growth rate.  We are building off a record year with expected 2016 top-line growth of 10% to 16% and expected 2016 bottom-line growth of 25% to 29%, with over 70% of our net sales coming from the consumer products."

205.   On the same call, in response to an investor question, Papa stated, "we still believe that the Perrigo organic growth rate, without any acquisitions, is still in that 5% to 10% range. . . .  I think you'll find that a 5% to 10% growth rate in a business that 70% of our sales are in the consumer side is a very good consumer-facing business, because you don't find many that are growing at that range.  So, we

still feel very optimistic about our organic growth rate and the consumer-facing part of our business."

206.   But as several lawsuits that cite confidential witnesses maintain, Papa and Brown, at the very least, knew that Perrigo's organic growth was actually around 0% to 1% from late 2013 onward, and in several quarters was even negative growth.  For example, as of September 27, 2015, Perrigo had organic growth of -9% and as of December 27, 2014, had organic growth of -0.2%, according to the Complaint in *Highfields Capital I LP v. Perrigo Co. PLC*, C.A. No. 1:19-cv-10285 (D. Mass. Feb. 14, 2019).  And a confidential witness who was cited in that action stated that Perrigo's growth was slowing because several significant product lines regarding diabetes, infant formula, diet drugs, and supplements were being discontinued or downsized into 2015, although none of that information was conveyed publicly.

207.   As the Court in the Securities Action pointed out, "The law does not permit corporate executives to mislead investors through half-truths . . . in touting their consistent ability to maintain organic growth rates in the 5-10% range and proclaiming that their 'strong durable base' would allow for continued consistent growth, Perrigo assumed a duty to disclose that recent performance fell substantially below the target range."

208.   By the beginning of Hendrickson's tenure, Perrigo began to back off from its earlier optimism regarding organic growth rates.  At the May 12, 2016 Q1 2016 call, when Hendrickson was asked directly "could you comment briefly on Perrigo's long-term organic revenue growth rate of 5% to 10%, and whether you expect to update that, or how should we think about that at this point," Hendrickson replied:

> David, on the long-term plan, what I will do is walk you through the process of how I'm going to work our team through it, rather than give you the number today, because I'm not prepared to I [sic] say here's what the next three years, four years look like. We are getting together here over the next few weeks and next month, and then presenting to the Board our perspective of our long range plan, which goes out and looks at that.  And I will commit to you and everyone else that in the summer time frame, we will be coming back to folks with our updated long range plan and outlook.

209.   Perrigo, in the post-Papa and Brown era, has admitted that in earlier years it exaggerated its growth.  At the May 9, 2019 Investor Day, Murray Kessler's presentation stated that "since 2015, we have not grown" and shows compound annual growth rate ("CAGR") of between 0% to -5% from 2015 through 2018.

## C.   Defendants Hid the Difficulties with Integrating Omega

210.   The Omega transaction was Perrigo's largest and most complex, for approximately $4.5 billion, and the company was headquartered in Belgium, with annual revenues of $1.6 billion as of September 30, 2014, and approximately 2,500 employees and 2,000 products, with a presence in 35 countries.  Yet Perrigo's

leaders, especially Papa and Brown, appeared to think integrating the company would be easy, treating Omega almost as another bolt-on acquisition.

211.   Even before the Mylan offer, Papa was trumpeting the value of the Omega transaction before the merger formally closed.  During a November 6, 2014 conference call announcing that Perrigo intended to acquire Omega, Papa told investors, "[O]ne of the real keys to this transaction is the immediate scale and broadened footprint this combination provides. . . . [T]here is a competitive fit of Omega within Perrigo through the company's combined geographic diversity and scale."  Furthermore, he stated:

> There are opportunities to generate top line synergies by driving products from both companies through complementary US and European commercial channels.  Further, with the application of [Perrigo's] supply chain excellence across Omega's footprint, we expect to drive additional efficiency and operational synergies through the combined organization.
>
> . . .
>
> On the operational side, we are excited by the many opportunities to deliver our world-class supply chain and operational expertise to Omega's existing operations.  As you can see, we are well on our way to identifying multiple opportunities to leverage our increased scale and drive more volume through our efficient manufacturing base.

212.   Moreover, during the same call, in response to a question about "an opportunity for [Perrigo], at least over time, to bring a lot of [Omega's product] source internal," Papa responded:

Sure. Great question, and I think that's another area of opportunity for us to be absolutely clear. The business that Omega has – is much of it or the majority of it, is outsourced. So much of the business does come from outside manufacturers.

We do believe that there are opportunities to take some of those products inside into the Perrigo manufacturing network and supply chain and procurement savings. So I do think there [are] opportunities there that we are excited about.

And that is another reason why we believe one plus one equals three or more. So no question about that. There [are] clearly supply chain opportunities in bringing our operational excellence approach to the business.

213. And in further response regarding cost efficiencies, Papa elaborated:

The way I look at this is that one of the strengths that the Perrigo organization brings to this transaction is a very efficient supply chain for procurement and manufacturing efficiency.

We certainly will not attempt to bring every product inside. But there will be opportunities for us to lower cost of goods, lower the Omega cost of goods by putting those products into Perrigo's very efficient supply chain.

Knowing that we are one of the world's largest OTC manufacturers when it comes to actually procurement of raw materials. Those raw materials that are appropriate for the US market are also very appropriate for the European market.

So there clearly will be procurement synergies that we will experience as a result of bringing some of those products inside.

214. At the January 12, 2015 JPMorgan Healthcare Conference, Papa told investors:

Obviously, we believe it's financially accretive, immediately accretive from day one, and also $1.7 billion in revenue that will add to the Perrigo portfolio of products opportunities. And clearly we also think there are some cost synergies. One of the

> things that Perrigo does very well is manufacturer – operational excellence in our facility, we make about 50 billion tablets every year, every second of every year, somewhere in the world 1,600 people taking a Perrigo product.  When we take that efficiency and bring into the Omega organization, where about 80% of their products are outsourced, where someone else is making it, we think that also will drive cost synergy for the Omega organization.

215.  Papa, in announcing the merger agreement, stated that the "combination of these two great companies accelerates Perrigo's international growth strategy, substantially diversifies our business streams and establishes a durable leadership position in the European O.T.C. marketplace."  According to Papa:

> We believe this strategic transaction will enhance shareholder value by further strengthening our industry-leading revenue and cash flow growth profile and by expanding market opportunities. Omega brings a leading OTC product portfolio, European capabilities, and a highly experienced management team to support Perrigo's continued growth. . . .  Our strong financial performance and operational structure have enabled the continued growth and globalization of our business model with Ireland as our gateway for this expansion.  Together, our combined company will have an even larger product portfolio, broader geographic reach, and enhanced scale.

216.  Papa and Brown also had information about Omega's businesses because they met with Omega's executive team in February 2015, and Perrigo was given access to Omega's data room for due diligence for the merger.  But rather than disclose negative information about potential integration problems, when the

transaction closed on March 30, 2015, Papa trumpeted it in a press release announcing the deal:

> The combination of Perrigo and Omega creates an industry leading, global healthcare company with the operational structure and cash flow generation to accelerate our international growth even further[.]. . .  This strategic combination creates a top 5 global OTC healthcare company by revenue, enhancing our leading OTC position through Omega's strong, established European commercial, regulatory and distribution platforms, which further enables us to capitalize on the many megatrends which bend in favor of consumer choice and cost control in healthcare.  We expect the combined companies will create tremendous value for consumers and shareholders for years to come. . . .  [T]he transaction [will] be immediately accretive and between $0.10 and $0.20 accretive to fiscal 2016 adjusted earnings per share . . . .  [The combined company will] achieve increasing revenue and supply chain synergies within Europe over time contributing greater than $125 million to gross profit in 2019.

217.  The press release also stated "Perrigo expects the transaction to be immediately accretive and between $0.10 and $0.20 accretive to fiscal 2016. . . . The Company expects to achieve increasing revenue and supply chain synergies within Europe over time contributing greater than $125 million to gross profit in 2019."  In addition, Perrigo stated that the merger is "[a]ccretive to Perrigo standalone value, adjusted operating income growth rates (on a constant currency basis) and cash flow generation" and also highlighted Coucke's management capability, stating that he "brings over 25 years of branded OTC leadership experience to the Perrigo executive committee[.]"  It also highlighted how the

merger expanded the Company's product portfolio, enhanced scale and distribution network in Europe, and highlighted the combination of "Perrigo's supply chain and operational excellence with Omega's OTC branding and regulatory expertise" and "[e]nhances Perrigo's strong financial profile through substantially diversified revenue and cash flow streams[.]"

218. Papa and Brown made numerous statements misrepresenting the growth and integration of Omega, the European branded consumer products business Perrigo bought in late 2015. Their statements included those in public filings and in investor calls, where they omitted to discuss present problems with the integration, and instead only revealed positive statements such as how Omega "has been accretive to our growth" and that the "back office is working smoothly" and "we . . . are . . . in line with our ongoing online integration process" and Perrigo "[h]as delivered on our integration plans" and "[w]e supplemented [Omega] with our manufacturing infrastructure." The Court in the Securities Action held that these were "statements of present fact" and thus not protectable under the PSLRA's forward-looking-statements safe harbor provision, and moreover in light of these positive statements, the statements that were omitted that tended to show troubles with integration were omissions of material facts. Furthermore, the Court found that Papa and Brown's statements about the status of the Omega integration "imply[] personal knowledge [that] support an inference of scienter." The Court

also found that allegations that Perrigo employees raised various issues relating to integration directly to Papa and Brown "provide circumstantial evidence of at least reckless behavior" when Papa and Brown ignored those concerns.

219.   Shortly before Mylan made its first offer to Perrigo, Perrigo closed its largest merger ever with Omega for $4.5 billion on March 30, 2015.   Omega was one of the largest over-the-counter healthcare companies in Europe, with commercial presence in 35 countries.   It was the Omega deal that gave Perrigo a sizable European presence, rather than the Elan merger a few years earlier that gave Perrigo an Irish domicile for tax purposes (but did not include significant business operations, as its only asset was a royalty stream from a drug it sold to Biogenic).

220.   Papa and Brown immediately pressed forward with investors that the Omega merger was "immediately accretive" toward Perrigo's earnings and profits, despite knowing of significant integration issues at the Company.

221.   In its April 21, 2015 investor presentation, Perrigo insisted that the Omega acquisition was "accretive to Perrigo's organic growth profile, and creates additional value derived from synergies and increased global scale."   The presentation certifies that "directors of Perrigo accept responsibility for the information contained in this presentation.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the

case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information."

222.   During an investor call on the same date, Papa further represented, "we have just completed the Omega acquisition, which, among other benefits, provides a significantly enhanced international platform for additional growth."

223.   In the same call, in response to a question about "the recent organic growth of Omega," Papa further stated:

> At Omega, we feel very good about the opportunity with Omega and specifically what I would refer to and we've talked about in the past about revenue synergies.  We do believe that there are revenue synergies with the product portfolio that we have at Perrigo as we bring the 3,000 Perrigo products and help to bring them to Omega and look for ways that we could do line extensions of existing Omega brands.  That's something that we have teams underway already from an integration process.  Those teams are very active in looking at which ones are the best ones to do, the earliest ones to do and move that forward.  We do believe that that will allow us with the Omega portfolio to be in that 5% to 10% compound annual growth rate.  Obviously, the more success we have with Omega, the more it would help us to be at the higher end of that from the revenue synergies point of view.

224.   He further represented in response to analyst questions:

> We're very pleased with our initial integration projects with Omega, so there [are] a lot of good activities happening with the integration team.  I'd say it's focused on both driving [those] topline numbers to put your question but it's also focused on improving the cost of goods sold.  We've got a supply chain team already working with them to drive the bottom line results as well.  As I talk about the growth of Omega from a historical point of view moving into the future, it has been accretive to our

growth rate. . . .  Importantly, if you think about what we're saying in our business, as I mentioned before, our total business expectation is to grow 5% to 10% across our total business organically.  If you think about what really is driving that business growth, as I said earlier in the call, about 75% of our business is on the consumer-facing side.  So, if you think about Omega, think about our consumer. If 75% or if the total is going 5% to 10%, you can absolutely understand that the 75% has to be growing exactly in that relative category for us to get a total of 5% to 10%.  So, I hope that's probably about as much as I can say about the future of Omega, but clearly that 5% to 10% is an important part.

225.   In response to a question about "revenue synergies" and "cost synergies" from Omega, Papa responded:

> [L]et me go back to Omega first.  There is no doubt that we are very excited about the revenue and the cost of goods sold synergies that we've seen in place.  I've talked a little bit about the revenue synergies.  We think those are in the hundreds of millions of dollars opportunities.  Those will start in year two and ramp up by year four.

