## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

RYAN R. KRUEGER, Derivatively on behalf of Nominal Defendant PERRIGO COMPANY PLC,

                Plaintiff,

    v.

BRADLEY A. ALFORD, *et al.*,

                Defendants,

PERRIGO COMPANY PLC,

                Nominal Defendant.

No. 2:19-cv-18652-MCA-LDW

Return Date: May 18, 2020

**Document Electronically Filed**

## MEMORANDUM OF LAW IN OPPOSITION TO
## ALL DEFENDANTS' MOTIONS TO DISMISS

SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
*Counsel for Plaintiff Ryan Krueger*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................1

    I.     FACTS.............................................................................................3

           A.    The Antitrust Conspiracy .....................................................4

           B.    Papa and Brown Covered Up Poor Performance to Ensure They Retain Control ..........................................8

           C.    Defendants Were Responsible for Improper Accounting for the Tysabri Revenue Stream, with Repercussions Reverberating to Today ..............................................13

    II.    PROCEDURAL HISTORY .................................................16

    III.   ARGUMENT ........................................................................17

           A.    Michigan Law Applies to This Derivative Action .....................17

           B.    New Jersey Is a Convenient Forum...........................22

           C.    Tax Claims Meet Demand Requirement ....................25

           D.    Personal Jurisdiction Arguments Are Waived or Should Be Decided After Limited Discovery..........................26

           E.    The Requirements of Section 14(a) of the Securities Exchange Act of 1934 Are Met.................................28

           F.    Hendrickson Had Proper Notice of the Demand and the Claims Fall Within the Statute of Limitations...........................30

           G.    Coucke's Dismissal from the Securities Action Does Not Preclude Claims Against Him Here ...........................31

           H.    If This Court Dismisses This Action, It Should Be Without Prejudice ......................................................33

CONCLUSION .......................................................................34

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chavez v. Dole Food Co., Inc.*,
836 F.3d 205 (3d Cir. 2016) ................................................................33

*City of Roseville Emps' Ret. Sys. v. Crain*,
Civ.A. No. 11-2919 (JLL), 2011 WL 5042061 (D.N.J. Oct. 24,
2011) ....................................................................................................33

*City Sch. Dist. of City of Newburgh v. Stubbins & Assocs., Inc.*,
85 N.Y. 2d 535 (1995) ..........................................................................27

*Clark v. B.H. Holland Co., Inc.*,
852 F. Supp. 1268 (E.D.N.C. 1994) ........................................17, 18, 19

*Currithers v. FedEx Ground Package Sys., Inc.*,
No. 04-10055, 2012 WL 458466 (E.D. Mich. Feb. 13, 2012) ............31

*Duha v. Agrium, Inc.*,
448 F.3d 867 (6th Cir. 2006) ...............................................................23

*Fresno Cty. Empls' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) ..................................................28

*Gentex Corp. v. Abbott*,
978 F. Supp. 2d 391 (M.D. Pa. 2013) ...................................................32

*Goya Foods, Inc. v. Unanue*,
233 F.3d 38 (1st Cir. 2000) ..................................................................17

*In re Caraco Pharm. Labs. S'holder Litig.*,
No. 329933, 2017 WL 2562635 (Mich. Ct. App. June 13, 2017) .......31

*In re Countrywide Fin. Corp. Deriv. Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...............................................28

*In re Insys Therapeutics Inc. Deriv. Litig.*,
Civ.A. No. 12696, 2017 WL 5953515 (Del. Ch. Nov. 30, 2017) .........3

*In re MF Global Holdings Ltd. Inv. Litig.*,
   998 F. Supp. 2d 157 (S.D.N.Y. 2014) ...............................................................19

*In re ORFA Sec. Litig.*,
   654 F. Supp. 1449 (D.N.J. 1987)........................................................................19

*In re Perrigo Co. PLC Sec. Litig.*,
   19cv70, 2020 WL 377881 (S.D.N.Y. Jan. 23, 2020) ...................................15, 28

*In re PLX Tech. Inc. Stockholders Litig.*,
   No. CV 9880, 2018 WL 5018535 (Del. Ch. Oct. 16, 2018), *aff'd,*
   211 A.3d 137 (Del. 2019) ...................................................................................32

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) ................................................................32

*Intarome Fragrance & Flavor Corp. v. Zarkades*,
   No. Civ 07-873 DRD, 2009 WL 931036 (D.N.J. Mar. 30, 2009).......................17

*Katz v. Pels*,
   774 F. Supp. 121 (S.D.N.Y. 1991) .....................................................................30

*Lony v. E.I. Du Pont de Nemours & Co.*,
   935 F.2d 604 (3d Cir. 1991) .........................................................................23, 26

*Loveridge v. Dreagoux*,
   678 F.2d 870 (10th Cir. 1982) ............................................................................21

*Middien v. Volvo Cars of N. Am., LLC*,
   No. 2:18-CV-3760 (CCC), 2020 WL 881535 (D.N.J. Feb. 24,
   2020) ...................................................................................................................33

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am.
   Sec., LLC*,
   446 F. Supp. 2d 163 (S.D.N.Y. 2006) ................................................................17

*Roofer's Pension Fund v. Papa*,
   C.A. No. 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2018) ....................26, 32

*Roofers' Pension Fund v. Papa*,
   No. 16-cv-2805 (D.N.J.) ............................................................................*passim*

iii

*Shaev v. Baker*,
    No. 16-CV-0554, 2017 WL 1735573 (N.D. Cal. May 4, 2017) .......................29

*Shaev v. Saper*,
    320 F.3d 373 (3d Cir. 2003) ..........................................................................28, 29

*Shuker v. Smith & Nephew, PLC*,
    885 F.3d 760 (3d Cir. 2018) ..............................................................................27

*Strunk v. Wells Fargo Bank, N.A.*,
    614 F. App'x 586 (3d Cir. 2015) ......................................................................27

*Tech. Dev. Co. v. Onischenko*,
    No. Civ. 05-4282 MLC, 2011 WL 6779552 (D.N.J. Dec. 23, 2011)................21

*Tyco Int'l v. Kozlowski*,
    756 F. Supp. 2d 553 (S.D.N.Y. 2010) ...............................................................19

*Westinghouse Elec. Corp. by Levit v. Franklin*,
    789 F. Supp. 1313 (D.N.J. 1992), *rev'd on other grounds*, 993 F.2d
    349 (3d Cir. 1993)..............................................................................................25

**Statutes, Rules, and Regulations**

MCL
    450.154a(1) .........................................................................................................31

MCL
    450.1541a......................................................................................................26, 31

## PRELIMINARY STATEMENT

Plaintiff Ryan Krueger ("Plaintiff") brings this action against various former and current directors and officers of Perrigo Company PLC ("Perrigo" or the "Company") to seek remedies for their breaches of fiduciary duty against the Company. These directors and officers either negligently or fraudulently concealed, condoned, or participated in a long-running antitrust conspiracy, concealed or failed to detect poor performance, and engaged in or condoned poor accounting practices, the consequences of which are being felt by the Company even today.