> On the cost of good sold synergy, I am delighted to inform you, the team already has.  I believe it's now 20 projects they have individually identified and are working towards lowering the cost to goods sold for the Omega organization by combining the talents of both our Perrigo team and the Omega team.  So, good collaboration work efforts going on relative to that activity.

226.   Omega was a key component of the "Base Guidance" in the Base Plus Plus Plus model, sharing equal space in the foundational layer with Perrigo's domestic consumer health business, forming the largest slot of the foundational layer as "Consumer Health [+] Branded."  The "Branded" business was Omega, as it has a European brand business.  Moreover, one of its major "Plus" factors was

"Expansive M&A" which Perrigo claimed had a "Multiplier Effect," and Omega was the showcase M&A that Perrigo achieved as a representative for the potential M&A it could do going forward.

227. During a May 6, 2015 investor conference, Papa further buttressed the case for Omega by stating that in reasoning why stockholders should reject Mylan's offer, Perrigo's Board "believe[d] we have a very strong standalone business" and "the offer from Mylan substantially undervalues the Perrigo Company, and doesn't take into account really some of the important things that we've done with the Omega business." He added:

> [Omega is] a really exciting prospect for us as a Company. So we think there [are] tremendous revenue synergies for us as a business as we put these two businesses together. Part of that revenue synergy is very simply we take the Perrigo products that we have today. Some of them are already approved in Europe. We take those and we look at ways we can do line extensions of Perrigo products via the – take a Perrigo product, a product that's a nighttime pain product, match it up with the brand item that Omega has today, and you launch a nighttime pain product by Omega. Very simple, it takes advantage of the brand equity that's already in place for the Omega products. We think that's a great revenue synergy opportunity.
>
> . . .
>
> One of the things Omega did really well was sales marketing. One of the things they, by their own admission, say they were not focused on was the supply chain and manufacturing. We think we can help them tremendously with that. We've already got over 20 projects, identified staff to lower the cost of goods of the Omega product. I remind you that 79% of what Omega sells today, they outsource. Some of those products we can bring into

a Perrigo facility or an Omega facility with our expertise, and lower the cost of goods by 30-40%, which will absolutely add to the bottom line of Omega and Perrigo.

228.   Moreover, Papa also highlighted how Omega would allow Perrigo to bolt-on additional acquisitions, which implied that Omega itself was well-integrated into Perrigo's business, stating, "Now that I've got the Omega business, and we're in 30 countries, we think the bolt-on strategy for the future can be very, very profitable for Perrigo shareholders as we now have a commercial footprint in these countries that we didn't have before. . . .  We're very excited about that and think that brings a significant number of synergies."

229.   During a May 12, 2015 investor conference, Papa again warded off the pending Mylan offer by emphasizing the value Omega would add to Perrigo:

> What we've said as a board is that we believe that offer substantially undervalues the Perrigo Company.   And specifically, we said relative to the – we're just getting started with the Omega transaction, and as a result of that we think there is a lot more opportunity for us as a company.  As we've gone from competing in approximately six countries now to about 39 countries we think there's a lot of opportunity for the Perrigo Company. . . .  So we do think that $202 or $187 number did significantly undervalue the Perrigo Company, especially given what we have now done with Omega.

230.   When asked to identify what he thought was "the most under-appreciated" aspect of the Omega merger, Papa replied:

> [W]e've become smarter about what's in . . . Omega and how the Perrigo products would fit within Omega and how the Perrigo products would fit within Omega, relative to taking the

easy example.  Omega has got some great products for pain, but they don't have a night time pain that also has a product in it that allows you to sleep better at night.  It is the combination products that we have we think that would fit naturally into the Omega pipeline and launch new line extensions of the Omega pain products.  That [is] a great easy example.

231.  During a May 18, 2015 investor call, Papa represented that he personally had "a chance to work with the [integration] team" and gave specific examples of Omega products and channels that Perrigo was using as examples of integration, and provided details about the integration process itself.

232.  Papa represented during a June 2, 2015 investor call that "Omega and Perrigo together were well-positioned" to achieve a "5% to 10% growth" and described the Omega acquisition as "immediately accretive" to Perrigo's shareholders.  And he represented that he personally "had to integrate the Omega organization[.]"

233.  Papa, Brown, and Coucke together presented at a June 2, 2015 investor call where they discussed Perrigo's acquisition of OTC brands from GSK in Europe.

234.  On the call, Papa highlighted:

> We've agreed that Perrigo will purchase a portfolio of brands from GSK through an all-cash acquisition.  The transaction has been unanimously approved by the Perrigo Board of Directors and the Board of the joint venture, and expected to close in the third quarter of 2015, pending the satisfaction of customary regulatory approvals.

With this acquisition, Perrigo gains access to several leading European OTC products. . . .

This portfolio generated net sales of approximately $110 million in 2014.  It is important to note that this portfolio achieved annual sales greater than $200 million in 2012 before a significant supply chain disruption affected sales of the acquired NRT products, illustrating the potential of these products, and also the importance of our global supply chain from the Perrigo organization.  We are thrilled to add these established OTC brands to our existing portfolio of leading products.

Further, these complementary-brand portfolios are well-positioned with geographic expansion through the Omega Pharma commercial platform in Europe, making them a perfect fit for our business.  This acquisition demonstrates the strength of our combined companies with Perrigo and Omega.  Since we announced our combination in November, we have been excited about the prospect of pursuing additional acquisitions that leverage our unique pan-European capabilities.

The beauty of today's announcement is that neither Perrigo nor Omega Pharma could have completed the transaction alone.  The combination of Omega Pharma's comprehensive commercial infrastructure in Europe and proven brand-building capabilities with the Perrigo supply chain excellence and expertise, especially in these product areas, uniquely position us to execute value-accretive deals such as this.

. . . [O]ver the past several months we have been speaking a lot about Perrigo's durable base for growth.  This includes our unparalleled consumer business, which on an annualized basis now represents over 75% of our business is now consumer-facing, thanks to the addition of Omega Pharma.

We are thrilled to already be putting Omega Pharma's infrastructure worth with inorganic growth that will continue to expand our base.  In short, todays acquisition is an outstanding example of our base-plus-plus-plus strategy in action, building on our durable global platform with strategic M&A that has a multiplier effect on our growth.

119

. . . [W]e are glad to have a chance to share some more detail on why we are so excited about the addition of the Omega Pharma to our business.  As previously disclosed on March 30, 2015, Omega Pharma is expected to contribute over $125 million in synergies to adjusted gross profit in 2019, and will further strengthen our industry-leading organic revenue growth profile.  Not only does Omega Pharma underscore our global strategy, it now positions us to continue European growth both organically and through acquisitions such as the one we're talking about today.

235.   He further added:

With Omega though, it was a perfect example of doing exactly what we did in the US, but now apply that to these 36 additional countries that I now have access to that I didn't before.  So I could not bolt on something in my German operations prior to Omega.  I didn't have German operations.  Now I do.  Now I can bolt things on to Germany.  I can bolt things on to Sweden.  That really is the logic of why we felt Omega was so strategically important to us, and it will allow us so many more opportunities to do these bolt-on transactions, which generally come with very good return characteristics, and why we think it's really important for the future success of the Perrigo Company.

236.   Coucke added to Papa's statements by emphasizing:

Due to Omega Pharma's unique model of engaging with pharmacies and retailers, and by distributing our products across our 36-country network, we are able to compete and to out-perform the largest global players in OTC Pharma. . . .  Omega Pharma has become a top-five player in European OTC and we are number one or two in a lot of key European markets.  We are continuing to grow, both organically by leveraging our commercial infrastructure and our OTC product portfolio, and through opportunistic growth options such as the acquisition that we are announcing today.

. . . [W]e have achieved the success we see today through our unique and disciplined approach, and under the leadership of an

exceptional management team that we have built here at Omega Pharma. Over the last three years as a private company, Omega Pharma has optimized its commercial infrastructure to deliver superior results.

First of all, we hired best-in-class management and a consumer-centric sales and marketing team with extensive OTC experience. Secondly, we streamlined the operations and we instituted an efficient management structure with real, efficient, direct, short reporting lines between Omega Pharma leadership team and country management.

Third, very important now with all the evolutions in Europe, we've bolstered our regulatory capabilities and we now have over 70 experienced regulatory specialists, so we are anticipating new challenges and creating innovative new opportunities. Fourth element of this transformation is that we focused on acquiring well-known but under-invested or under-financed brands, and we optimized their performance. Finally, we focused on our top 20 brands.

. . . Omega Pharma's unique platform extends across 36 countries, and you know that in Europe there are a lot of mom-and-dad shops at pharmacies, so we reach 211,000 pharmacies, 105,000 retail pharmacies, and 3,900 para-pharmacies. This organization brings us closer to our individual customers than our peers.

Our go-to-market approach is highly tailored to each geography, as our regional teams are best in class and really adapted country by country. These critical elements enable us to pursue this small, targeted approach.

This applies to our strong regulatory capabilities as well. Our unique network allows us to be more efficient with our marketing and A&P dollars or euros to compete with some of the world's largest pharma companies. The combination of push and pull really makes us unique and more efficient.

Now, through the combination with Perrigo, we can accelerate what Omega Pharma has been doing for decades. We are now

121

better equipped, prepared to add additional high-margin products to our unique platform across all of Europe. That you can see on the next slide, where we have illustrated how our buy-and-build strategy has worked for us historically, utilizing both acquisitions to bolster our infrastructure, as well as brand acquisitions to achieve the top-five position we hold today.

We have a real strong track record of successfully acquiring and integrating products that fit into our world-class distribution network, creating the multiplier effect [Papa] talked about earlier to grow margins and capture market shares. In OTC in Europe you've got high markets, high cross margins, with a lot of investments, so the multiplier effect, if you can leverage on that, is really important.

. . .

I would like to highlight the number of brands here that are number one in their respective markets, as a result of our targeted investments. We can see that most of our products are number one in single markets or even within Europe.

. . . The success of these products is a testament to our brand-building capabilities, which we will continue to leverage to grow the great brands that we have acquired today. Of course, this will be complemented by a strong pipeline of OTC products, a pipeline that we are building on our own and together with the Perrigo group now.

. . .

Perrigo could not have done this acquisition standing alone. Omega, not part of the Perrigo group, would not have been able to do this acquisition. Together we have the financial capacity, the manufacturing ability, and global presence to continue strategic bolt-on acquisitions.

We are really excited to add this set of leading brands to our already solid portfolio of OTC products. Our unique commercial platform, together with our proven brand-building

abilities, will enable us to leverage these brands to their fullest potential.

237.   Brown further reiterated the merits of the deal by stressing:

> As [Coucke] and [Papa] have already highlighted, this acquisition is a fantastic opportunity for Perrigo. In fact, it is a fairly obvious expression of the strategy we stated only a few weeks ago. These GSK assets generated net sales of approximately $110 million in calendar 2014, which increases pro forma branded consumer health care net sales for that year by approximately 8%.

> As we insert these brands into our existing infrastructure, we anticipate they will enhance both the segment's adjusted growth and operating margins. We expect this deal to both immediately exceed our ROIC threshold and be immediately accretive to calendar 2015 adjusted EPS.

> By employing the strategies that [Coucke] outlined, we see significant ROIC upside in coming years. We expect a return of 2 times our weighted average cost of capital by year three. In addition, the transaction is another example of the benefits of our Irish domicile as a platform for international expansion, and we have done just that, with the combination with Omega Pharma and now today's acquisition of these promising brands.

> One of the most powerful components of our financial story that I love to talk about is our business model's strong, consistent, and growing free cash flow generation. With over $1.2 billion of operating cash flow expected in calendar 2015, we clearly have the financial fire power to continue to grow and invest in our business, while also pursuing additional value-adding acquisitions, like the one we are announcing today.

> We closed the Omega Pharma acquisition on March 30. On April 21, we laid out our base-plus-plus-plus strategy for continued growth, including the expansive M&A multiplier effect. And in just the last month we have announced three all-cash acquisitions, as we continue to execute on our robust corporate development pipeline. Our cash-flow generation and

balance sheet strength enable us to do this again and again and again.

238. Papa then reiterated:

Hopefully after listening to [Coucke] and [Brown] you are all as excited as we are about the Omega platform, and what it allows us to do as demonstrated by today's announcement.  What's great about this deal is that neither Perrigo nor Omega Pharma could have done it as a stand-alone Company.  Together we have the financial power, the commercial platform, and the supply-chain expertise to successfully acquire and grow these brands.