Defendants raise various defenses against Plaintiff's action but they all fail. First, Defendants argue that Irish law should apply to the fiduciary claims. But the facts in this case compel the application of Michigan corporate law because:

- The Company has substantial, longstanding ties to Michigan;

- Conversely, the Company has negligible ties to Ireland;

- The Company's nerve center remains in Michigan;

- The wrongdoing at issue here was orchestrated almost entirely in Michigan; and

- A substantial part of the wrongdoing occurred when the Company was incorporated in Michigan, and continued afterwards when the Company

1

redomiciled in Ireland to take advantage of Ireland's favorable tax treatment.

Second, Defendants argue that the Court should dismiss this case on *forum non conveniens* grounds.  But this argument should be rejected for the following reasons:

- Perrigo, Papa, and Brown are already defending themselves in this Court in numerous securities actions relating to the Mylan takeover, and therefore, with proper coordination between Plaintiff here and the parties there, will undergo minimal or no inconvenience from defending themselves in this action;

- The other Defendants, similarly, for the most part, reside in the United States and would be less inconvenienced from defending an action in New Jersey than in Ireland;

- Moreover, the burden to Defendants as individuals is minimal because counsel will coordinate document productions and travel to deposition locations that are convenient to the Individual Defendants;

- Because, as Defendants themselves concede in their stay arguments, most of the underlying wrongdoing in this case overlaps with the allegations in the securities actions before this Court, it would actually promote judicial

efficiency to have the claims in this action heard here rather than split them with a court that has less or no familiarity with the issues; and

- In the absence of inconvenience to Defendants and in the interest of promoting judicial efficiency, Plaintiff's choice of forum should receive great deference.

Furthermore, with respect to the tax liability issues, they are the proper subject of the lawsuit here because they relate to the accounting treatment for the Tysabri revenue stream, and therefore, Defendants have had proper notice of the claims in the Demand.  And, as explained below, Defendants' other defenses also fail.[1]

## I.    FACTS

Members of Perrigo's senior management engaged in widespread misconduct, whether intentional or negligent, that only in recent years has come to

---

[1]    Plaintiff would not be opposed to a stay pending resolution of the securities action. But if the Court denies Defendants' Motions to Dismiss and instead stays Plaintiff's Action, Plaintiff respectfully requests that, during the pendency of the stay, the Court order Defendants to provide Plaintiff with discovery that is being provided to plaintiffs in the various securities actions, because of the high degree of factual overlap between Plaintiff's action and the securities actions, and thus the minimal burden on Defendants to merely provide a copy of documents that have already been provided to other parties. *See In re Insys Therapeutics Inc. Deriv. Litig.*, Civ.A. No. 12696, 2017 WL 5953515, at *4 (Del. Ch. Nov. 30, 2017) (ordering defendants to produce to derivative action plaintiff the same "written discovery" produced in related securities action "'[b]ecause the two actions are somewhat related[.]'").   Unless otherwise noted, citations are omitted, and emphasis is added.

light.  Since 2006, certain officers of Perrigo concealed the fact that Perrigo's profits from its generics prescription medicine business ("Generics Rx") sales were inflated by illegal price fixing.  From 2011 through 2015, Defendants Joseph C. Papa ("Papa") and Judy L. Brown ("Brown") misrepresented the organic growth of Perrigo to falsely boost investor confidence.  In 2015, Defendants falsely touted synergies with Omega and made over-optimistic predictions of earnings, all to ward off a takeover attempt by Mylan.  Finally, Defendants touted the value of the Tysabri royalty stream, while willfully or negligently failing to treat the asset correctly in accounting.  These misstatements have continuing impact today when accounting issues relating to the Elan acquisition, whose sole asset was the Tysabri royalty stream, became the subject of Irish Revenue and Internal Revenue Service ("IRS") inquiries that have resulted in enormous tax assessments being made against Perrigo.

### A.    The Antitrust Conspiracy

For many years, Perrigo's most profitable business was its Generics Rx business, which was run from Michigan, and where Perrigo had its manufacturing facilities primarily in Michigan, New Jersey, and other American locations.  ¶92.[2] From the end of 2013 through the first quarter of 2015, Generics Rx contributed

---

[2]    All references to "¶" and "¶¶" are to the Verified Stockholder Derivative Complaint filed in this Court on Oct. 2, 2019 (ECF No. 1).

between $81.1 million to $127.7 million in quarterly net operating income, and was the number-one net operating income generator among all Perrigo divisions. *Id*. But its profits actually came from a massive market allocation and price-fixing conspiracy that numerous other generics manufacturers between 2006 and 2017 engaged in; this was only revealed, definitively, when Perrigo's Michigan officers were raided by the Department of Justice's Antitrust Division ("DOJ") in May 2017. ¶93.

To engage in this conspiracy, Perrigo and its co-conspirators used code language such as "[p]lay [n]ice in the [s]andbox" and set agreements on prices through trade association events. ¶94. Individual Defendant[3] Douglas S. Boothe ("Boothe") was personally involved in this conspiracy, because he headed the Generics Rx business and served on a trade association board, both when he was employed at Perrigo and before, when he was employed by Actavis (a co-conspirator); this involvement was cited by the Antitrust Action, MDL No. 2724 (E.D. Pa.), court as evidence for Perrigo's participation in the conspiracy. ¶¶95-96. And indeed, his membership on the trade association board coincided with Perrigo's increase in price for one of the drugs. ¶96. Another drug that Perrigo sold, econazole, also increased in price almost simultaneously with Taro (a co-conspirator) and only a few months behind co-conspirator, Teligent. *Id*.

---

[3] All capitalized terms shall bear the same meaning as those terms in the Complaint.