This comes less than three months after the close of Omega Pharma.  This acquisition underscores the power of Perrigo and gives us the opportunity to do what we've done well in the past – add more items, more products to the truck, but now do it on a whole new continent as we deliver to our customers.

In closing, we continue to execute on our base-plus-plus strategy, building on our durable and growing global platform. This acquisition is an example of our strategy in action, leveraging our unique combination of capabilities to expand our global base business.

We remain focused on executing this strategy going forward to continue delivering on our 5% to 10% organic CAGR goal. Plus, as outlined today, strategic acquisitions will continue to provide a multiplier effect to our growth.

239. In response to a question about sales growth, Papa reaffirmed, "[W]e've talked about a 5% to 10% CAGR growth rate and then we can supplement that with inorganic activity.  Just simple answer is we expect that the growth rate for these assets will be within that 5% to 10% revenue compound

annual growth rate as we think about the settlement.  Obviously, though, we are very excited about the upside as we bring back the supply chain."  Coucke added:

> We feel very confident that they will at least contribute to that 5% to 10% compound average growth rate that Perrigo always wants to have.
>
> There is here the special situation of the supply problems, which maybe is a big opportunity.  And if there is one company who is able to restore these brands like they were a few years ago it is Omega Pharma, but it will need a lot of hard work, so for the moment we feel very confident with 5% to 10%.  If we can do more, if we can do faster, we'll do so.

240.   Brown added to Coucke's comments:

> On the capacity question, I jokingly like to say our passports are going to continue to need more inserts.  The team has been busy cultivating a rich corporate development funnel.  In fact, this transaction that we're announcing this morning was first put in the books in the early part of calendar 2015, so this is just a culmination of work that's been going on for months, even before the closing of Omega.
>
> And there are many projects that are currently under way.  We do continue to look at new opportunities and they're in the exact areas that we have been talking about all along: continuing to explore European expansion and work with Marc and his team; finding brands like the ones we're announcing today; continuing to look for adjacent category assets within the US in our consumer health care business; continuing to look for RX products; RX business; and technologies that can continue to enhance that rich portfolio, as well.

241.   In response to a question about "supply chain issues" and whether that would mean whether there would be "immediate 5% to 10% contribution to the growth," Papa responded: "The supply chain issues . . . were prior to the acquisition

. . . by the Perrigo Company.  Those were not specific to us. . . .  Now that we have taken it over we believe, because of some of the capabilities we have, we will be able to work through those supply chain comments. [sic]"  Coucke further responded "it should be very reasonable to have 5% to 10% annual growth. . . .  So should be a good combination with the Omega skills."

242.  Regarding a question whether the "sales progression of the acquired portfolio will be similar to the overall consumer business" Papa responded:

> [W]e think that this business will be very consistent with our 5% to 10% top-line growth for the business.  Obviously, we get the one-time effect of a transaction, but beyond that, we think the growth of this business will be in that 5% to 10%.
>
> We could do a little bit better, depending on how quickly we get back the nicotine replacement therapy, but I would use that 5% to 10% part of the growth rate as your base for what you are thinking about.

243.  Finally, as closing comments, Papa offered:

> Thank you very much for having the opportunity to share with you the excitement we feel about the Omega acquisition; but importantly, how these types of transactions, where we acquire additional products to put into the Omega basket of goods, will allow us to continue to grow this business, continue to have a very durable business.  As we've said before, it gives us a chance to illustrate the value we believe our base business plus-plus-plus, and how we think about that for the future.

244.  Brown, in an investor presentation at the Oppenheimer Consumer Conference on June 23, 2015, elaborated in response to a question about "Omega integration and opportunities to get the Perrigo brands over to Europe":

So Omega Pharmaceuticals, a company that grew dramatically. Started in the mid-1990s by its founder who was a pharmacist and thought that there was a niche potential in the European over-the-counter pharma market of product lines that were potentially not being well served by big pharma, and continued to acquire small brands and build them together over the course of many years.

Bought many smaller companies. Built them together, created infrastructure, which is what made the asset incredibly appealing for us at Perrigo was we had aspirations of growing internationally, but didn't have a distribution footprint. So as I mentioned earlier, part of the strength of our business model in the U.S. is that we have a truck rolling to pretty much every chain store, every large grocery store in the United States. We can reach everyone and we can reach them almost on the daily basis. We did not have that infrastructure in Europe, but many, many hundreds of products that we eventually could sell if we had the infrastructure upon which to sell it.

Omega gave us that. 35 countries in Europe, many brands, distribution reach. That made it what we felt was a great marriage and what the seller felt was also a wonderful marriage was the combination of their commercial knowledge, their sales and marketing prowess, and their reach with our product and our supply-chain base.

We closed the transaction on March 30, so we are about nine weeks in right now, and we are online – I should say in line with our ongoing online integration process. Back office is working smoothly. We're bringing them onto all of our back-office systems, and importantly what was the underlying core of his deal was allowing Omega to remain independent in their sales and marketing process, not interfering with that, but providing them product to put into that pipeline.

So that will – that is a regulatory process. They have been making selections of products in certain countries that they want from our lineup and starting the regulatory processes that are required to get those new drugs approved in those new markets. And that is on track. And it is exciting for that team because in

one fell swoop you have leading sales and marketing teams country by country being able to pick from a list of products that are relevant to and important for their patients and consumers locally.  So we are well underway.

. . .

We have management teams who are in charge of Omega integration who are actively involved on a day-to-day basis in both running Omega and another team that is focused on helping them get those product launches, helping on the integration. That was underway.  That was rolling down the tracks before the Mylan letter came out, and that continues, so it is not as if the entire management team suddenly stops doing everything they are doing and is focused exclusively on the offer.

245.  Brown responded to a question about whether "Mylan impacted the integration process for Omega in any way" with "No.  That team continues to do what their mission is and what they have been scheduled to do. . . .  [Omega is] more invigorated than ever by the combination of what we can do together.  So that team is doing their thing and I am off to Belgium next week.  That was process like normal."  Brown also, in reaffirming Perrigo's targeted annual growth rate of 5-10%, attributed the growth to "the combined Perrigo and Omega footprint."

246.  At an August 5, 2015 earnings call, Papa represented:

Even with all the noise you have been following over the past few months, our nearly 13,000 Perrigo employees have announced three M&A transactions, delivered on our Omega integration plan, achieved great operational efficiencies and productivity improvement, executed on new product launches and delivered on our Base Plus Plus Plus strategy.  It's great work by the team.

. . .

128

With the record adjusted operating income in our Consumer Healthcare business, the strong performance of our recently acquired Pan-European Omega business and these recently announced transactions, which bolt on very nicely to our existing infrastructure, I'm excited about the future prospects and our mega trends in this truly global Consumer business platform. I'm excited about the future prospects and our mega trends in this truly global Consumer business platform.

247. Brown continued:

We continue to execute on the integration of Omega and broaden our customer and patient reach, further the process of shifting our fiscal year end from June to December to ameliorate your financial analyses going forward, updated the market on our strategies to achieve organic three-year compound annual growth rate of 5% to 10%, announced three acquisitions since closing Omega, received two unsolicited offers from Mylan to acquire Perrigo, and continue to actively pursue new corporate development opportunities. All while achieving record results in the quarter. Never a dull moment at Perrigo and seemingly never enough pages in our passports.

Before we dive into the quarter, I'd like to first remind you of our continued focus on providing highly transparent financial and operational results. With the addition of our Pan-European BCH segment and our focus on continued geographic expansion, we will now provide you with constant currency revenue information to enable easier analysis of the underlying performance of our business outside the US.

Consolidated results from our durable base business portfolio bolstered by the newly acquired Branded Consumer Healthcare [Omega] segment, delivered 37% growth in adjusted net income. Consolidated adjusted gross margin expanded 460 basis points to 49.1% with positive contributions from BCH, supply chain efficiencies and overall positive product mix.

As [Papa] talks about frequently, the moat around Perrigo's margins via our supply chain prowess, was clearly evident this quarter as year-over-year organic adjusted gross margin

expanded over 300 basis points driven by focused global sourcing and continued manufacturing efficiencies throughout our operations.

. . .

[Y]ou can see that net sales within Branded Consumer Healthcare were $401 million for the quarter, an all time record quarter for Omega Pharma. This impressive result was driven by an 11% increase in sales of the top 20 brands on a constant currency basis versus last year and the launch of a number of exciting new products including XLS Max Strength, a line extension to the brand XLS Medical for weight loss, new versions and flavors of Bronchostop, an herbal cough medicine, and strong distribution sales in the quarter.

. . .

We continue to expect Branded Consumer Healthcare to contribute approximately 20% of total Perrigo consolidated net sales for the full year with strong net sales over the remainder of calendar 2015. Note that though our forecast in this new business anticipates that the June quarter just ended will be the highest revenue quarter in the calendar year due to new product launches . . . and strong distribution sales we just realized in that particular period. Note also, that the current BCH forecast now does include $25 million in net sales associated with recently announced acquisitions which we expect will close in the September quarter.

248. In response to a question about "how much growth is left for Perrigo over the longer-term, especially in light of some of the news events. . . . Are you just at the beginning, middle, or end of the Company's growth and how committed are you as a management team to see this through," Papa responded that there are "three mega trends that continue to drive the business, each of them contributing to that growth," and among his points he stated:

130

[W]e see tremendous opportunities now that we've aligned and acquired the Omega organization and what that means for us on the Branded Consumer business. And importantly, the same things that have helped Perrigo grow in the past where we've bolted on incremental assets, we think we can do the same thing. We think the GSK asset, the Yokebe asset, are just the beginning of things that we can bolt on as we look to continue to grow that Omega asset. We are really excited about the future and I think that's just an overview of how excited we feel about where we can go with this business.

249. In response to a question about Omega's business, Brown responded:

Just backing up, the question was on distribution. The Omega business has historically had the leading distribution of generics and some branded products out of Belgium, from their historical presence there. On a pro forma go-forward basis, that would represent about 15% of their revenues. . . . [A] full-year annualized run rate of Omega of about $1.6 billion revenue run rate. About 20% was distribution and on a go-forward, it would be about 15% go-forward.

250. In response to a question that focused on the U.S. consumer business, Brown added a point about Omega's growth:

[T]he team has quite a long list of new products opportunities both organically as well as their plans for putting in product that is currently in the US Consumer portfolio and plugging that into [Omega's] format. Which, as we've talked about, is a key driver of long-term future revenue growth within the Omega platform. We haven't called that number out yet. As we get better clarity we will. But suffice it to say that will be accretive to the $1 billion we talked about.

251. In response to a question about whether Perrigo was prioritizing Omega over U.S. consumer growth, Papa responded, "We have to prioritize but I think we have the resources now to do both. I think with what we can do in both, in

the European platform and the US platform we have the capabilities based on cash flow."

252.   In response to a question about how it appears Perrigo had no topline growth without accounting for Omega, while Brown focused on the overall picture, Papa made further comments along those lines but also added:

> Omega we think is tremendously important to our future and what we're looking to try to accomplish as we take those businesses and we get the revenue synergies and the cost of goods sold synergies in Omega, we think that's going to be an important part of it.  And obviously, as [Brown] talked about, the business has done quite well in the quarter and we expect to see great things from Omega.

253.  On August 6, 2015, Perrigo filed a presentation with the SEC, *Creating Long-Term Value for Shareholders*, which leaned heavily on Omega, for example, stating that the Omega merger "[s]upports [Perrigo's] global strategy and positions Perrigo for continued European organic and inorganic growth" and with Omega has obtained "a world-class management team and leading European distribution network spanning at least 35 countries" and the "[c]ombined commercial infrastructure, supply chain capabilities and financial strength enables highly synergistic bolt-on transactions."  Moreover, the presentation states, "the Board unanimously concluded that the [Mylan] offer substantially undervalues the Company and its future growth prospects and is not in the best interests of Perrigo's shareholders."

254.  In their September 17, 2015 press release disclosing the Board's recommendation to reject Mylan's tender offer, *Responding to Mylan's Inadequate Tender Offer: Perrigo's Board Recommends That You Reject the Offer and **Do Not Tender***, the Board stated that Mylan's tender offer "substantially undervalues the Company and does not adequately compensate shareholders for Perrigo's exceptional standalone growth prospects." (Emphasis in original). And those growth prospects include business relating to Omega, as support, stating: "We continue to build upon our recently acquired pan-European branded consumer healthcare platform . . . demonstrating our unique positioning to capitalize on the growing $30 billion European OTC market opportunity."