This Court found that Papa and Brown likely had knowledge of this conspiracy and repeatedly misrepresented the competition and pricing pressure Perrigo faced in order to conceal the conspiracy. ¶¶97-101. Papa repeatedly stated prices were "flat to up slightly" when, in reality, they were up by as much as 1,852%, and that profits were sustainable because Generics Rx was a "real star" with "unique positioning" when, in reality, the profits were a result of an unsustainable antitrust conspiracy. ¶98. And Brown also masked the true extent of the conspiracy by focusing on "sharp price erosion" and "continued pricing pressure" and "competitive pressure." *Id.* This Court found that Papa and Brown had the motive to lie about the true state of affairs because dramatic price increases would have actually left it vulnerable to losing market share. ¶99.

Yet, at the same time, Papa and Brown also were trying to hide the fact that the antitrust conspiracy was vulnerable to quickly unraveling due to the FDA's getting ready to issue a flood of generics approvals. ¶100. Perrigo kept track of its competitors and their generics approvals, and yet, Papa and Brown told investors repeatedly – especially between April to October 2015 during Perrigo's takeover battle with Mylan – that Perrigo sought to keep generics prices "flat to up slightly." ¶100. When asked during an August 5, 2015 earnings call about "how sustainable" the price increases were, Papa omitted to mention the increased competition from the pending generics approvals. *Id.* Furthermore, during an October 2015 call,

Brown advised investors that "nearly all of [Perrigo's] revenues are insulated from the current pricing drama you see playing out in the pharmaceutical industry today." *Id*.

Furthermore, Brown and Papa signed off on Form 10-Qs throughout 2014 and 2015 that described Perrigo's Generics Rx strategy as "to be the first to market with those new products that are exposed to less competition because they have formulations that are more difficult and costly to develop and launch" rather than the true state of affairs, which was Perrigo's participation in an antitrust conspiracy.  ¶102.

In addition to Papa and Brown, Individual Defendant directors Laurie Brlas ("Brlas"), Gary M. Cohen ("Cohen"), Jacqualyn Fouse ("Fouse"), Ellen R. Hoffing ("Hoffing"), Michael J. Jandernoa ("Jandernoa"), Gerald K. Kunkle, Jr. ("Kunkle"), Herman Morris ("Morris"), and Donal O'Connor ("O'Connor") signed off on Form 10-K disclosures regarding how "one of [Perrigo's] primary competitive advantages is its ability to introduce difficult to develop and/or manufacture topical and other specialty generic equivalents to brand name drug products."  ¶103.

Finally, between 2014 and 2017, Papa, Brown, and John T. Hendrickson ("Hendrickson") made other misleading statements about the strength and competitiveness of Perrigo's Generics Rx business.  ¶¶104-23 (statements by Papa

and Brown); 124-28 (statements by Brown); 129-41 (statements by Brown and Hendrickson).

### B. Papa and Brown Covered Up Poor Performance to Ensure They Retain Control

Papa and Brown were motivated to cover up poor performance in 2015 because they sought to maintain control while they warded off a takeover attempt by Mylan. ¶142. When Mylan made its offer to Perrigo, the latter was riding high because it appeared to have high, steady organic growth and was successfully integrating its largest acquisition ever and rapidly expanding its international operations due to its acquisition of Omega. ¶143. But these purported gains were the result of fraud, which Papa and Brown covered up – and in the immediate aftermath of the Mylan tender offer, Hendrickson also partially covered up. *Id*.

Papa and Brown misled the public regarding Perrigo's organic growth for several years. They signed all of the Company's filings and spoke to investors during conference calls. This Court in *Roofers' Pension Fund v. Papa*, No. 16-cv-2805 (D.N.J.) (the "Securities Action") found it telling that Papa and Brown never disputed that recent growth had slowed or was negative, but instead masked the true decline by signing statements that misreported net sales through blending the three-year growth rate instead of using annualized growth, and implied that organic growth rates would be 5% to 10% per year. ¶146.

Even before Mylan made its offer, in 2014, Papa stated that organic growth accounted for half of Perrigo's annual revenue growth of 15% to 16% over the past four years, and the Company targeted 5%-10% organic growth during any three-year period.  ¶147.  Brown would reemphasize that Perrigo "looked at these numbers very carefully[.]"  ¶149.

And in response to Mylan's takeover bid, Papa and Brown became even more aggressive in pushing the case that Perrigo had healthy organic growth, including in an April 22, 2015 presentation, jointly stating Perrigo had a "compelling growth strategy" and had organic growth between 2011 and 2014 of 7%-8% and that Perrigo had the "ability to keep delivering" organic growth at 5% to 10%.  ¶152.  Perrigo buttressed this message by emphasizing the "durability of our diverse product portfolio. . . .  We have met our organic-only goals in the past and fully intend to do so in the future."  *Id*.  Papa, in discussing the presentation, emphasized Perrigo's "base, plus, plus, plus" including "base business [of] . . . compound annual growth rate of that, 5% to 10%" and "$1 billion of new product revenues we are expecting over the next three years[.]"  ¶156.

Throughout this period, Papa and Brown made similar statements regarding how Perrigo has "met our consolidated organic-only [growth] goals" and otherwise represented its ability to continue to meet 5%-10% organic growth.  ¶¶164-205. Yet Papa and Brown knew that, based on Perrigo's growth, it had actually declined

to 0% to 1% by late 2013 and in some subsequent quarters was actually negative. ¶206. This Court in the Securities Action, found that in disclosing only Perrigo's "consistent ability to maintain growth rates in the 5%-10% range and proclaiming that their 'strong durable base' would allow for continued consistent growth," Papa and Brown caused Perrigo to violate its "duty to disclose that recent performance fell substantially below the target range." ¶207.

On May 9, 2019, current CEO Murray S. Kessler ("Kessler") admitted that "since 2015, we have not grown" and showed compound annual growth rates of between 0% to -5% from 2015 to 2018. ¶209.