255.  And in the accompanying September 17, 2015 phone call, Papa stated that Mylan's "current offer on the table is not even in the right ZIP code, when compared to Perrigo's stand-alone value" and the Board "unanimously determined that the offer substantially undervalues the Company and does not adequately compensate shareholders for Perrigo's exceptional growth prospects." Moreover, Papa stated, "the Omega transaction . . . has done outstanding." Moreover, in contrasting Mylan's "dilutive" offer with Perrigo's prospects, Papa stated:

> We supplemented [Omega] with our manufacturing infrastructure so that we can – one of the clear synergies we saw is that we – Omega was manufacturing only about 23% of what they were selling. The other 77% was from outside their company. We said, we can bring some of that back into our

business, into the Perrigo infrastructure, lower the cost of goods sold, and drive that to the bottom.

256.   In a September 17, 2015 letter to shareholders filed with the SEC on form SC14D-9, Papa stated, "Mylan's offer not only fails to reflect Perrigo's outstanding track record of value creation, it also undervalues our compelling prospects for continued growth and sustainable, long-term shareholder value" that includes "build[ing] upon our recently acquired pan-European [Omega] branded consumer healthcare platform . . . ."   The letter also stated that Perrigo has "successfully integrated 27 acquisitions with trailing 12-month net sales of more than $3.2 billion, all while maintaining our relentless focus on return on invested capital.  Simply stated, Perrigo has an outstanding track record of value creation and our future is bright."   The letter also represented: "[t]he directors of Papa accept responsibility for the information contained in this announcement.  To the best of the knowledge and beliefs of the directors (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."

257.  Furthermore, at the September 17, 2015 Morgan Stanley Healthcare Conference, Papa responded to a question about how Perrigo was "driving the organization to execute" on its growth agenda:

> Our concept is we believe we have a base business that's going to be able to grow that 5% to 10% especially now that we've added the Omega business. We just closed Omega on March 30. So now we've got Omega, which allows us not to compete in the six countries where we were before Omega. But now we're up to 39 countries. So a tremendous expansion of our geographic foot print, very important to us.

258.   And in its October 22, 2015 earnings forecast, Perrigo represented that 2016 net sales for Branded Consumer Health, *i.e.*, Omega would reach 5%-10% and that the "integration and realization of synergies in relation to the acquisition of Omega Pharma . . . will proceed as planned and will not be subject to unforeseen material delays." The report indicated that these hypotheses were "compiled with scrupulous care, accuracy and objectivity by the directors."

259.   Also as part of its October 22, 2015 earnings call and presentation, Perrigo issued a presentation called *Creating Value for Shareholders: Now and For the Long Term*. The presentation made statements along the lines of what Papa said in the earnings call: "[Perrigo] built up the platform with the acquisition of Omega, which has enabled us to provide quality healthcare products to hundreds of millions more consumers globally. We are continuing to build on this platform, realizing even greater benefits than we initially expected."

260.   During the October 22, 2015 call, Papa stated:

> Earlier this year, we built up the platform with the acquisition of Omega, which has enabled us to provide quality healthcare products to hundreds of millions more consumers globally. We

are continuing to build on this platform, realizing even greater benefits than we initially expected.

As an example, our recently purchased portfolio of leading OTC brands from GSK and the adult nutrition products, we add 15 more products to the back of our European trucks delivered to all of our customers.  Today is the next step in optimizing our global presence.

We are capitalizing on the potential of the colorful global platform we built and creating operational structure that will accelerate our earnings potential.  To that end, we are taking immediate steps to consolidate our operations, supply chain, and procurement management activities to one global center of excellence in Ireland.

By eliminating redundancy and enhancing purchasing power we will further maximize value.  On a full run rate basis these acts are expected to drive operational and tax benefits, reducing operating costs by an estimated $105 million.

Next, we are going to increase our organizational efficiency. I'm very excited to announce that John Hendrickson, formally [sic] Executive Vice President of Global Operating and Supply Chain, will be promoted to the role of President effective immediately.

With 26 years of experience at Perrigo, he has a deep understanding of our business, proven management skills, and a strong competitive drive to ensure Perrigo continues to deliver at the highest level in our industry in terms of quality, efficiency, and innovation.  The shift will also allow me to personally focus even greater attention on Perrigo's overall strategy and particularly our M&A opportunities.

We've also announced initiatives to accelerate the realization of actions on the shared services model.  We are already a lean organization, but we are always seeking continuous improvement.  It is in our DNA.

> We are taking steps to right-size the organization, eliminate redundant administrative functions, and generally streamline our organizational structure.

261.   Moreover, in response to a question about how "branded consumer looked a little light this quarter," Papa blamed it on Mylan:

> One of the things that [the questioner] actually pointed out in a video you did, is that our branded consumer business does have some distribution of products, for generic products, and as a result of this Mylan offer we are having some difficulty, or what I would refer to a negative synergy, in shipping some of our products from the Omega Company into our distributor.  This is one of the absolutely negative synergies that we pointed out in the past, and we're seeing the realization of that as the current distributor is actually putting off the acceptance of any additional product until we get this offer behind us.

> And that we hope, as I said, on November 13 [when the Mylan tender offer expires] this will be behind us and we will then go back into a situation where we will have a better situation there. The branded consumer business I think [Brown] mentioned, I would simply mention as a result of some of the distribution product sales that have not occurred during the current quarter.

262.   Furthermore, Brown, in response to a question about "cost synergies," Brown noted:

> As you may recall we closed the Omega transaction a mere seven days before Irish takeover laws fell over us with the announcement of Mylan's intention to make an offer for us.

> In that period of time, in that quiet period, we were already continuing the work of planning the leverage of this platform that we had in place posted [sic] Elan, post Omega.  And the supply chain benefits we're talking about today relate to our consolidation of profits and one center of excellence, about the focus of a core single global team focusing on driving value to that combined truly global platform now, and expanding the

value creation that will be possible all the way through the P&L, both in 2016 and well into the future with other consolidation activities within our supply chain and operations that are outlined in the following pages.

We are not trying to mix discussion here on vertical integration. We are focusing on the value creation potential of the model that we have with this Management team at our superior multiple, and able to capture quickly incremental enhanced value [to] shareholders immediately.

263.   Furthermore, regarding a question about "any opportunities internationally in the near term to further leverage the Omega platform," Papa responded:

The answer is absolutely yes.

What I would describe to you is that we believe Omega is exactly in the same place that our consumer healthcare US business was eight years ago, nine years ago. A great business Omega has today, but we do believe there's opportunities to bolt on additional products and additional geographies to sell more products to our existing customers.

We've got a great network of sales representatives and pharmacies that we do business with today. We believe that by adding – bolting on additional products to that category we can drive significantly the leverage in our Omega capabilities.

Obviously couple that with our ability to reduce the cost of goods sold for Omega by bringing more products into our distribution – I'm sorry, into our manufacturing plants. We think that will drive tremendous bottom line for Omega.

264.   And in response to another question about "the revenue impact of this distributor issue" regarding Omega, Papa responded, "I think the issue is really the question of a negative synergy that we pointed out to you before . . . [T]his is a real-

life example . . . that if there is a change of control, there will be negative synergies." Brown added, "I think the question was directed toward operating expenses and the variable spend. . . . They continue to make investments and still grew operating margin. . . . [T]hose were not compromised in any way in this quarter and we continue to plan to make investments in Q4." Papa further added, "[p]robably best to look at the numbers that [Brown] talked about for the gross margin expansion that really accentuates what [Brown] just said. That is really where you are seeing the significant improvements in gross margin as the result of the efficiency of our operations and supply chain."

265. Furthermore, in response to another question about "operational cost and savings," Brown responded:

> Talking in vague qualitative strokes about initiatives underway without putting dollars on them and attaching them to a guidance number or some framework that you can use in your modeling would we believe certainly have [been] perceived as wishy-washy. The initiative is underway, post Elan, establishment of a European global base, the acquisition of Omega.
>
> We talked at length at the time of the acquisition of Omega about our using that as our next ex-US global geographic expansion base, leveraging our global supply chain, utilizing our Irish headquarters to pull our operations together and create a base. We have been talking about these items for some time, we just haven't quantified them.
>
> And as Joe just said, as we are now 10 weeks out from the end of the calendar year we are now in a position to both expertise our calendar 2016 and quantify for you to give you a solid

> framework of understanding our confidence in that year-over-year strong growth rate, why you should feel good about the 2016 numbers and the underlying initiatives that buttress this plan.

266. At the November 10, 2015 Credit Suisse Healthcare Conference, to reassure investors about his plan for the Company, Papa represented, "I told a couple of people, I said: We need to make sure we are successful with the Omega transaction.  It had just closed on May 30, just before the announcement of the Mylan hostile tender offer.  So I wanted to make sure we were successful with Omega."  Later at the conference, he reiterated, "[W]e built the and brought in the Omega business" and "[w]here I've tried to focus on with Omega is our OTC franchise[.]" He added in response to another question regarding M&A, "[T]here's a lot of assets out there as we look to just build on our Omega franchise and build it as a stronger standalone business.  So that's really where I'm focusing my energies on the European side, is go after consumer-facing products in the European platform and roll them up by country looking at other opportunities, as well as obviously growing Omega organically.  In the latest quarter, Omega's top 20 brands were up about 6%, very consistent with what are our expectations."

267. Even after the Mylan tender offer was rejected, Papa continued to misrepresent the success of the Omega integration efforts.  At the January 5, 2016 Goldman Sachs Healthcare Conference, Papa responded to a question about how

Perrigo was getting synergies and succeeding in integration with Omega, the latter

of which the analyst thought was "pretty much behind you" by stating:

> [W]e felt there would be revenue synergies of $100 million-plus
> and cost-of-goods-sold synergies in the order of magnitude of
> the $25 million range.  We still feel very good about those –
> certainly on the cost-of-goods-sold synergies.  We clearly are
> seeing projects in place that are going to generate far superior to
> $25 million just by simply either bringing some of the products
> that were outsourced inside and/or things that we are doing just
> to leverage the Perrigo supply chain to get better raw material
> costs.  So we feel very good about that.
>
> . . . .
>
> On the question of the revenue synergies, those are very simple.
> We simply said there are projects that very simply – Omega had
> a Beconase product for allergies.  They did not – that was a
> spray.  They did not have an oral Beconase product.  We took
> our cetirizine product already approved in Europe, married it to
> the Beconase trade name and launched oral Beconase.  Very
> simple example, way to get a revenue synergy.  That's actually
> already underway.  That's not a big product, but it's just simply
> an example.
>
> We've got a number of other projects like that that we are
> executing on that are going to take longer because they were not
> approved in Europe.  So they're going to take three or four
> years, but we think there are other product opportunities for us
> to do that for the future.
>
> . . .
>
> Those are the things that we're looking at because we already
> had that formulation to bring those into our platform for Omega.
>
> The other synergy we believe is important is that t we're going
> to take some of the niche brands of Omega and bring them to the
> US.  You may have saw during the nose of the last eight months
> that we acquired our very first branded product in the US.  A

very small brand product called Scar Away; it's for scars to try to reduce that scar – scarring tissue.  We launched – we have that in the US now.  We believe that will help us in our footprint to bring some of the smaller niche brands from Omega back to the US and start to enter into that category.

One of the things we know about Perrigo is that one of the things that we have going for us is that we have a very strong platform with all of these large retailers.  We can leverage that platform with these large retailers by bringing some of the smaller brands into their footprints and get complete or very large distribution, and obviously work with them on how we can get the sales and the pull-through.

268.  Papa reiterated similar views at the January 11, 2016 JPMorgan Healthcare Conference:

Our branded consumer healthcare is a business we acquired, the Omega Company.   We acquired Omega and closed the transaction on March 30 of 2015 and it's one of the things that we think is very important to our future.

First and foremost, it moved us from a company competing in approximately 6 countries to a Company now being in 39 countries.  So dramatically expanded our geographic footprint, which we think is important for our future.

Number two: we are now [a] top five over-the-counter company in Europe.  In fact, one of the fastest-growing over-the-counter companies in Europe.  We also think it well positions us for additional M&A in the branded consumer healthcare space in Europe as there is additional opportunities to roll up additional consumer assets in the rest of Europe.  So we are very excited about that.

Within Omega, we try to find those where there's some unmet needs because of either formulation or something that we can do to make our product unique to the consumers.

Importantly, as we think about the future, with our branded consumer healthcare business, we think there [are] over $200 million of new product sales in our branded consumer healthcare business from 2016 to 2018. And once again, [these are] not large blockbusters. It will be the magnitude of the number of products that we launch: over 80 new SKUs generating – that will generate over the $200 million of revenue for 2016 to 2018.

So once again, we are trying to go after just the volume of the products that we launch into the marketplace. There's not large blockbusters, but we think that is very important for having a unique and sustainable business for the future. So many of the products we launch will be line extensions of some of these well-known brands that we have today.