Furthermore, Papa and Brown hid the difficulties of integrating Omega. Perrigo's acquisition was its largest ever, for approximately $4.5 billion, in late 2014. ¶210. Immediately after the acquisition, Perrigo, through Papa, began to aggressively trumpet the value of the transaction. Papa told investors in a November 6, 2014 conference call that "there is a competitive fit of Omega within Perrigo through the company's combined geographical diversity and scale" and about "opportunities to generate top line synergies by driving products from both companies through complementary US and European commercial channels." ¶211. In January 2015, Papa started touting how the acquisition was "immediately accretive from day one[.]" ¶214. But by no later than February 2015, when Papa and Brown met with Omega's executive team and were given access to Omega's

data room for due diligence to complete the merger, they already knew that there would be challenges to integrating the Company.  ¶216.  Yet in March 2015, when the transaction closed, Papa refused to disclose the problems, but instead trumpeted how the deal "creates an industry leading, global healthcare company with the operational structure and cash flow generation to accelerate our international growth even further . . . .  [T]he transaction [will] be immediately accretive[.]"  *Id.*

Moreover, during the course of the takeover fight, Papa and Brown made numerous statements about how Omega "has been accretive to our growth" and how its "back office is working smoothly" and Perrigo "[h]as delivered on our integration plans[,]" despite the fact that there were present problems with the integration process they knew about but failed to disclose.  ¶218.  The Court in the Securities Action held that these were "statements of present fact" and that they were material misrepresentations or omissions, and Papa and Brown's statements "imply[] personal knowledge [that] support an inference of scienter[.]"  *Id.*  Papa and Brown also made numerous other similar statements, including those where they indicated they worked with the integration team directly.  ¶¶220-66.  And Papa and Brown continued to stress the growth and successful integration of Omega even after the Mylan takeover was rejected by stockholders.  ¶¶267-72.  Although investors began to express more skepticism about the Omega integration in 2016, Hendrickson continued to express "optimism about the power of the

11

platform that [Omega] provides us." ¶273.   Both Hendrickson and Brown attempted to explain away impairment charges – the first of which, for $467 million, was taken in May 2016 – by explaining that they were due to "changes in the current market and performance of the brand[.]"  ¶¶274-83.  But their denials could not mask the truth, as Perrigo took over $2 billion of impairment charges throughout 2016, finally admitting in late 2016 that $866 million was due to "a decline in our 2016 performance expectations . . . and a reduction in the Company's long-range revenue growth and margin forecasts."  ¶277.

Papa and Brown were personally motivated to hide negative information because they were compensated with bonuses for warding off the takeover.  In 2015, they were respectively awarded $500,000 and $375,000 in "special cash bonus[es]" and RSUS of $1.5 million and $375,000, for "key contributions related to Mylan's takeover attempt."  ¶286.  Moreover, their concealing problems, and therefore leading to artificially higher performance for the Company, led to their being awarded higher regular compensation, including $19,000,000 in 2014 and $11,000,000 in 2015 for Papa, and $6,500,000 in 2014 and $3,500,000 in 2015 for Brown.  *Id.*

### C.   Defendants Were Responsible for Improper Accounting for the Tysabri Revenue Stream, with Repercussions Reverberating to Today

Perrigo acquired Elan in 2013, which had one asset – the royalty stream from Tysabri.  To save on taxes, Perrigo accepted Elan's method of taking into account the Tysabri income stream as trading income rather than as a capital gain. But Perrigo appeared to have a different treatment for this asset in its U.S. S.E.C. filings, booking the royalty stream as an "intangible asset" with a value of $5.8 billion to $6.1 billion to be amortized over 20 years.  ¶¶292-96.  Perrigo maintained this accounting treatment and valuation until the start of 2017, when it announced it would sell the rights to the Tysabri royalty stream for $2.2 billion – roughly 1/3 of the value it had previously maintained for the asset.  ¶161.  This led to an impairment charge of $2.6 billion.  ¶304.  This Court in the Securities Action found that the sheer size of this impairment was evidence that Papa and Brown, who had earlier maintained the higher value of the asset consistently, as evidence they knew it was fraud.  ¶311.  The Court also found "some probative value" to the fact that Brown resigned on the same day that Perrigo would need to investigate its revenue recognition practices as a result of this impairment.  *Id*.

Furthermore, Hendrickson and Ronald L. Winowiecki ("Winowiecki"), who signed the Form 10-Q and Form 8-K filed on April 25, 2017, announced that the Company's auditor, Ernst & Young, had advised that previously issued financial

statements between the last quarter of 2013 all the way through October 1, 2016, would not be relied upon and that E&Y "consulted" with the Company to have its statements corrected, because they were not U.S. generally accepted accounting principles ("GAAP") compliant as they relate to the accounting of the Tysabri royalty stream. ¶305. But this was itself a misstatement, because E&Y did not "consult" with the Company – rather, it demanded the restatement or it would withhold its accounting sign-off from public filings. *Id.*

But this was only the beginning of Perrigo's troubles relating to the accounting treatment. In November 2018, Perrigo faced further trouble when Irish Revenue assessed $1.9 billion (€1.65 billion) for improperly recording Tysabri revenues as "trading income" – at Ireland's lower business tax rate of 12.5% – versus chargeable capital gains at 33%. ¶315. And in April 2019, Perrigo disclosed that the IRS assessed it $873 million in taxes relating to Tysabri, as well. *Id.* But instead of confronting the problem head-on, Kessler and Winowiecki instead downplayed the tax audits, stating they had "multiple audits in multiple other jurisdictions" and characterizing the results of the audit as "uncertain," and thus refusing to reserve losses for it. ¶¶317-18. However, in a securities action filed on the Irish tax assessment, the Court disagreed that statements made to the contrary were correct because Perrigo and its officers should have known that these losses had a high enough probability to require disclosure because they were

given detailed assessments, including a multi-page letter from the Irish Revenue Department, spelling out exactly how much they owed.  *In re Perrigo Co. PLC Sec. Litig.*, 19cv70 (DLC), 2020 WL 377881, at \*11 (S.D.N.Y. Jan. 23, 2020). Furthermore, Winowiecki resigned on March 20, 2019, only shortly after Perrigo disclosed the size of the tax liability from Irish Revenue.  ¶321.  Moreover, Kessler continued to downplay the liability risk, telling investors at a May 14, 2019 conference that the Irish Revenue Audit had only been "rushed through in a few weeks" even though he knew it had been going on for more than a year, and that Irish Revenue had not "spelled out their rationale" and had only issued a letter of "a couple of pages" even though he had actually received a detailed seven-page single-spaced letter that explicitly laid out the reasons for the assessment and the amount.  ¶323.