Another example of what we think is important with Omega is it gave us an opportunity to acquire some additional products. We did a transaction with GlaxoSmithKline to acquire the NiQuitin franchise, a nicotine replacement therapy franchise, as they were coming together with their business with Novartis. We think that is an important part of how we can differentiate ourselves in growth for the future as we acquire some of these large product opportunities.

This one happened to be a pan-European asset, but there also assets within a specific company in Europe or specific country within Europe that we think we can acquire, and then roll out across the entire market.

Another notable example of this would be a product called Yokebe that we acquired in Germany that we intend to rollout across our European platform. So some great opportunities for acquisitions in our European platform for the future and we look to make that an important part of the Omega and the Perrigo story for the future.

. . .

Closing up, what does it mean? We look at our growth drivers for 2016 and beyond. Number one: Omega. We think it was [a] great opportunity to increase our geographic footprint. We see

> some good significant opportunities for the future on synergies,
> both on the revenue as also on the supply chain opportunity.

269.   On the February 18, 2016 Q4 2015 earnings call, Perrigo began to admit difficulties regarding integrating Omega, but Papa attempted to deflect the blame by emphasizing market trends as the reasons Omega underperformed the expectations that Papa had set for it in the minds of investors:

> We have a great European platform in place, which provides a broad distribution network, highlighted by unique access to the greater than $30 billion OTC European space, representing a great opportunity in a number of markets with high barriers to entry.  Many of our branded products ranked first or second in net sales in their respective markets.   They are growing organically through line extensions and by launching existing products into other European markets.
>
> We also plan to continue growing inorganically through strategic product acquisitions in our European platform.  Perrigo is in a unique position of the top five OTC company by revenue in Europe, contributing to our geographic diversification within the global OTC marketplace.  Due to the reasons outlined, we continue to expect the BCH OTC platform to have a growth rate higher than the market averages.
>
> Now, notwithstanding these comments, the fourth-quarter results in our BCH segment were below our expectations.  Let me review a few factors that contributed to the underperformance.
>
> First, as you are likely aware, we did not get the benefits of a normal cough-cold-flu season in Europe.  Second, the branded consumer healthcare segment continued to experience lower net sales due to channel dynamics with the generic distribution that I discussed last quarter.   These dynamics accounted for approximately 25% of the branded consumer healthcare net sales miss against our expectations.

Third, additionally, in December, the branded consumer healthcare team made considerable A&P investments – advertising and promotion investments – to grow certain branded lifestyle products, including a weight loss product, which typically peeks during summer months. They did so with the expectation of converting these products into a full-year maintenance product.

Unfortunately, these investments did not generate the desired sales in the quarter, even though they may still prove useful for a longer-term perspective. In any event, it is clear that this large A&P investment adversely affected the adjusted operating margin this quarter.

Finally, in certain end markets, we had some challenges, including, most notably, Spain and Germany, which accounted for nearly 60% of the sales missed to our internal expectations. We are taking actions to restructure our business in these locations.

As outlined in this morning's release, we realized a pretax noncash impairment charge of approximately $185 million related to intangible assets acquired in conjunction with the $4.5 billion Omega acquisition, or approximately 4% of the acquisition price. To be clear, we incurred this impairment because the fair value of certain acquired branded consumer healthcare brands was below the carrying value. However, the fair value of other acquired intangibles improved but these increases are not recognized under accounting rules.

270. And in outlining "our plan to drive performance in the BCH business," Perrigo implicitly acknowledged earlier problems with integration by stating "the plan will focus on improvements in organizational design or people, business processes, and product resource allocations." In particular, Perrigo will be "strengthening the line of connectivity and functional accountability of the BCH business with Perrigo standards" by "implementing four key process improvements

– number one, sales forecasting, inventory control and operations planning; number two, financial forecasting, planning and analysis; number three, supply chain integration; and number four, an incentive-based compensation that is focused on adjusted operating income and return on invested capital, similar to the existing Perrigo system."   Perrigo also admitted, "we are changing the management structure of the BCH segment by expanding the BCH executive committee" and by "putting Perrigo's matrix leadership model in place, which we believe will deliver better transparency and accountability and ensure continuing concentration on return on investment."  Furthermore, "we are going to take specific actions in select countries to right-size the business, streamline, and restructure sales organizations" and "[a]s part of this leadership change, President John Hendrickson of Perrigo has joined the BCH executive team as part of their team."   Furthermore, Brown acknowledges in a later part of the call that the main reason for "[w]hat has changed in our guidance . . . are the BCH dynamics we previously discussed.  It will take time to benefit from the people, process and product changes that [Papa] described earlier.  While these items will reduce our ability to capture the upside originally expected in 2016 in BCH, we expect to continue to drive strong earnings growth for the entire Company."

271.  At the same time Papa and Brown minimized the extent of their knowledge.  Papa claimed that "on the question of when did we become aware of

146

some of the challenges with the BCH business, it was really in the middle of January as we were consolidating our business during the close.  It really wasn't until the middle part of January that we became aware of some of the issues specifically with the BCH business."  Moreover, Papa admitted, "There's no doubt that the events that occurred when we closed the Omega, or branded consumer healthcare, transaction on March 30 of 2015, and followed by a hostile attempt at a takeover starting around April 8.  Did that cause some challenges for us as we focused on the business?  Yes, it did.  Clearly you see, though, through that time period the latter half of 2015 we had strong business performance in our Rx team.  We had strong business performance in our OTC or store brand business.  As we are trying to put resources towards branded consumer healthcare, there were some challenges."

272.  And in response to a question on the February 18, 2016 call where an analyst asked why earlier action hadn't been taking regarding these "blocking and tackling issues, things that we'd expect you to do from day one," Papa responded:

> Okay, let's start out of the first part of your question, branded consumer healthcare, a question of the timing of any changes.  I think you said it well.  We acquired what we thought is clearly a great business and we continue to believe it is a great business.  As we found, though, there are some things that happened.  It's a private company and some things in private companies we think we can improve on, basically, as we think about the Perrigo process that we go through, whether it be the sales forecasting, the supply chain integration – on all the things that we do really

well – the financial planning and analysis.  All those things are process things that we can do better.

And clearly, that is why, when I made my comments, it was partially on the people side, partially on the process side, and clearly something on the product side.  For example, there are some products that just do not meet our return of investment capital hurdles and we're going to make some decisions about those particular products.

Could we have tried to do this earlier?  I'd say that the original business performance was very strong.  We felt it was moving in the right direction.  I still believe it's going to move in the right direction, but I do think there are some things that we can improve on.  And that's really the purpose of my comments and certainly the direct involvement that I plan to take over the next 6 to 12 months.

273.  Moreover, at the May 12, 2016 Q1 2016 Earnings call, Hendrickson

expressed:

Despite some challenges, my view of [Omega and the BCH segment] is one of optimism about the power of the platform that it provides us.  Perrigo is now able to distribute products to an additional 32 countries globally, reaching greater than 300,000 pharmacists and retailers in these countries

. . .

The European OTC market represents $30 billion a year in sales.  Since the beginning of this calendar year, I have worked with the country leaders and the executive team in our branded consumer healthcare division, to develop a deeper understanding of the day-to-day operations of the business.  We are now fully and effectively integrating BCH into our existing leadership structure.  We are building upon the team's core sales and marketing strengths, implementing our own strong operational controls and structures.

As CEO, I have made a number of additional changes to the BCH business, such as coming to mutual agreement with Mark Coucke that he would resign[.]

. . .

These changes are in conjunction with the important decisions [Brown] has made in the finance organization. She has enhanced financial management, and we are actively in the processes of putting BCH's sales, forecasting, inventory control and operations planning onto Perrigo's existing platform, and upgrading the financial planning and analysis to support these activities and drive growth.

274. Moreover, to explain the second impairment charge taken against Omega, for $467 million, Brown explained:

The change in fair value from previous estimates was due primarily to the changes in the current market and performance of the brands, such that the evaluation of the brand prioritization and product extensions or launches in new regions are being more focused to maximize the potential of the whole basket of brands in the segment portfolio. The result, as outlined in our press release this morning, is that we realized a pre-tax non-cash impairment charge of approximately $467 million related to intangible assets acquired in conjunction with the Omega acquisition. $273 million related to indefinite lived intangible assets, and the remaining $194 million related to goodwill.

275. And in response to a question about how Hendrickson could "get us comfortable that integration will go well" with Omega, Hendrickson responded:

First of all, I do, as you said, have great confidence with the team and the initial actions we've taken with the Omega, with branded consumer healthcare as we call it, in Europe. . . .

We also added one of our experienced financial leaders to that business about two months ago. He has already begun a much

stronger financial planning, financial control acumen to the BCH team.  So I feel good about that.

Do I think that you can add a brand across every European country, just like you do in the US?  No.  Each of our brands are more specialized within regions there.  It might be the Nordics, or it might be down in the Baltic areas, but they're all more regionalized.

I believe that even within those regions, one of the advantages that Omega has in our branded consumer healthcare division is they have the ability to launch products within region segments and make them profitable.  So when I say bolt-ons, it may not be just one Pan-European brand, it may be brands that are much more regional but we can add to that infrastructure and grow.  So I do have confidence in that.  I have confidence in our ability to continue to provide growth onto that platform.

I think the integration; we're going to continue.  They have a great sales marketing dry footprint.  The way they work with each country, whether it's a pharmacy-driven country, whether it's more like the UK, which tends to be more like the US from a retailer distribution, no matter what, they've got a good infrastructure there, and they've been able to show strong leadership.  And so, I've got a lot of confidence in the business drivers there, et cetera.  I think we need the operational backbone, the financial backbone that Perrigo brings, to solidify that overall structure.

276.   In response to a question about how Omega "longer term it's always been characterized as 5% to 10% growing business and also the strategic rationale is really be less of an operating synergy plan but more of a revenue synergy and so does that still stand," Hendrickson responded:

On the Omega front, I would say on the long-term look at the Omega growth, I'm going to say the same thing I did earlier, which is, I want to make sure we get a chance to get our whole team together to look at the long range plan, to review it and

150

consolidate it.  We look at it by business segment, but then we look at what other value we can bring to each of those businesses.  And, again, my commitment is to come back to you and others in the summer here with our long-range growth plan related to Omega.

When you think about the synergistic side that we have with the branded consumer healthcare business, they are still there.  The operating side synergies, the team's still driving hard to try and deliver, driving those to the bottom line.

The revenue synergies, in my mind, are still there.  They take, and even in our model, longer to get to because you have multiple registrations, multiple how do you advertise and promote different things, multiple regulations within different countries, even in the US.

In my perspective, they are still there from a long-term plan standpoint.  But just take longer to get to those ultimate revenue synergies.

By putting [Brown] in her new role, one of her great opportunities will be taking the products that we have in different divisions, and figuring out how do we leverage those across our global business portfolios.  So that will be one of [Brown]'s key-to-dos, beginning tomorrow.

277.  But starting in early 2016, Perrigo entered a series of impairment charges relating to Omega that demonstrated that the integration had not been smooth.  The charges totaled over $2 billion, which was nearly half the purchase price of the company.  On February 18, 2016, Perrigo disclosed for the first time that Omega needed to be restructured, and took a $185 million impairment.  Then on April 25, 2016, Perrigo announced it was considering further additional impairment charges for Omega assets, and announced charges on May 12, 2016

totaling $467 million.  Then, on August 10, 2016, Perrigo announced it would need "transformational organizational changes" at Omega and on December 8, 2016, it confirmed Perrigo would be restructuring the entire branded division – which consisted primarily of Omega.  These led to additional impairment charges.  On November 10, 2016, Brown, on the Perrigo Q3 2016 earnings call, announced "an impairment for indefinite and definite lived intangible assets and goodwill related to our BCH business of $1.7 billion."  This announcement was also made in the press release Perrigo issued that morning, which broke the impairment down to $804 million from goodwill and $866 million in "brand intangible assets" which "included a decline in our 2016 performance expectations for the remainder of the year and a reduction in the Company's long-range revenue growth and margin forecasts."  Brown further explained:

> In the third quarter, we realized an impairment for indefinite and definite lived intangible assets and goodwill related to our BCH business of $1.7 billion.  The factors that contributed to this impairment were, one, changes in the market and performance of the brand due to moderated new product launch assumptions; two, execution of certain key product strategies falling short of operating management plans, causing a reduction to baseline forecast models in France, Germany, and Italy; three, certain macroeconomic factors which have continued to impact the business more than expected, in addition to unfavorable foreign currency impacts experienced primarily in the UK related to Brexit; and, four, a change in the Belgian forecast due to a fundamental reduction in volume with a major wholesaler that is not expected to be short term in nature.