These misstatements concerning the tax assessments relating to Tysabri were exacerbated by the misleading optimistic statements in the 2018 and 2019 Proxies, which only disclosed Perrigo's cash on hand, but did not disclose that these amounts (under $700 million), did not nearly cover the disastrous liabilities they were being assessed; the U.S. liability alone is $843 million.  ¶¶326-28.  As a result of these false statements, the Directors were able to garner the confidence of the stockholders and win re-election to their positions, despite their negligence in allowing this improper accounting to take place.  ¶329.

## II.    PROCEDURAL HISTORY

On October 30, 2018, Plaintiff served a pre-suit investigation and litigation Demand (the "Demand") on Perrigo's Board, setting forth the above-described issues.  ¶338.  Plaintiff put the Board on notice that various officers and directors should be investigated for their roles in the wrongdoing.  Plaintiff also stressed that the claims should be under Michigan law because Michigan has the greater interest in the case, with Perrigo's incorporation in Ireland being mostly a tax ploy while Perrigo's executive corps continued to run the Company from its Michigan headquarters.  Plaintiff received a pro forma response on November 7, 2018 from Perrigo's U.S. counsel that the Demand had been received, claiming that the Board takes misconduct allegations "seriously," but receiving no response on whether the Board ever actually investigated the claims.  ¶¶339-40.  Instead, Plaintiff received only one other response, three months later, on January 29, 2019, when Perrigo's Irish counsel responded that Plaintiff should bring claims under Irish law, but again made no indication that the Board considered the substance of Plaintiff's claims. ¶341.  Almost a year later, hearing still nothing from the Board, Plaintiff filed his Complaint on October 2, 2019.

## III.   ARGUMENT

### A.   Michigan Law Applies to This Derivative Action

Generally, the law of the state of incorporation governs claims of breach of fiduciary duties by directors and officers of a corporation under the internal affairs doctrine, but the doctrine is "not without exception."   *Intarome Fragrance & Flavor Corp. v. Zarkades*, No. Civ 07-873 DRD, 2009 WL 931036, at *14 (D.N.J. Mar. 30, 2009).  "The principles compelling a forum state to apply foreign law come into play only when a legitimate and substantial interest of another state would thereby be served." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006).  Here, Ireland does not have a "substantial" interest.  Rather, Michigan does, because Defendants' "business activities occurred primarily in" Michigan "and have no connection to" the state of incorporation.  *Goya Foods, Inc. v. Unanue*, 233 F.3d 38, 43 n.4 (1st Cir. 2000); *see also Clark v. B.H. Holland Co., Inc.*, 852 F. Supp. 1268, 1273 (E.D.N.C. 1994) (applying law of principal place of business because it "seems to have many more significant relationships with the parties and with the transactions at issue than" state of incorporation).

Like the cases cited above, Michigan law – rather than Irish law – should apply here because Perrigo, at heart, is a **_Michigan_** corporation.  Perrigo, itself, admits in contemporaneous pending litigation with the IRS that its "principal place

17

of business is, and at all times relevant to this action was, in Allegan, Michigan" ¶38.  Perrigo's reincorporation in Ireland was motivated by its desire to take advantage of lower corporate tax rates.  At the time of the merger with Elan, Papa emphasized that redomiciling would cut Perrigo's tax rate from 30% to 17%, and Brown told investors the tax rate could go even lower.  ¶39.   Top Perrigo executives emphasized that Perrigo would maintain and even expand its operations in Michigan.  *Id*.  Hendrickson, at the time Perrigo's head of global operation and supply chain, stated publicly that the merger "doesn't mean any changes for our current strategies, our current investments.  We're very committed to Michigan, continuing on with our investment path of $300 million (in Michigan) over the next three years, expanding 650 jobs just in the west Michigan area."  *Id*.  Perrigo recently doubled down on this Michigan-centric commitment by acquiring a Grand Rapids, Michigan-based oral care company, Ranir, for $750 million.   ¶41.  Furthermore, Perrigo's key domestic subsidiaries are headquartered and incorporated in Michigan.  ¶36.

In contrast to Perrigo's extensive ties in Michigan and the United States, Perrigo has negligible ties to Ireland.  The company it merged with to effect its redomiciliation, Elan, had only one asset: not tangible manufacturing plants, which Perrigo had in the United States, or even a significant customer service corps; rather, Elan's one asset was its entitlement to royalties from Tysabri.  *See*

Declaration of Jing-Li Yu ("Yu Decl."), filed herewith, Ex. A, S-4 Am. 4 (describing the Elan-Perrigo merger) at 87 (Elan's financial advisor noting that Tysabri royalties were Elan's "sole source of revenue").  Elan did not actually own the drug itself which it had sold to Biogen.  *Id*.  Perrigo did not acquire a significant international operation until it acquired Omega, which had its operations on the Continent and its headquarters in Belgium.  ¶210.

Here, the reason for applying Michigan law rather than Irish law is even greater because "[m]any of the acts complained of which formed the gravamen of [the] Complaint took place in" Michigan rather than Ireland.  *In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1455 (D.N.J. 1987) (in shareholder derivative action, applying law of corporation's primary of business rather than law of state of incorporation); *see also In re MF Global Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 180 (S.D.N.Y. 2014) (in fiduciary duty action, New York and Illinois law applies, rather than Delaware law, because the former "have a more significant relationship . . . with this dispute" and "'the alleged breaches of duty were masterminded there'"); *Tyco Int'l v. Kozlowski*¸ 756 F. Supp. 2d 553, 559 (S.D.N.Y. 2010) (applying law of primary place of business, New York, rather than law of state of incorporation, Bermuda, in fiduciary duty claim against ex-officer because New York has the greater interest in "deterring fraud and theft within its borders").

During the relevant period, the nerve center of Perrigo remained in Michigan. Almost all of the officers who are alleged to have committed wrongdoing are or were based in Michigan, including Papa, Brown, Hendrickson, Winowiecki, Boothe, and Kessler. ¶35. Perrigo's auditor is also located in Grand Rapids, Michigan, which indicates that the Company's financial records and decision-making also remains in Michigan. ¶37. Furthermore, the DOJ's antitrust raids were all conducted in Perrigo's Michigan offices, further suggesting that the wrongdoing was orchestrated there. ¶34.

Because this case primarily involves claims against Perrigo's former or current officers, it primarily relates to their wrongdoing. Their wrongdoing occurred in Michigan because they lived and worked in Michigan. Thus, Michigan has the greater interest in enforcing its laws to ensure that those who live and work in Michigan follow the laws. Ireland, by contrast, has a negligible interest – and indeed to date, Ireland's primary concern appears to be that Perrigo not take advantage of a shell presence to free-ride off taxes, thus the multi-billion-dollar assessment from Irish Revenue.