278.   But during the same call, Hendrickson continued to strike an optimistic note regarding the Omega transaction, stating, "'[w]e're executing against our plans in BCH to drive greater profitability and enhance the business."

279.   The first question for the call was regarding Omega, "[Y]ou have an impairment charge on the Omega business, and you have a reset growth rate in there.  Could you give us a before and after that you used in your calculation?" Brown responded:

> Specifically, why don't I step back for a second and just give everyone a comment on the impairment overall, because I am quite certain that many of you are curious as to the fact that we had a large impairment recorded in May and are again going through the same exercise only six months later.  The entire process of calculating impairment starts with run rate indicators on the underlying assets of the business.
>
> . . . [Y]ou noted that we have outlined as the basis of the original assets, the original purchase price accounting, our definite and indefinite lived assets by product category.  Which means – and I remember commenting on this in our May earnings call – that if expectations on those specific categories change over time, it changes the perspectives on the long-term indefinite cash flows discounted back to today.
>
> What does that mean?  At the time we did our evaluation in May, we had certain assertions, country by country, on the future cash flows from our XLS, medical technology, a weight loss product, other products in our lifestyle category, as well as certain other products in our cough/cold and our animal health categories in Europe.
>
> In the last six months, some of the assertions on those product categories have changed further, both combination of the four things I outlined in the call, macroeconomic factors and the

management team's assertion of how to utilize those assets best on a go-forward basis.

So, yes, inherent to your question, has the expectation of run rate, of revenues from those categories changed. Yes. And that is the underlying starting point of an indicator of impairment and the reason that the entire process had to be started over again, to rerun cash flows for those product categories, those definite and indefinite lived assets. And due to the magnitude of the change projected in those particular products and categories, it did also trigger the indicator to run a goodwill impairment analysis – IE, what are the total cash flows of the total business even including those assets that are not specifically targeted as the product categories I've commented on already.

So, stepping back, the underlying expectation on run rate for our business in Europe continues to be to grow at a rate above market, but the combination of products to get there, the assertion of brand strategies to make them successful, and the contributors of two of those cash flows on a long-term basis have changed, thereby creating the underlying impairment that you see in the books today.

280. Hendrickson responded further, "I think we expect that our business will continue to grow faster in the markets we're in, and we need to turn around the specific markets that aren't performing as well as planned, as we said earlier, and that the products and issues we had in the country certainly caused a big portion of the impairment that we had."

281. In response to a question about whether the impairment "doesn't necessarily reflect specifically a change in long-term outlook," Hendrickson responded:

As we've talked about and laid out the parts of the impairment, that doesn't really say that you can't grow the business going

154

forward or the business won't grow.  It doesn't say that anything you buy will layer into there and grow it.  So, you are exactly right . . . it is performing as we expected, are different products performing. . . .  But it certainly doesn't say there isn't growth for the business and there aren't ways to enhance that growth.

282.  Brown clarified:

I just want to make sure, again, going back to my earlier comment that, by definition, the fact that there is an impairment of indefinite and definite lived intangibles means that our expectations for those specific assets and their future cash flows have changed.  The fact that we had a goodwill impairment in addition means, by definition, that the long-term cash flows coming from the entire business that we acquired have stepped down.  It's a bounding box, algebraic equation that one must re-examine each year to say – are the expected cash flows streams from all of the assets that were acquired the same or have they moved since acquisition or since the last goodwill evaluation.

So, the answer is, yes, it has stepped down, and then, to John's point, there's still growth in the model, to the earlier comment, there's still growth expectations ahead of the market.  But, importantly, you can't step away from the earlier statement of having the expectations changed.  Absolutely, that's what triggered the impairment calculation.  But there is still growth in the model for a host of countries and for pan-European basis, yes.

283.  In response to a question about "long-term operating margin targets" for Omega, Hendrickson responded:

I think when you look at BCH longer term, our goal is to continue to drive that operating margin up to what I call our consumer healthcare margin – so, up to the higher teens, in my mind.  We've got a lot of work to get there because, as [Brown] said, we're looking at 10% or so.  That includes product growth at higher margins than where we're at, as well as operating efficiencies to deliver supports to those products, the more the sales can drop to the bottom.

284.   Moreover, other litigation has revealed that at least one executive has gone on the record to testify as to the Omega integration issues the top Perrigo leaders attempted to keep hidden away.  In the Securities Action, Christine Kincaid, Perrigo's Global Cyber Security Manager from June 2015 through December 2015, who was responsible for IT integration projects in Europe, has disclosed that IT integration between Perrigo and Omega had "completely stalled by mid-2015."  She further described the Omega acquisition as one known at that time to be a "total write off" that did not present "immediate" accretive value or growth opportunities.

285.   Relatedly, Perrigo issued vastly inflated earnings guidance in the middle of the takeover battle.  On October 22, 2015, Perrigo guided investors to expect earnings of $9.30 to $9.83 per share in 2016.  But almost immediately after Perrigo shareholders rejected the Mylan offer, Perrigo lowered its earnings guidance just one quarter into 2016 to $8.20 to $8.60 per share.

286.   Papa and Brown were well compensated for their efforts in warding off the takeover.  In 2015, they were awarded "special cash bonus[es]" of $500,000 and $375,000, as well as RSUs of $1.5 million and $375,000, respectively, specifically for "key contributions related to Mylan's takeover attempt."  On top of that, Papa made $19,000,000 in 2014 and $11,000,000 in 2015, and Brown made $6,500,000 in 2014 and $3,500,000 in 2015 in regular compensation, which gave them an

incentive to want to remain in leadership positions in standalone Perrigo rather than be folded into the Mylan organization.

### D. Perrigo Improperly Accounted for the Tysabri Revenue Stream, and the Repercussions Reverberate to the Present Day

287. Perrigo's biggest problem was that it improperly accounted for the value of royalties from Tysabri, a blockbuster drug used to treat multiple sclerosis that was the main asset (and sole source of revenue) of Elan when Perrigo acquired it.

288. Perrigo misled the public as to Tysabri's value by improperly accounting for the revenue in violation of GAAP and through misleading statements about its value, which misled the public into overvaluing the asset.

289. Perrigo repeatedly referred to the revenues from Tysabri both in its "Base" part of the model, since Tysabri revenues consisted entirely of fees from its "Specialty Science" segment, as well as the "Tysabri upside" as one of its "Pluses." In numerous presentations, Perrigo represented that the value of the Tysabri royalty stream was $5.8 billion.  For example, on May 6, 2015, Papa in the Deutsche Bank Health Care conference, talked about Tysabri clinical trials and their potential for approval, and noted the importance because it would lead to increases in the current $5.8 billion valuation and would lead to over $2 billion in revenues, which was a milestone in Perrigo's agreement with Biogen.  In the presentation, Papa stated Mylan severely undervalued the asset.  Even as clinical trials for the additional

indications did not bear fruit, and Papa and Brown were aware, they still represented to the public that these trials were promising.

290.   Moreover, the Individual Defendants repeatedly made statements trumpeting the value of Tysabri.

291.   For example, on January 13, 2014, during the JPMorgan Healthcare Conference, Papa stated:

> We're very excited about the Tysabri opportunity.  We think it's a fabulous medication for patients with MS.  We've got a great partner in Biogen that are commercializing this product.  So we're excited what that means.  We think, importantly, the reason that Tysabri is exciting to us, it is an escalating royalty.  The royalty today is going to continue to escalate as a percentage of sales.  We've got a great partner and also this product is at an approximately 1% tax rate, so very low tax rate for this product, gives us a very nice position with this product for the future.  Importantly, because the product is a biologic, with a REMS program, we think it has a very long life in terms of its time period of market exclusivity.  So very excited about the Tysabri team and what that meant for us, as we bring together the Elan organization, plus Perrigo for the future.

292.   Papa and Brown signed the 2Q 2014 Form 10-Q filed on February 6, 2014, which stated, "[t]he Company acquired a significant revenue stream and a $6.1 billion intangible asset for the Multiple Sclerosis drug Tysabri."  The February 6, 2014 10-Q also claimed that Perrigo's financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."  It referred to the Tysabri royalty stream as an "intangible asset" and reiterated that its

"preliminary value is $6.1 billion, which is being amortized on a straight-line basis over its useful life of 20 years."

293.  On May 7, 2014, Perrigo filed its 3Q 2014 Form 10-Q, signed by Papa and Brown, which made the same statements.

294.  On August 14, 2014, Perrigo filed with the SEC its fiscal year 2014 Form 10-K, signed by Defendants Papa, Brown, Brlas, Cohen, Fouse, Hoffing, Jandernoa, Kunkle, Morris, and O'Connor, which stated:

> The Company acquired a significant revenue stream and a $5.8 billion intangible asset related to sales of the Multiple Sclerosis drug Tysabri® with the acquisition of Elan.  The company collects quarterly royalty payments from Biogenic Idec, which is solely responsible for the sales and distribution of the drug.  The Tysabri® royalty stream is expected to contribute significant revenues, operating income and cash flows to the Company's results of operations.

295.  The Form 10-K stated the financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')" and stated that the Tysabri royalty stream was an "intangible asset" whose "value is $5.8 billion, which is being amortized over its useful life of 20 years."

296.  On November 6, 2014, Perrigo filed its 1Q 2015 Form 10-Q signed by Papa and Brown claiming the financial statements were prepared in accordance with GAAP and referred to the Tysabri royalty stream as an "intangible asset" with a value of "$5.8 billion, which is being amortized over a useful life of 20 years."

297.   On February 5, 2015, Perrigo filed its 2Q 2015 Form 10-Q, signed by Papa and Brown, stating they were prepared in accordance with GAAP and stating the Tysabri royalty stream was an "intangible asset" and the value is "$5.8 billion, which is being amortized over a useful life of 20 years."   On the earnings call the same day, Brown described "specialty sciences revenue[s] were $87 million, comprised of Tysabri royalties at 18% for an entire quarter, versus 12% a year ago for the 13 days between the December 18, 2013 closing of the Elan transaction and the fiscal quarter end."

298.   On April 29, 2015, Perrigo filed its Form 10-Q for the quarter ending March 28, 2015, signed by Papa and Brown, stating it was "prepared in accordance with" GAAP and calling the Tysabri royalty stream an "intangible asset" whose "value is $5.8 billion, which is being amortized over a useful life of 20 years."

299.   On August 13, 2015, Perrigo filed its Form 10-K signed by Defendants Papa, Brown, Brlas, Cohen, Fouse, Hoffing, Jandernoa, Kunkle, Morris and O'Connor, which referenced GAAP and did not disclose the fair value of the Tysabri royalty stream as of the end of the fiscal year, instead, stating the value is "$5.8 billion and a useful life of 20 years" and categorizing Tysabri as an "intangible asset."

300.   On November 2, 2015, Perrigo filed its quarterly report on Form 10-Q for the quarter ending September 26, 2015, stating that financial statements were

prepared in accordance with GAAP and not updating previous statements that

Tysbari was worth $5.8 billion and was an "intangible asset."

> Betaseron, Copaxone, [Rebif].
>
> So we think the category of highly effective – especially when the introduction of new competition like Roche and other people are promoting is going to just expand that slice of the pie.  So we feel very good about it.

301.  On February 25, 2016, Defendants Papa, Brown, Brlas, Cohen, Coucke, Fouse, Hoffing, Jandernoa, Kunkle, Morris and O'Connor signed Form 10-KT, which stated the Tysabri royalty stream had a "value of $5.8 billion and a useful life of 20 years."

302.  In a conference call with investors on May 12, 2016, Hendrickson conceded that the Tysabri royalty stream was a "financial asset," but in subsequent 10-Q's in 2016, the Company continued to treat it as an "intangible asset" by failing to account for the royalty stream pursuant to GAAP or to disclose its fair market value, and continued to represent that the royalty stream's "fair value exceeded the carrying value," in Form 10-Qs issued on May 16, 2016, August 10, 2016, and November 10, 2016.

303.  The public was then caught by surprise when Perrigo announced on February 27, 2017 that it would sell its rights to the Tysabri royalties for $2.2 billion, less than half of the $5.8 billion the improper accounting made it seem worth.

304. Moreover, in a Q4 2016 earnings call held on February 27, 2017, immediately after Brown's departure, the new acting CFO, Ronald L. Winowiecki, stated:

> I first want to discuss the notification we filed with the SEC to delay our 10-K filing.  The scope of work that is still required to finalize Perrigo's financial statements includes the final impairment calculations related to the announced sale of Tysabri, the undeferred tax assets and other related effects at Omega Pharma NV.