Arguably, these executives breached their employment agreements by engaging in illegal conduct, and Michigan has the greater interest in enforcing contractual obligations. ¶32. Moreover, to the extent that the officers' misconduct implicates unjust enrichment by violating their employment agreements, these

agreements are governed by Michigan law, and therefore Michigan has the greater interest in applying its law rather than Ireland. *Loveridge v. Dreagoux*, 678 F.2d 870, 877 (10th Cir. 1982) (applying law of the state where "the contract was negotiated and executed").

Furthermore, much of the wrongdoing at issue here centers around the Generics Rx business. Defendant Boothe, who ran the Generics Rx business, lived and worked in Michigan, and the Perrigo Pharmaceuticals subsidiary was incorporated in Michigan.  ¶35. Moreover, much of the wrongdoing relating to antitrust and concealing the lack of growth – though concealed until recently – occurred before the end of 2013, when Perrigo redomiciled to Ireland.  ¶36.  The majority of the antitrust conspiracy, which started in 2006, and much of the concealment of the lack of organic growth, occurred before the closing of the acquisition, when Perrigo was both headquartered and incorporated in Michigan. ¶34.  The fact that Perrigo was incorporated in Michigan and ***had no connection to Ireland whatsoever*** during part of the wrongdoing at issue here further argues in favor of applying Michigan law here.  *See Tech. Dev. Co. v. Onischenko*, No. Civ. 05-4282 MLC, 2011 WL 6779552, at *11 (D.N.J. Dec. 23, 2011) (conflicts of law principles may not favor applying law of Bermuda, the state of incorporation, versus New Jersey, the principal place of business, where state of incorporation

"has little connection to this claim with the exception of [defendant] being incorporated there and [defendant] having a bank account there").

Moreover, Perrigo's business activities are predominantly in the United States; the Company's 2018 Annual Report states that its "primary manufacturing facilities are in the Unites States" – where it has 45 facilities – while Ireland has only one. ¶33. Perrigo also recently entered a licensing deal with Merck, where it will manufacture Merck's Nasonex, a U.S.-based product. ¶42. In addition, Perrigo trades on the New York Stock Exchange but does not trade on an Irish equivalent. And Perrigo's current CEO, on taking over the reins from his predecessor, stated at the May 19, 2019 Investor Day that Perrigo would focus on "building on our U.S. store brand core" and the "first priority will be fixing the Consumer Americas business[.]" ¶40. Furthermore, Perrigo's largest customer is Walmart, which accounts for 13% to 19% of Perrigo's net sales, and those sales generally align with Walmart's U.S. retail market shares. ¶33.

### B.    New Jersey Is a Convenient Forum

In the Third Circuit, the Court generally defers to plaintiffs' choice of forum except when the choice would be extremely inconvenient to defendants or the court and provide little benefit to the plaintiff:

> When a plaintiff brings an action in a court with jurisdiction, such as here, "a plaintiff's choice of forum should rarely be disturbed." [citing *Piper*, 454 U.S. at 241, 102 S. Ct. at 258]. A court may exercise its discretion to dismiss a case only when trial of the action would

22

> '"establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to a plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'"   *Id.* (quoting *Koster v. Am. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)).

*Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d 604, 608–09 (3d Cir. 1991).

> The Sixth Circuit, which includes Michigan, concurs with this view:

> In general, the standard of deference for a U.S. plaintiff's choice of a home forum permits dismissal only when the defendant "establish[es] such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." (citing *Koster*, 330 U.S. at 524).

*Duha v. Agrium, Inc.*, 448 F.3d 867, 873–74 (6th Cir. 2006).

Here, there is little inconvenience to Defendants and it would actually promote the conservation of judicial and litigation resources to litigate the case in this Court, as explained below.

To the extent Defendants' *forum non conveniens* argument centers on their argument that Irish law should apply and that the case should be heard in Ireland, Defendants do not explain why this Court would not be equipped to hear claims under Irish law, and in any event, the Court should reject that argument because Michigan law applies. *See supra* §III. A.

Moreover, for all the arguments that Defendants raise about the inconvenience to them of litigating in New Jersey, they appear to contradict this argument in their stay argument: they note that similar wrongdoing underlies both

23

this action and the Mylan takeover litigation, and almost every securities action based on misrepresentations made during the period around the Mylan takeover battle is being prosecuted in the District of New Jersey.  Defs.' Mot. 23-25 dated Jan. 1, 2020 (ECF No. 41-1) ("Defs.' Mot.").  This is an especially salient point for Papa and Brown, because as defendants remaining in the Securities Action, they are already defending themselves before this Court.  This wrongdoing underlies the vast majority of Plaintiff's concerns, as well.  Should the Court allow Plaintiff to move forward with this action, the parties' counsel can coordinate to reduce or eliminate any extra burden on Defendants.

Furthermore, for most of the Defendants, the burden to them would likely be less than the burden of having this case heard in Ireland.  For the two European Defendants (O'Connor and Coucke), the physical burden on either Defendant would also be minimal.  The document discovery would likely be coordinated by counsel.  And the physical burden of traveling to depositions would also mainly be counsel's burden, because counsel will travel to the locations most convenient to Defendants; there is no rule that any Individual Defendant need be deposed in New Jersey because the action is in this Court.  As for the burden of attending trial, because almost all of the Defendants are residents of the United States, the burden to them of traveling to New Jersey for trial would be less than the burden of traveling to Ireland for trial.  In addition, their claims of inconvenience ring hollow

24

because Defendants did not raise *forum non conveniens* arguments in their motions to dismiss in either securities action.  Yu Decl., Exs. B and C.

Defendants, in making judicial-economy arguments for staying the action, also admit that having the case in New Jersey rather than in another forum would actually *reduce* the overall burden on judicial resources and *increase* judicial efficiency.  Defs.' Mot. at 27-28.  Plaintiff agrees with this assessment regarding conserving judicial resources and increasing judicial efficiency by having this case heard here.  This Court is already familiar with many or most of the facts underlying the alleged misconduct and the parties in this action.  Rather than have multiple courts or judges administer to these cases based on similar underlying conduct, Plaintiff agrees with Defendants that it would be more efficient to have this Court administer to all the claims.