> Let me provide some detail.  As you saw in our recent press release, the Perrigo business development team finalized an agreement to announce the sale of the Tysabri royalty today. The accounting team has taken this development and updated facts and circumstances that led to this announcement and is running a process to calculate the final impaired value of the milestones associated with the Tysabri asset.

> While this may sound easy, the calculations are complicated and we need to have our calculations and procedures reviewed by our auditors.  We have provided our current estimated calculations in the unaudited GAAP preliminary financial results reported today.  In addition, certain deferred tax assets were identified that existed at the time of the acquisition of Omega. We are quantifying the results of these assets, which will be a non-cash reclassification between goodwill and deferred taxes. Completing our procedures also requires us to evaluate the related effects of this reclassification.

> Further, in preparing the accounting treatment for today's announced sale of Tysabri, and in completing the 10-K disclosure language associated with the new revenue recognition standard, ASC606, which goes into effect in 2018.  Late Wednesday, February 22, Ernst & Young, our independent auditors, notified us that they are evaluating the historical revenue recognition practices associated with Tysabri.  So let's step back and provide some color on this disclosure.

. . .

> We realized an intangible asset impairment of $2.6 billion and a goodwill impairment charge of approximately $201 million in the Specialty Sciences segment associated with the announced sale of Tysabri.

305.   In an April 25, 2017 filing of Form 8-K with the SEC, the Company admitted that in consultation with management and Ernst & Young, it "concluded that the Company's previously issued financial statements (and any related audit reports of EY" between the quarter ending December 2013 (shortly after the Elan-Perrigo merger closed) all through October 1, 2016, "should not be relied upon" because of "a correction in accounting under U.S. generally accepted accounting principles . . . related to the Tysabri royalty stream."  But the Company's statement – approved by Hendrickson and Winowiecki – was incorrect; E&Y did not "consult with" the Company; it demanded the restatement.

306.   And Hendrickson discussed this development on a Q1 2017 sales call on April 25, 2017:

> I'll begin the call by commenting on this afternoon's announcement of our intention to restate our financial statements and providing an update on top-line first quarter sales metrics. . . .
>
> [W]e have been working diligently with our auditors to address the accounting matters outlined in our Form 12b-25 filed on February 27, 2017.   After extensive evaluation, it has been determined that Tysabri will be accounted for as a financial asset as opposed to an intangible asset.  Following this correction in

accounting, the board has concluded that certain historical financial statements can no longer be relied on.

307.   Winowiecki added further:

Today we announced that the Perrigo Board of Directors, on a recommendation from the Audit Committee and after consulting with management and our independent auditor, concluded that investors should no longer rely on our previously issued financial statements for the 2 fiscal years ended June 28, 2014, and June 27, 2015, and the transition or subperiod from June 28th, 2015, to December 31, 2015.  As outlined in the Form 10-K filed today or – excuse me, Form 8-K filed today, the effective periods also included the quarterly reports for these fiscal years and the subperiod as well as the three 2016 quarterly reports.

The determination follows the correction in accounting under U.S. GAAP related to Tysabri royalty stream.  Let me walk you through the history of this decision.  On Wednesday, February 22, 2017, in preparing the accounting treatment for the now completed sale of Tysabri and the 10-K disclosure language associated with the new revenue recognition standard, our independent auditor, E&Y, notified us that they were evaluating the historical revenue recognition practices associated with the Tysabri royalty stream.  Specifically, they were reassessing the classification of the intangible asset related to the royalty stream and the potential classification as a financial asset.  As the accounting for a financial asset may be new to you, let me give you a view of the accounting framework at 80,000 feet.

. . .

Before making some final comments on our process to complete our filings, let me discuss one other accounting matter outlined in this afternoon's 8-K.  In connection with the financial closing for the year ended December 31, 2016, we identified certain deferred tax assets that existed at the timing of our acquisition of Omega on April 1, 2015, in the amount of approximately $220 million.  The resulting balance sheet reclassification will require a reduction of goodwill, offsetting a corresponding reduction to

net deferred tax liabilities at the date of the Omega acquisition. Third, that we have evaluated the accounting effect subsequent to the acquisition date related to the identified deferred tax assets, including the impairments of Omega goodwill recorded in fiscal 2016.

As goodwill is now lower, giving this reclass, we currently expect the impairments to the directionally lower than previously recognized.

We have concluded that a correction of accounting is required in certain affected periods as described in our Form 8-K. With that, let me make a few final comments on process. Best practice is that when a company completes a restatement, all other previously identified adjustments are also included in the restated financial statements, irrespective of size. Consistent with that practice, our restated financial statements will include all identified adjustments. As outlined in our 8-K filing, the restatements affect both annual and quarterly periods.

308. And in its Form 10-K on May 22, 2017, Perrigo finally admitted it had "material weaknesses" in internal controls and that it "did not maintain, in all material respects, effective internal controls over financial reporting" throughout the Mylan bid period.

309. Furthermore, on the May 23, 2017 preliminary earnings call for Q12017, Winowiecki admitted:

In our Form 10-K filing, you will see that certain material weaknesses have been identified. We have already taken action to address certain aspects of the improvement requirements and are driving action plans to remediate these weaknesses. With the oversight of the Audit Committee, we are committed to timely addressing these matters and currently expect to complete the necessary actions by the end of calendar 2017.

310.   The Court in the Securities Action found several statements in Perrigo's filings to contain misleading statements, such as how "[e]ach of Perrigo's quarterly reports filed in 2016 on Form 10-Q claimed to have assessed the current fair value of the Tysabri royalty stream, and each reported to investors that 'fair value exceeded the carrying value.'   On each of these measurement dates . . . Defendants now admit . . . the actual value was less than the carrying value." Moreover, even though Defendants claimed that they had issued disclosures showing the stream's depreciation and the impact of potential new competition, the Court was "unconvinced.  As alleged, Defendants maintained their claim that the royalty stream's fair value exceeded its carrying value, even after their own warnings and the issuance of the analysts' report discussed above."

311.   Furthermore, the Court in the Securities Action found it persuasive that "Perrigo issued one of the largest restatements by any public company in decades, in which it purportedly admitted that it violated GAAP in every one of its Class Period financial statements and that its misclassification of the Tysabri royalty stream caused more than $1 billion in error."  The Court considered the sheer size of the restatement - $1 billion – as evidence Papa and Brown acted with scienter. The Court also found "some probative value" to the fact that Brown resigned on the same day Perrigo announced that it would investigate past revenue-recognition practices.

312.   Moreover, the Board and Brown specifically were on notice to be more careful regarding their GAAP and accounting-related issues because they received a publicly filed SEC letter on October 3, 2016, and they responded in detail in public SEC filings on October 14, 2016.  The SEC's two questions were:

a.   "In your next earnings release, please provide a more substantive, and concise, discussion of how each of your non-GAAP measures is useful to investors.  Please provide us with your proposed changes in your response letter for the measures you expect to include in your next earnings release."

i.   In response, Perrigo enclosed a sample disclosure prefaced with a note, "[w]e respectfully acknowledge the Staff's comment and will revise our disclosure included in future earnings releases to enhance the description of the reasons why management believes our non-GAAP financial measures provide useful information to investors.  Set forth below is an example of how we propose to enhance our future disclosures.  In addressing the usefulness of the non-GAAP measures, we have grouped them in three categories – profit measures, profit margins and net sales – as we view the measures within each group as helpful for similar reasons when used by our management and investors in evaluating our business.  We expect our future disclosures would be substantially in this proposed form, with appropriate changes depending on the particular non-GAAP information."

b.   "Please explain to us in detail how you calculated the income tax effects of your non-GAAP adjustments.  See Question 102.11 of the updated Non-GAAP Compliance and Disclosure Interpretation issued on May 17, 2016."

i.   In Perrigo's response, it stated, "[i]n light of the Staff's comment, in future earnings releases we will enhance our disclosure related to income tax effects on our non-GAAP financial measures, consistent with the updated Compliance and Disclosure Interpretations issued on May 17, 2016."

313.   The SEC followed up with another question on November 7, 2016, reproduced by Perrigo in its November 14, 2016 response.  The SEC asked, "[w]e acknowledge your response to prior comment 2.  Please represent to us that in future earnings releases we will disclose the underlying cause for any material discrete income tax adjustments reflected in your non-GAAP earnings, including any specific adjustments recorded related to the interim tax accounting requirements within ASC 740."

314.   In response, Perrigo through Brown committed, "[t]he Company represents that in its future earnings releases it will disclose the underlying cause for any material discrete income tax adjustments reflected in the Company's non-GAAP earnings, including any specific adjustments recorded related to the interim tax accounting requirements within ASC 740."

315.   The repercussions of the improper accounting for Tysabri are not limited to the decimation of the Company's market capitalization.  The improper accounting now threatens the Company's bottom line and may even lead to the Company's bankruptcy.  In November 2018, Perrigo faced further trouble based on the Tysabri royalty stream when Irish Revenue assessed Perrigo $1.9 billion or €1.65 billion for back taxes related to Elan recording the sale of licenses relating to Tysabri and other IP as trading income, taxed at 12.5%, when the Irish authorities claimed these revenues should have been recorded as chargeable gains at 33%.

Irish Revenue had previously issued an audit findings letter to Elan Pharma in October 2018, and after two written submissions and a meeting with Elan/Perrigo representatives, led to an assessment notice less than a month later.  And as Perrigo is in the midst of appealing this tax assessment, in April 2019, it disclosed that the IRS has also assessed it with a $873 million tax bill that is also related to Tysabri. Thus, Perrigo faces a tax bill that could approach $3 billion, when its annual revenues are only $5 billion and its cash on hand is only $600 million.  If Perrigo finds itself obligated to pay these bills, it will almost certainly put the Company out of business.

316.  As an analyst from Wells Fargo, David Maris, mentioned, "[W]hen two tax authorities are seeking nearly $3 billion in taxes, we would suggest assuming that this isn't some sort of complete misunderstanding of the rules and tax laws and one or both are likely to extract some sizable concessions from the company[.]"  Maris also noted that the large tax assessments meant it would be uncertain whether the Board could commit to using the proceeds of a planned sale of the pharmaceuticals division for repurchasing stock.

317.  Moreover, Kessler and Winowiecki both appeared to be in denial of the impact of the tax audit.  In the Form 10-K that they and the Board signed on March 1, 2018, for the year 2017, they stated:

> We have ongoing audits in multiple other jurisdictions the resolution of which remains uncertain.  These jurisdictions

include, but are not limited to the U.S., Israel, Ireland, and other jurisdictions in Europe.  In addition to the matters discussed above, the IRS is currently auditing our fiscal years ended June 29, 2013, June 28, 2014, and June 27, 2015.  The Israel Tax Authority is currently auditing our fiscal years ended June 29, 2013 and June 28, 2014 (which covers the period of the Elan transaction).  The Ireland Tax Authority is currently auditing our years ended December 31, 2012 and December 31, 2013.

318.   However, they did not disclose that far from "uncertain," Perrigo already knew the likely result of the audit.  They did not disclose that in November 2017, Irish Revenue had informed them of the subject matter of the audit, *i.e.*, that the 33% capital gains tax rate should be applied to the $6 billion Tysabri transaction at Elan instead of the 12.% trading income rate; they did not disclose that Perrigo and Irish Revenue already had an in-person "initial audit meeting" on January 29, 2018, during which Irish Revenue and Perrigo went over in detail what precise deductions Irish Revenue might allow against the $6 billion chargeable gain.

319.   Defendants repeated these misrepresentations in the March 23, 2018 proxy statement filed on Schedule 14A, and on the May 8, 2018 Form 10-Q (signed by Kessler and Winowiecki), and the August 9, 2018 Form 10-Q.

320.   On November 8, 2018, Kessler and Winowiecki signed a Form 10-Q that disclosed that Perrigo had "received an audit finding letter from" Irish Revenue relating to "Elan's taxation of the 2013 sale of Tysabri intellectual property and other assets related to Tysabri to Biogen Idec from Elan."  The Form 10-Q stated that Perrigo "disagree[d] with the Irish Revenue position as asserted in the audit

finding letter." But despite by now knowing what Irish Revenue's position was, the Company did not disclose it, despite the fact that a $2 billion tax levy would be highly material.

321. And further probative of scienter was Winowiecki resigning on March 20, 2019, only shortly after Defendants revealed the size of the tax liability.

322. Perrigo's management continues to deny the impact of the tax assessments. Perrigo's current CEO, Murray Kessler, insists that the legal process will take five to seven years and Perrigo will in the meantime not have to pay any money, and insists that there is no need to hold any money in reserve because of his perceived strength for Perrigo's case. At the May 9, 2019 earnings call and 2019 Investor Day, when asked specifically about the "tax liability issues" – the "around $840 million" assessment from the IRS and the "$1.9 billion, plus 8% interest would bring it to around $400 or $500 million" assessment from the Irish government, "And are you considering doing any reserving against these potentially large tax bills? And if you've not done so, why is that?" – Kessler responded, "Well, we're not reserving against them because we don't believe we're going to lose them." The new CFO, Silock, did not correct Kessler's misstatements.