### C. Tax Claims Meet Demand Requirement

The tax liabilities were not disclosed until after Plaintiff brought his Demand.  But they are a fair subject for this lawsuit because the tax liabilities arose out of the same core allegations that the Demand flagged: accounting issues relating to Tysabri.  The Irish Revenue assessment was due to how the Tysabri revenue stream was being booked by Perrigo and its predecessor Elan.  ¶¶315-23.  Thus, Defendants were on notice of such allegations, and this is sufficient for making these allegations the proper subject of the litigation.  *Westinghouse Elec.*

*Corp. by Levit v. Franklin*, 789 F. Supp. 1313, 1322 (D.N.J. 1992), *rev'd on other grounds*, 993 F.2d 349 (3d Cir. 1993) (demand letter requesting action against "'responsible individuals'" "'for all damages'" meets demand requirement).

### D. Personal Jurisdiction Arguments Are Waived or Should Be Decided After Limited Discovery[4]

Defendants who challenge jurisdiction have joined in the argument that *forum non conveniens* favors Ireland as the forum to adjudicate this dispute. But *forum non conveniens* presupposes that the so-called inconvenient forum **has** jurisdiction. *Lony*, 935 F.2d at 608. As such, the Individual Defendants have actually conceded that the Court **does have** jurisdiction by joining in the *forum non conveniens* argument.

Furthermore, Brown and the former directors are or were defendants in the Securities Action before this Court. They previously had an opportunity to contest personal jurisdiction but declined to do so. Yu Decl., Ex. B. Given that the allegations against Brown and the former directors almost entirely overlap with the

---

[4] Although the Former Directors mention that this Court dismissed the claims against them in the Securities Action, that dismissal is not dispositive here because the two actions involve different mental states. The Court dismissed the former directors because of failure to demonstrate *scienter*. *Roofer's Pension Fund v. Papa*, C.A. No. 16-2805, 2018 WL 3601229, at n.12 (D.N.J. July 27, 2018). But this Court has already found that many of the misrepresentations or omissions as to the Omega integration, organic growth, and the Tysabri income stream are material. *Id.*, at *6-15. Under Michigan law, directors are also responsible for negligent conduct, which the inaccurate certifications would make them liable for. MCL 450.1541a.

allegations in the Securities Action complaint, and given that there is privity between the parties (because Plaintiff is a member of the Securities Action class), Brown and the former directors are precluded from asserting the jurisdiction defense now. *Strunk v. Wells Fargo Bank, N.A.*, 614 F. App'x 586, 588-89 (3d Cir. 2015) (applying claim preclusion where party did not raise claims that could have been brought under the same underlying conduct in a previous action); *City Sch. Dist. of City of Newburgh v. Stubbins & Assocs., Inc.*, 85 N.Y. 2d 535, 538-39 (1995) (plaintiff who was intended beneficiary of a contract was in "functional privity" with defendant). The defendants in the Securities Action relating to the tax liabilities similarly have not contested personal jurisdiction. Yu Decl., Ex. C.

To the extent that jurisdiction depends on a factual record and Plaintiff has not had an opportunity to conduct any discovery, should the Court reach the jurisdiction issue for any Defendants and determine that Plaintiff has not made a *prima facie* case for personal jurisdiction over the Defendants who have contested the issue, Plaintiff requests the opportunity to conduct limited jurisdictional discovery to determine if indeed there are no contacts between New Jersey and the officers. *See, e.g.*, *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 781 (3d Cir. 2018) (holding that plaintiff should be allowed to conduct limited jurisdictional discovery).

**E.    The Requirements of Section 14(a) of the Securities Exchange Act of 1934 Are Met**

Only Jeffrey C. Smith ("Smith") contests the applicability of the Section 14(a) claims.   Unlike a claim under Rule 10b-5, a claim under 14(a) need not allege scienter.   *Fresno Cty. Empls' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 557 (S.D.N.Y. 2017) (Section 14(a) claims do not "require[] pleading[s] that a defendant acted with intent to defraud.").   Rather:

> To state a claim under § 14(a), a plaintiff must allege that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."   An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.

*Shaev v. Saper*, 320 F.3d 373, 379 (3d Cir. 2003).

Here, Plaintiff has alleged all of these elements.

*First*, Plaintiff has alleged that the 2018 and 2019 Proxies were misleading because they did not disclose the potentially ruinous liabilities that Perrigo faced. In the Securities Action on 10b-5 claims, the Court there has already held that disclosure of these liabilities is material because "GAAP's disclosure obligations for loss contingencies are triggered by awareness of a reasonably possible loss and by manifestation of awareness of a possible claim.   Disclosures may not await final determinations."   *In re Perrigo Co. PLC Sec. Litig.*, No. 19cv70 (DLC), 2020 WL 377881, at *8 (S.D.N.Y. Jan. 23, 2020); *see also In re Countrywide Fin. Corp.*

28

*Deriv. Litig.*, 554 F. Supp. 2d 1044, 1077 (C.D. Cal. 2008) ("'[T]he true operational and financial state of Countrywide' would have been material to shareholders during a proxy vote because of its impact on the Company's balance sheet.").

*Second*, the misleading representations and omissions caused Plaintiff injury in that it harmed his right to an informed vote; interference with "'fair corporate suffrage'" is a cognizable shareholder injury. *Saper*, 320 F.3d at 378.

*Third*, the proxy solicitation provided the "essential link" in informing Plaintiff how to exercise his corporate suffrage, and this led him and other shareholders to vote for directors who had failed to disclose material liabilities. *See Shaev v. Baker*, No. 16-CV-0554, 2017 WL 1735573, at *15 (N.D. Cal. May 4, 2017) (allowing Section 14(a) claim where, *inter alia*, Wells Fargo Proxy statements included false and misleading statements and omissions and "[a]bsent these false or misleading statements and omissions in the Proxy Statements, Plaintiffs contend that shareholders would not have voted to re-elect Board members[]").