323. On May 14, 2019, Kessler further misrepresented that the Audit had been "rushed through in a few weeks" even though the process had been ongoing for more than a year, and claimed Irish Revenue had not "spelled out their

rationale" and had only issued a letter that was "a couple of pages" – even though it was actually a seven-page single-spaced in-detail Audit Letter explicitly laying out the reasons for why Irish Revenue assessed the Tysabri revenue stream as being based on the capital gains tax rate instead of the trading income tax rate. The new CFO, Silock, did nothing to correct Kessler's misstatements.

## VI.   DEFENDANTS ISSUE MISLEADING PROXY STATEMENTS FAILING TO DISCLOSE TAX AUDITS

324.   At the time the 2018 Proxy was issued on March 23, 2018, Director Defendants were already on notice of an audit from Irish Revenue. And at the time of the 2019 Proxy, Director Defendants were on notice of an audit from the IRS, as well.

325.   Despite being on notice, Director Defendants did not disclose these audits, the upcoming penalty, or the risk of penalties in the Proxies.

326.   Instead, Director Defendants only disclosed positive "Performance Update[s]" in the Proxies. In 2018, they disclosed that "[s]trategic initiatives delivered balance sheet strength and optionality" and that Perrigo had "$679 million in total cash on hand as of December 31, 2017."

327.   But they did not disclose that these cash reserves presented a false picture of financial health because of the multi-billion dollar tax penalties that Perrigo would soon face. They did not disclose that Perrigo had several discussions with Irish Revenue at that point, including a November 2017 letter and a January

172

2018 meeting where Irish Revenue laid out in detail what their allegations were, how and what they were calculating as penalties, and gave Perrigo the estimated amount of the penalty, which would be close to $2 billion, dwarfing the cash reserves Perrigo has on hand.

328.   In the 2019 Proxy on March 14, 2019, Director Defendants failed to address any of the concerns presented by the November 2018 disclosure of Irish Revenue's tax assessment.  They also did not disclose that the IRS was about to assess $843 million in back taxes against Perrigo.  Instead, Director Defendants only disclosed that Perrigo "[a]chieved 102% operating cash flow conversion to adjusted net income and cash from operations of $643 million."  The IRS penalty alone would have dwarfed those cash reserves.

329.   Both times, this false presentation of Perrigo's financial health served as essential links in the elections of the Director Defendants.  Perrigo, at the time, was going through a period of transition, especially since by 2018, numerous lawsuits had been filed against Perrigo for securities fraud relating to misrepresentations made during the Mylan tender offer process, and for improper accounting of the Tysabri royalty revenue stream, and in the aftermath; numerous lawsuits had also been lodged against Perrigo for its part in the antitrust conspiracies regarding price-fixing in the generic pharmaceuticals market. Perrigo's stock price had also undergone a precipitous decline since the Mylan

tender-offer process.  Thus, Perrigo's Board required all the investor confidence they could muster to ensure their re-election.

330.  By hiding the information about Perrigo's upcoming massive tax assessments, and by instead emphasizing Perrigo's financial health, including outlining Perrigo's cash reserves, the Director Defendants misled Perrigo's investors into voting for their election or re-election to the Board.

331. Had investors known about the massive tax assessments – both dwarfing Perrigo's cash reserves, and the 2019 IRS assessment following mere months after the massive Irish Revenue assessment, and together accounting for almost five times the amount of cash Perrigo had on hand, they would not have voted to elect the Director Defendants.

332.  Moreover, investors suffer further damage from having such blatantly negligent or poor management of the Company in the hands of these directors.

## VII.   DAMAGES TO PERRIGO

333.  As a result of the Individual Defendants' knowing or negligent misconduct, Perrigo engaged in an unlawful and deceptive scheme of regularly fixing prices on generic prescription drugs, making misleading statements or omissions to investors, and engaging in improper accounting practices.  Perrigo's conduct violated the applicable federal and state laws and regulations and operated to the detriment of the Company, its investors, and its customers.

334.   Further, as a direct and proximate result of the Individual Defendants' actions, Perrigo has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

    a.    costs incurred from defending, settling, or paying an adverse judgment in private securities and antitrust litigations and/or actions brought by various state AGs;

    b.    costs incurred from implementing any corrective and/or remedial measures ordered by state and federal authorities, or agreed to by virtue of a settlement or a compromise;

    c.    costs incurred from defending, settling, or paying any adverse judgment from any other legal actions pertaining to Perrigo's improper practices or misstatements; and

    d.    costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Perrigo.

335.   Finally, Perrigo's business, goodwill, and reputation have been, and will continue to be, severely damaged by the Individual Defendants' decision to allow and/or failure to prevent the Company's systemic violation of state and federal laws.

## VIII.  DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

336.   Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

337.   Plaintiff has owned stock in Perrigo continuously since 1997, and will fairly and adequately represent the interests of all Perrigo stockholders.

338.   Plaintiff made a demand on the Board on October 30, 2018, to investigate wrongdoing as alleged herein.

339.   On November 7, 2019, Plaintiff received a response that the Board "takes seriously" all allegations of misconduct.

340.   But Plaintiff received no further correspondence on whether the Board in fact considered or investigated Plaintiff's allegations.

341.   Instead, Plaintiff heard nothing further from the Board until January 29, 2019, via a letter from Perrigo's Irish counsel.  In this letter, Defendants, the Board, and the Company made no indications that they at all considered Plaintiff's demand.  Rather, the letter disagreed with Plaintiff's assessment that Michigan law probably governs with respect to stockholder derivative suits, and instead, claims that only Irish law would govern.

342.   Since then, Plaintiff has received no additional response from the Board.

343.   Because it has been 11 months since Plaintiff sent his Demand, and the Board has yet to offer any response to indicate it is investigating or has even substantively considered Plaintiff's demand despite the serious wrongdoing at issue in this case the Board wrongfully refused Plaintiff's demand.

## IX.   CAUSES OF ACTION

<u>**COUNT I**</u>
**Breach of Fiduciary Duty**
**(Against the Individual Defendants)**

344.   Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

345.   The Individual Defendants owed, and owe, Perrigo the highest fiduciary obligations of good faith, fair dealing, loyalty, and due care in managing the Company's affairs.

346.   The Individual Defendants, individually and collectively, violated and breached their fiduciary duty by:

> a.   failing to ensure that Perrigo, and its directors and officers, complied with federal laws; and

> b.   failing to conduct an adequate investigation of known potential (and/or actual) violations of federal laws.

347.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Perrigo has sustained significant damages – both financially and to its corporate image and goodwill.  Such damages include, among other things, the cost of defending Perrigo in numerous securities fraud and antitrust actions, including the costs associated with any settlements thereof.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

348.   Plaintiff, on behalf of Perrigo, has no adequate remedy at law.

## COUNT II
**Unjust Enrichment**
**(Against the Individual Defendants)**

349.   Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

350.   As a result of the misconduct described herein, the Individual Defendants will be, and have been, unjustly enriched at the expense of the Company and its stockholders.

351.   The Individual Defendants granted, authorized, approved, and/or received millions of dollars in outsized executive or director compensation while condoning the misconduct alleged herein.   The Individual Defendants should be required to disgorge the ill-gotten gains they have obtained, and/or will otherwise unjustly obtain, at the expense of Perrigo and its stockholders.   A constructive trust for the benefit of the Company should be imposed thereon.

352.   All incentive compensation payments and stock sale proceeds granted, authorized, approved, and/or received by the Individual Defendants were at the expense of Perrigo.   The Company was inadequately compensated for these payments and stock sale proceeds.

353.   As a direct and proximate result of the Individual Defendants' unjust enrichment, Perrigo has suffered damages, not only monetarily, but also to its innate image and goodwill.

## COUNT III
### Violation of Section 14(a) of the Exchange Act
### (Against the Director Defendants and Kessler)

354. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

355. SEC Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. §240.14a-9(a).

356. The Director Defendants and Kessler exercised control over Perrigo and caused the Company to disseminate the false and misleading Proxy Statements. The Proxy Statements materially misrepresented the effectiveness of the Board's oversight of internal controls at Perrigo, and the Board's compliance with Perrigo's corporate governance documents.

357. As stated herein, the Proxy Statements contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the Exchange Act and Rule

14a-9 promulgated thereunder.  These false statements and omissions were essential links in the election of certain of the Director Defendants and Kessler to Perrigo's Board and the continued illegal management of Perrigo.

358.   The written communications made by the Director Defendants and Kessler, as described herein, constitute violations of Rule 14a-9 and §14(a) because such communications were materially false and/or misleading and were provided in a negligent manner.

359.   At all relevant times to the dissemination of the materially false and/or misleading Proxy Statements, Director Defendants and Kessler were aware of, and/or had access to, the true facts concerning Perrigo's operation.

360.   Perrigo has been severely injured by this conduct and is entitled to damages and equitable relief.

## COUNT IV
### Violation of Section 29(b) of the Exchange Act
### (Against the Director Defendants and Kessler)

361.   Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

362.   Director Defendants and Kessler each received incentive compensation and fees, including stock awards, while engaging in conduct that violated § 14(a) of the Exchange Act.  The Individual Defendants' incentive compensation and fees should be rescinded under §29 of the Exchange Act because Individual Defendants

violates 14(a) of the Exchange Act by issuing false and misleading reports to Perrigo's stockholders regarding the nature of, and responsibility for, the Company's internal controls and operations.   All of the payments Director Defendants and Kessler received are, therefore, voidable by Perrigo.

363.   Perrigo is in privity with the Director Defendants and Kessler with respect to the incentive compensation and fees provided by Perrigo to Director Defendants and Kessler.   Director Defendants and Kessler have engaged in prohibited conduct in violation of the securities laws, as alleged herein.

364.   Perrigo has been severely injured by the misconduct of the Director Defendants and Kessler.   Accordingly, Perrigo is entitled to damages, *i.e.*, recession of the incentive and compensation and fees granted to Director Defendants and Kessler.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in Perrigo's favor against the Individual Defendants as follows:

A.   Declaring that this action is a proper derivative action, Plaintiff is an adequate representative on Perrigo's behalf, and demand is excused;

B.   Declaring that the Individual Defendants have breached their fiduciary duties owed to Perrigo and its stockholders;

C.      Awarding Perrigo the damages it sustained due to the violations alleged herein from each of the Individual Defendants, jointly and severally, together with interest thereon;

D.      Awarding to Perrigo restitution from the Individual Defendants and ordering disgorgement of all unlawfully obtained profits, benefits, and other compensation obtained by the Individual Defendants;

E.      Directing Perrigo to take all necessary actions to reform and improve its corporate governance and internal procedures, comply with the Company's existing governance obligations and all applicable laws, and protect the Company and its stockholders from a recurrence of the damaging events described herein;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## XI.  JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  October 2, 2019          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*s/* Jonathan M. Zimmerman
Jonathan M. Zimmerman (D.N.J. #JZ1400)
Jing-Li Yu
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone:  (212) 223-6444
Facsimile:   (212) 223-6334
jzimmerman@scott-scott.com
jyu@scott-scott.com

Geoffrey M. Johnson
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44118
Telephone:  (216) 229-6088
Facsimile:   (860) 537-4432
gjohnson@scott-scott.com

Amber L. Eck
**HAEGGQUIST & ECK, LLP**
225 Broadway, Suite 2050
San Diego, CA  92101
Telephone:  (619) 342-8000
Facsimile:   (619) 342-7878
ambere@haelaw.com

*Counsel for Plaintiff Ryan Krueger*

## VERIFICATION OF RYAN R. KRUEGER

I, Ryan R. Krueger, being duly sworn, depose and say:

I am a plaintiff in the action captioned *Krueger v. Alford*.  I verify that I have reviewed the Verified Stockholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern me, are true to my personal knowledge.  I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

I have not received, been promised or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting this action of serving as a representative party in this action except (i) such fees, costs or other payments as the Court expressly approves to be paid to Plaintiffs, or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures directly in connection with the prosecution of this action.

Dated: _10-01-19_

_____
RYAN R. KRUEGER

Sworn and subscribed before me this _1st_ day of _Oct_ 2019.

_____
NOTARY PUBLIC

My commission expires:

_5/27/24_

ALISA MEYER
Notary Public, State of Michigan
County of Allegan
My Commission Expires___5/27/24___
Acting in the County of Allegan