Smith was on the Board from February 7, 2017 to August 7, 2019.  The 2018 and 2019 Proxies were issued on March 23, 2018 and March 14, 2019, respectively, and Plaintiff alleged these Proxies made misleading statements about the income of Perrigo at the end of 2017 and 2018.  All of these periods covered

times when Smith was on Perrigo's Board, and indeed, Smith was on the Remuneration Committee and chaired the Nominating and Governance Committee. Thus, he would, or should, have been familiar with the requirements of accuracy in proxies, and as a director and as a committee member, would have or should have reviewed the Proxy before it became public. His allowing misleading statements or omissions to be circulated publicly was at least negligent. *See Katz v. Pels*, 774 F. Supp. 121, 126 (S.D.N.Y. 1991) ("In order to establish liability under the proxy laws, it is sufficient to show that the corporate officers and directors who authorized the proxy statement negligently failed to adhere to the rules requiring full disclosure."). For all these reasons, Plaintiff's claims should survive

### F. Hendrickson Had Proper Notice of the Demand and the Claims Fall Within the Statute of Limitations

Hendrickson also claims that the Demand was not made properly against him. But he was on notice because the Demand specified that the Board should investigate him for the same misconduct as the other directors and officers. Furthermore, a demand only needs to provide notice – it need not spell out each claim in detail. *See supra* §III. C.

Hendrickson is also the only Defendant to raise the defense that claims as to him would be barred because of the statute of limitations. But the statute of limitations has not run out because of the continuing wrong: the antitrust

30

conspiracy ran until at least May 2017, when Perrigo's Michigan headquarters were raided by the DOJ.  *Currithers v. FedEx Ground Package Sys., Inc.*, No. 04-10055, 2012 WL 458466, at *9 (E.D. Mich. Feb. 13, 2012) ("Where a defendant's wrongful acts are of a continuing nature, the period of limitation does not run until the wrong is abated and a separate cause of action can accrue each day that defendant's tortious conduct continues.").  And the misrepresentations with respect to integration, organic growth, and Tysabri were not corrected until the truth was revealed to the market, at the end of 2016 and by the beginning of 2017.

### G.    Coucke's Dismissal from the Securities Action Does Not Preclude Claims Against Him Here

Coucke argues that Plaintiff's claims fail because the claims against Coucke were dismissed in the Securities Action.  However, an important distinction that prevents this Court's prior opinion from precluding Plaintiff's claims here is that a derivative action, for breach of fiduciary duty, need not allege scienter.  Instead, the standard is negligence, because under Michigan law, directors "shall discharge [their] duties . . . [w]ith the care of an ordinarily prudent person[.]"  MCL 450.1541a; *see also In re Caraco Pharm. Labs. S'holder Litig.*, No. 329933, 2017 WL 2562635, at *7 (Mich. Ct. App. June 13, 2017) ("Under MCL 450.154a(1), directors and officers of a corporation owe certain fiduciary duties, including the duty to act in good faith [and] to act with ordinary care[.]").  And Perrigo's articles

of incorporation expressly ***do not*** exculpate directors for duty of care breaches. ¶75.

In light of Michigan law establishing liability for duty of care violations and the lack of an exculpatory clause, "[t]o plead a case against a corporate officer" like Coucke, Plaintiff need not establish his scienter or his motives but "requires only such allegations that show he ***participated in*** the wrongful acts." *Gentex Corp. v. Abbott*, 978 F. Supp. 2d 391, 403 (M.D. Pa. 2013) (emphasis in original); *see also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 639 (S.D.N.Y. 2007) ("However, where . . . the corporate officers are a narrowly defined group charged with the day-to-day operations of a public corporation, it is reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violations.").

Moreover, the Court, in fact, ***did*** find many of the misrepresentations regarding the Tysabri royalty stream to be material, and only held that these misrepresentations were not actionable because the securities plaintiffs had failed to allege scienter. *Roofer's Pension*, 2018 WL 3601229, at *9-10. Thus, Coucke is still liable for signing or approving misleading filings in the fiduciary context, because allowing for the dissemination of misleading statements, especially when he expressly represented their accuracy, is negligent. *See In re PLX Tech. Inc. Stockholders Litig.*, No. CV 9880, 2018 WL 5018535, at *2 (Del. Ch. Oct. 16,

2018), *aff'd,* 211 A.3d 137 (Del. 2019) (while director's failure to be informed was not "morally culpable," failure to disclose information they did not know about was breach of fiduciary duty of disclosure).

### H.    If This Court Dismisses This Action, It Should Be Without Prejudice

Although Plaintiff respectfully submits that his claims should move forward, if the Court disagrees, Plaintiff requests that any dismissal should be without prejudice.  Plaintiff can cure defects in pleading through amendment, which this Circuit grants liberally.  *See Middien v. Volvo Cars of N. Am., LLC*, No. 2:18-CV-3760 (CCC), 2020 WL 881535, at *3 (D.N.J. Feb. 24, 2020) ("'The Third Circuit has consistently emphasized the liberal approach to pleading embodied by Rule 15.'  The Court should only deny leave when these factors 'suggest that amendment would be unjust.'").  Or, if the Court determines the forum is incorrect, the Court can transfer the case to the correct forum or Plaintiff can cure the defect by re-filing in the correct forum.  *See Chavez v. Dole Food Co., Inc*., 836 F.3d 205, 223–24 (3d Cir. 2016) (where another Federal forum has jurisdiction, "the interest of justice requires transfer rather than dismissal" by the court without jurisdiction).  Finally, if the Court determines that Plaintiff's filing is premature, a dismissal without prejudice would allow Plaintiff to re-file, if necessary, when his claims ripen.  *City of Roseville Emps' Ret. Sys. v. Crain*, Civ.A. No. 11-2919 (JLL), 2011

WL 5042061, at *12-13 (D.N.J. Oct. 24, 2011) (dismissing without prejudice and with leave to amend complaint that failed to meet demand futility standard).

## CONCLUSION

For all the above reasons, the Court should deny Defendants' motions to dismiss in full.

Dated:  March 10, 2020          Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*s/* Jonathan M. Zimmerman
Jonathan M. Zimmerman (D.N.J. #JZ1400)
Jing-Li Yu (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
jzimmerman@scott-scott.com
jyu@scott-scott.com

Geoffrey M. Johnson (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44118
Telephone: 216-229-6088
Facsimile:  860-537-4432
gjohnson@scott-scott.com

Amber L. Eck
**HAEGGQUIST & ECK, LLP**
225 Broadway, Suite 2050
San Diego, CA 92101
Telephone: 619-342-8000
Facsimile:  619-342-7878
ambere@haelaw.com

*Counsel for Plaintiff Ryan Krueger*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 10, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

 s/ Jonathan M. Zimmerman
Jonathan M. Zimmerman (D.N.J. #JZ1400)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169